*In the*

# United States Court of Appeals

*for the*

# Tenth Circuit

JEANETTA VAUGHN,

*Plaintiff-Appellee,*

v.

JP MORGAN CHASE & CO., et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Colorado
Case No. 1:23-CV-02266-CNS-NRN

## DEFENDANTS-APPELLANTS' APPENDIX

Naomi Beer
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
Telephone: 303.572.6500
beern@gtlaw.com

Katherine M. Clemente
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone: 212.801.9200
clementek@gtlaw.com

Elliot H. Scherker
Brigid F. Cech Samole
GREENBERG TRAURIG, P.A.
333 Southeast Second Avenue
Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500
scherkere@gtlaw.com
cechsamoleb@gtlaw.com
miamiappellateservice@gtlaw.com

*Attorneys for Defendants-Appellants, JPMorgan Chase Bank, N.A.
and Trina Pelech*

# INDEX

| Date | Description | Page Designation |
|------|-------------|------------------|
|  | District of Colorado Docket | A:5-11 |
| 9/5/2023 | Notice of Removal (DE 1) | A:12-18 |
| 9/5/2023 | Complaint and Jury Demand (DE 1-2) | A:19-44 |
| 9/5/2023 | Complaint and Jury Demand (DE 4) | A:45-70 |
| 10/11/2023 | Motion to Compel Arbitration and Stay Proceedings (DE 19) | A:71-93 |
| 10/11/2023 | Deposit Account Agreement and Privacy Notice (DE 19-3) | A:94-121 |
| 10/11/2023 | Declaration of Dene Stover (DE 19-6) | A:122-129 |
| 11/14/2023 | Plaintiff's Response to Defendants' Motion to Compel Arbitration and Stay Proceedings (DE 24) | A:130-149 |
| 12/5/2023 | Defendants' Reply in Support of Motion to Compel Arbitration and Stay Proceedings (DE 32) | A:150-164 |
| 12/15/2023 | Order Denying Defendants' Motion to Compel Arbitration (DE 34) | A:165-186 |
| 1/11/2024 | Defendants JP Morgan Chase Bank, N.A. and Trina Pelech's Notice of Appeal and Mandatory Stay (DE 36) | A:187-189 |

## CERTIFICATE OF DIGITAL SUBMISSION

1.    This document complies with the privacy redaction requirements of Fed. R. App. P. 25(a)(5) and 10th Cir. R. 25.5 because there is no information requiring redaction in this document.

2.    All hard copies to be submitted to the Court are exact copies of the version submitted electronically.

3.    The electronically submitted version of this document was scanned for viruses with the most recent version of a commercial virus scanning program (Vipre software version 12.3.8147; Definitions version 102374 – 7.92242 [June 30, 2022]; Vipre engine version 5.6.8.8 – 3.0), and according to the program is free of viruses.

By: */s/ Elliot H. Scherker*
Elliot H. Scherker

# CERTIFICATE OF SERVICE

Counsel for Defendants-Appellants hereby certifies that on March 6, 2024, I electronically filed Defendants-Appellants' Appendix with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the Appellate CM/ECF system. The following participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system:

Felipe Bohnet-Gomez
2701 Lawrence St., Suite 100
Denver, Colorado 80205
Fbg@rmlawyers.com

*Counsel for Plaintiff-Appellee*

By:  /s/ *Elliot H. Scherker*
　　　Elliot H. Scherker

**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

APPEAL,JD1,MJ CIV PP,NDISPO

## U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:23-cv-02266-CNS-NRN

Vaughn v. JP Morgan Chase and Co. et al

Assigned to: Judge Charlotte N. Sweeney

Referred to: Magistrate Judge N. Reid Neureiter

Case in other court: Arapahoe County District Court, 2023CV31550

U.S Court of Appeals, 10th Cir., 24-01016

Cause: 28:1331cr - Fed. Question - Civil Rights (Race Discrimination)

Date Filed: 09/05/2023

Jury Demand: Plaintiff

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

### Plaintiff

**Jeanetta Vaughn**

represented by

**Crist Anthony Smith Whitney**
Rathod Mohamedbhai LLC
2701 Lawrence Street
Suite 100
Denver, CO 80205
720-434-7461
Email: cw@rmlawyers.com
*ATTORNEY TO BE NOTICED*

**Iris Halpern**
Rathod Mohamedbhai LLC
2701 Lawrence Street
Suite 100
Denver, CO 80205
303-578-4400
Fax: 303-578-4401
Email: ih@rmlawyers.com
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**JP Morgan Chase & Co.**
*a corporation*
*doing business as*
Chase Bank

represented by

**April Christine Connally**
Greenberg Traurig LLP
1144 15th Street
Suite 3300
Denver, CO 80202
303-572-6500
Fax: 303-572-6540
Email: April.Connally@gtlaw.com

A:5

*ATTORNEY TO BE NOTICED*

**Sarah Marie Mathews**
Greenberg Traurig LLP
1144 15th Street
Suite 3300
Denver, CO 80202
303-572-6512
Email: mathewss@gtlaw.com
*TERMINATED: 10/11/2023*
*ATTORNEY TO BE NOTICED*

**Naomi G. Beer**
Greenberg Traurig LLP
1144 15th Street
Suite 3300
Denver, CO 80202
303-572-6500
Fax: 572-6540
Email: beern@gtlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Trina Pelech**                    represented by    **April Christine Connally**
*an individual*                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Sarah Marie Mathews**
                                                       (See above for address)
                                                       *TERMINATED: 10/11/2023*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Naomi G. Beer**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/05/2023 | 1 | NOTICE OF REMOVAL by JP Morgan Chase and Co. d/b/a Chase Bank, Trina Pelech from Arapahoe District Court State of Colorado, Case Number 2023CV31550. (Filing fee $ 402, Receipt Number CCODC-9278550), filed by JP Morgan Chase and Co. d/b/a Chase Bank, Trina Pelech. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9)(Beer, Naomi) (Entered: 09/05/2023) |
| 09/05/2023 | 2 | CORPORATE DISCLOSURE STATEMENT identifying Other Affiliate Vangaurd Group, Inc. for JP Morgan Chase and Co. d/b/a Chase Bank. (Beer, Naomi) (Entered: 09/05/2023) |

**A:6**

| 09/05/2023 | 3 | FIRST AND FINAL NOTICE TO ALL ATTORNEY(S) AND UNREPRESENTED PARTIES IN REMOVED, TRANSFERRED, OR OTHER CASES. To receive any further notice in a case removed or transferred to this court, or special matters including discovery disputes, bankruptcy appeals, or withdrawals of reference, Multi-district litigation (MDL), etc., all attorneys and unrepresented parties must enter an appearance under D.C.COLO.LAttyR 5(a). An attorney must be an active member of this court's bar and be in good standing in accordance with D.C.COLO.LAttyR 3. A waiver of the fee for bar admission may apply in limited situations. (Text Only Entry) (efoga, ) (Entered: 09/06/2023) |
|---|---|---|
| 09/05/2023 | 4 | COMPLAINT and Jury Demand against JP Morgan Chase & Co., Trina Pelech, filed by Jeanetta Vaughn.(efoga, ) (Entered: 09/06/2023) |
| 09/05/2023 | 5 | AFFIDAVIT/RETURN of Service of Complaint, Summonses, and Civil Cover Sheet upon JP Morgan Chase Bank and Trina Pelech on 8/28/2023 (efoga, ) (Entered: 09/06/2023) |
| 09/05/2023 | 6 | Case assigned to Magistrate Judge N. Reid Neureiter. Text Only Entry (efoga, ) (Entered: 09/06/2023) |
| 09/06/2023 | 7 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. No summons issued. (efoga, ) (Entered: 09/06/2023) |
| 09/06/2023 | 8 | NOTICE of Entry of Appearance by Iris Halpern on behalf of Jeanetta Vaughn Attorney Iris Halpern added to party Jeanetta Vaughn (pty:pla) (Halpern, Iris) (Entered: 09/06/2023) |
| 09/06/2023 | 9 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE AND SETTING DEADLINE FOR FILING OF CONSENT/NON-CONSENT FORM, Entered by Magistrate Judge N. Reid Neureiter. **IT IS HEREBY ORDERED that on or before October 31, 2023, the parties shall complete and file the Consent/Non-Consent Form (see Dkt. #7), indicating either unanimous consent of the parties or that consent has been declined. Please note that this date may be earlier than the default deadlines contemplated by D.C.COLO.LCivR 40.1(c)(4).** IT IS FURTHER ORDERED that a Scheduling/Planning Conference pursuant to Fed.R.Civ.P.16(b) shall be held on: November 14, 2023 at 11:00 a.m. in Courtroom C-203, Second Floor Byron G. Rogers U.S. Courthouse, 1929 Stout Street, Denver, Colorado 80294. **The Scheduling Conference will be conducted via telephone. The partiesare directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time.** PLEASE READ ATTACHED ORDER. (norlin, ) (Entered: 09/07/2023) |
| 09/11/2023 | 10 | NOTICE of Entry of Appearance *of Counsel* by April Christine Connally on behalf of JP Morgan Chase & Co., Trina PelechAttorney April Christine Connally added to party JP Morgan Chase & Co.(pty:dft), Attorney April Christine Connally added to party Trina Pelech(pty:dft) (Connally, April) (Entered: 09/11/2023) |
| 09/11/2023 | 11 | NOTICE of Entry of Appearance *of Counsel* by Sarah Marie Mathews on behalf of JP Morgan Chase & Co., Trina PelechAttorney Sarah Marie Mathews added to party JP Morgan Chase & Co.(pty:dft), Attorney Sarah Marie Mathews added to party Trina Pelech(pty:dft) (Mathews, Sarah) (Entered: 09/11/2023) |

A:7

| 09/27/2023 | 12 | CONSENT to Jurisdiction of Magistrate Judge by Defendants JP Morgan Chase & Co., Trina Pelech All parties do not consent.. (Beer, Naomi) (Entered: 09/27/2023) |
|---|---|---|
| 09/27/2023 | 13 | REASSIGNING JUDGE. Pursuant to Magistrate Consent Form (Dkt. # 12), this action is randomly reassigned to Judge Robert E. Blackburn,. All future pleadings should be designated as 23-cv-02266-REB. (Text Only Entry) (norlin, ) (Entered: 09/27/2023) |
| 09/28/2023 | 14 | MEMORANDUM RETURNING CASE by Senior Judge Robert E. Blackburn. This case is randomly assigned to Judge Charlotte N. Sweeney for all further proceedings. (schap, ) (Entered: 09/28/2023) |
| 09/29/2023 | 15 | ORDER REFERRING CASE to Magistrate Judge N. Reid Neureiter for **non-dispositive matters**. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of Local Civ. R. 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, (4) pursuant to Local Civ. R. 16.6 and at the discretion of the Magistrate Judge, convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. By Judge Charlotte N. Sweeney on 9/29/23. Text Only Entry (jdyne) (Entered: 09/29/2023) |
| 10/10/2023 | 16 | Unopposed MOTION to Withdraw as Attorney *Sarah M. Mathews* by Defendants JP Morgan Chase & Co., Trina Pelech. (Beer, Naomi) (Entered: 10/10/2023) |
| 10/11/2023 | 17 | ORDER granting 16 Unopposed Motion to Withdraw Attorney Sarah M. Mathews. Attorney Sarah M. Mathews is withdrawn. By Judge Charlotte N. Sweeney on 10/11/2023. Text Only Entry(cnsja. ) (Entered: 10/11/2023) |
| 10/11/2023 | 18 | MOTION to Stay *the Proceedings Pending Disposition of Defendants' Motion to Compel Arbitration* by Defendants JP Morgan Chase & Co., Trina Pelech. (Beer, Naomi) (Entered: 10/11/2023) |
| 10/11/2023 | 19 | MOTION to Compel *Arbitration and Stay Proceedings* by Defendants JP Morgan Chase & Co., Trina Pelech. (Attachments: # 1 Affidavit of William A. Garrett, # 2 Affidavit of Laura L. Deck, # 3 Exhibit A to Declaration of Laura L. Deck, # 4 Exhibit B to Declaration of Laura L. Deck, # 5 Exhibit C to Declaration of Laura L. Deck, # 6 Affidavit of Dene Stover, # 7 Exhibit A to Declaration of Dene Stover, # 8 Exhibit B to Declaration of Dene Stover)(Beer, Naomi) (Entered: 10/11/2023) |
| 10/30/2023 | 20 | Joint MOTION for Extension of Time to File Response/Reply as to 19 MOTION to Compel *Arbitration and Stay Proceedings*, 18 MOTION to Stay *the Proceedings Pending Disposition of Defendants' Motion to Compel Arbitration* by Plaintiff Jeanetta Vaughn. (Halpern, Iris) (Entered: 10/30/2023) |
| 10/31/2023 | 21 | ORDER granting 20 Joint Motion for Extension of Time to File Response/Reply as to 19 Motion to Compel Arbitration and Stay Proceedings and 18 Motion to Stay the Proceedings Pending Disposition of Defendants' Motion to Compel Arbitration. The Plaintiff's Responses are due 11/13/2023, and Defendants' Replies are due by 12/5/2023. By Judge Charlotte N. Sweeney on 10/31/2023. Text Only Entry(cnsja. ) (Entered: 10/31/2023) |

A:8

| | | |
|---|---|---|
| 11/08/2023 | 22 | Proposed Scheduling Order *Jointly Submitted* by Plaintiff Jeanetta Vaughn. (Halpern, Iris) (Entered: 11/08/2023) |
| 11/13/2023 | 23 | REPLY to Response to 18 MOTION to Stay *the Proceedings Pending Disposition of Defendants' Motion to Compel Arbitration* filed by Plaintiff Jeanetta Vaughn. (Halpern, Iris) (Entered: 11/13/2023) |
| 11/14/2023 | 24 | RESPONSE to 19 MOTION to Compel *Arbitration and Stay Proceedings* Attorney Crist Anthony Smith Whitney added to party Jeanetta Vaughn (pty:pla) filed by Plaintiff Jeanetta Vaughn. (Attachments: # 1 Exhibit Chase Video Footage, # 2 Exhibit Officer Video Footage)(Smith Whitney, Crist) (Entered: 11/14/2023) |
| 11/14/2023 | 25 | MINUTE ORDER re: 24 Response to 19 Motion to Compel Arbitration and Stay Proceedings. The Response 24 is STRICKEN for failure to comply with this Court's Uniform Practice Standards regarding page limits. See Civ. Practice Standard 10.1(c). The Court grants the Plaintiff to and including November 17, 2023 to refile a compliant brief. By Judge Charlotte N. Sweeney on 11/14/2023. Text Only Entry (cnsja. ) Modified on 11/14/2023 to correct docket number. (cnsja. ). (Entered: 11/14/2023) |
| 11/14/2023 | 26 | MINUTE ENTRY for proceedings held before Magistrate Judge N. Reid Neureiter: Scheduling Conference held on 11/14/2023. FTR: Courtroom C203. (rvill, ) (Entered: 11/14/2023) |
| 11/14/2023 | 27 | SCHEDULING ORDER: Telephonic Status Conference set for 2/28/2024 at 2:00 PM in Courtroom C203 before Magistrate Judge N. Reid Neureiter. Five minutes prior to the start of the hearing, the parties shall call the conference line (888) 398-2342, Access Code 5755390# to participate. Discovery due by 6/7/2024. Dispositive Motions due by 7/12/2024. By Magistrate Judge N. Reid Neureiter on November 14, 2023. (rvill, ) (Entered: 11/14/2023) |
| 11/16/2023 | 28 | RESPONSE to 19 MOTION to Compel *Arbitration and Stay Proceedings* filed by Plaintiff Jeanetta Vaughn. (Attachments: # 1 Exhibit Exhibit 1 - Chase Video Footage, # 2 Exhibit Exhibit 2 - Officer Video Footage)(Halpern, Iris) (Entered: 11/16/2023) |
| 11/17/2023 | 29 | MINUTE ORDER: A Final Pretrial Conference is set for 11/14/2024 at 9:00 AM in Courtroom A 702 before Judge Charlotte N. Sweeney. The parties' Proposed Final Pretrial Order is due by 11/7/2024. In addition to filing, please email the proposed order in editable format to Sweeney_Chambers@cod.uscourts.gov. By Judge Charlotte N. Sweeney on 11/17/2023. Text Only Entry (cnsja. ) (Entered: 11/17/2023) |
| 11/21/2023 | 30 | Conventionally Submitted Material : 1 Flash drive to Response to Motion, 28 Exhibit 1 and 2 by Plaintiff Jeanetta Vaughn. Location of stored item: Clerk's Office oversize area A-1-9. Text Only Entry. (jcharl, ) (Entered: 11/22/2023) |
| 12/05/2023 | 31 | MINUTE ORDER Entered by Magistrate Judge N. Reid Neureiter on 12/5/2023. Due to a scheduling conflict, it is hereby ORDERED that the Status Conference set on February 28, 2024 at 2:00 p.m. is VACATED and RESET on March 4, 2024 at 11:00 a.m. the parties are reminded to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time. (Entered: 12/05/2023) |
| 12/05/2023 | 32 | REPLY to Response to 19 MOTION to Compel *Arbitration and Stay Proceedings* filed by Defendants JP Morgan Chase & Co., Trina Pelech. (Beer, Naomi) (Entered: 12/05/2023) |

**A:9**

| 12/05/2023 | 33 | REPLY to Response to 18 MOTION to Stay *the Proceedings Pending Disposition of Defendants' Motion to Compel Arbitration* filed by Defendants JP Morgan Chase & Co., Trina Pelech. (Beer, Naomi) (Entered: 12/05/2023) |
|---|---|---|
| 12/15/2023 | 34 | ORDER denying 19 Motion to Compel Arbitration and Stay Proceedings; denying as moot 18 Motion to Stay the Proceedings Pending Disposition of Defendants' Motion to Compel Arbitration. By Judge Charlotte N. Sweeney on 12/15/23.(jdyne) (Entered: 12/15/2023) |
| 01/08/2024 | 35 | STIPULATION for Extension of Time *for Defendants to Respond to Plaintiff's Discovery Requests* by Defendants JP Morgan Chase & Co., Trina Pelech. (Beer, Naomi) (Entered: 01/08/2024) |
| 01/11/2024 | 36 | NOTICE OF APPEAL as to 34 Order on Motion to Stay, Order on Motion to Compel by Defendants JP Morgan Chase & Co., Trina Pelech (Filing fee $ 605, Receipt Number ACODC-9483868) (Beer, Naomi) (Entered: 01/11/2024) |
| 01/12/2024 | 37 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 36 Notice of Appeal filed by Trina Pelech, JP Morgan Chase & Co. to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record, # 2 Docket Sheet)(sphil, ) (Entered: 01/12/2024) |
| 01/12/2024 | 38 | USCA Case Number 24-1016 for 36 Notice of Appeal filed by Trina Pelech, JP Morgan Chase & Co.. (sphil, ) (Entered: 01/16/2024) |
| 01/26/2024 | 39 | LETTER TO USCA and all counsel certifying the record is complete as to 36 Notice of Appeal filed by Trina Pelech, JP Morgan Chase & Co.. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 24-1016) Text Only Entry. (sphil, ) (Entered: 01/26/2024) |
| 01/26/2024 | 40 | TRANSCRIPT ORDER FORM re 36 Notice of Appeal by Defendants JP Morgan Chase & Co., Trina Pelech (Beer, Naomi) (Entered: 01/26/2024) |
| 01/29/2024 | 41 | TRANSCRIPT of TELEPHONIC SCHEDULING CONFERENCE held on 11/14/2023 before Magistrate Judge Neureiter. Pages: 1-22. Prepared by: AB Litigation Services. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 01/29/2024) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/29/2024 13:34:44 | | |
| **PACER Login:** | suarezo070 | **Client Code:** 202850.077300 |

**A:10**

| Description: | Docket Report | Search Criteria: | 1:23-cv-02266-CNS-NRN |
|---|---|---|---|
| Billable Pages: | 6 | Cost: | 0.60 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Number:

JEANETTA VAUGHN,

      Plaintiff,

v.

JP MORGAN CHASE & CO. D/B/A CHASE BANK; A
CORPORATION, AND
TRINA PELECH; AN INDIVIDUAL

      Defendants.

---

## NOTICE OF REMOVAL

---

TO THE CLERK OF COURT OF THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO

      Please take notice that Defendants JPMorgan Chase Bank, N.A.[1] ("Chase") and Trina

Pelech (collectively, "Defendants"), pursuant to 28 U.S.C. §§ 1331, 1367, 1441(a) and 1446(a)

and D.C.COLO.LCivR 81.1, hereby remove to this Court the state court action described below.

As grounds for this Notice of Removal, Defendants state as follows:

### OVERVIEW

      Plaintiff's case in Arapahoe County District Court is removable to the United States

District Court for the District of Colorado because Plaintiff recently asserted claims against all

Defendants which raise a federal question under 28 U.S.C. § 1331 and which makes removal

appropriate under 28 U.S.C. § 1446.  Further, the federal District Court has supplemental

---

[1] JPMorgan Chase Bank, N.A. is incorrectly named as JPMorgan Chase & Co d/b/a Chase Bank.

1

**A:12**

jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because all of Plaintiff's claims are part of the same case or controversy – alleged discrimination.  This Notice of Removal is timely.

**PROCEDURAL BACKGROUND**

1.      On August 11, 2023, Plaintiff Jeanetta Vaughn filed a Complaint and Jury Demand (original Complaint) in an action entitled *Jeanetta Vaughn v. JP Morgan Chase & Co. d/b/a Chase Bank; a corporation, and Trina Pelech; an Individual*, Case Number 2023CV31550, in the District Court, Arapahoe County, State of Colorado (the "State Action").

2.      On August 28, 2023, Plaintiff filed a waiver of service declaration in the State Action after having sent the Complaint to undersigned counsel of record via e-mail. Undersigned counsel represents the Defendants, both of whom consent to removal.

3.      Also submitted as attachments hereto are true and accurate copies of the filings in the State Action:

|           | Filing Date | Title                                                          |
|-----------|-------------|----------------------------------------------------------------|
| Exhibit 1 | 8/11/2023   | Complaint w/ Jury Demand                                        |
| Exhibit 2 | 8/11/2023   | Civil Case Cover Sheet                                          |
| Exhibit 3 | 8/11/2023   | Summons - Chase Bank                                            |
| Exhibit 4 | 8/11/2023   | Summons - Trina Pelech                                          |
| Exhibit 5 | 8/11/2023   | Notice that C.R.C.P. 16.1 Simplified Procedure Does Not Apply   |
| Exhibit 6 | 8/11/2023   | Delay Reduction Order                                           |
| Exhibit 7 | 8/11/2023   | Division 204 Order Re Pretrial Matters and Discovery Protocol   |
| Exhibit 8 | 8/28/2023   | Waiver of Service                                               |
| Exhibit 9 | 9/1/2023    | Arapahoe District Court Docket Sheet                            |

4.      There have been no other filings to date in the State Court action. A true and correct copy of the docket sheet is attached as <u>Exhibit 9</u>.

**A:13**

5.      The Notice of Removal is filed within 30 days of service of the Summons and Complaint and is thus timely under 28 U.S.C. § 1446(b).

6.      The District Court of Arapahoe County, Colorado is located within this judicial district. *See* 28 U.S.C. § 85. This Notice of Removal is therefore properly filed in this Court pursuant to 28 U.S.C. § 1441(a).

7.      Plaintiff's claims all revolve around the same nucleus of operative fact – that is, alleged discrimination.

<u>**LEGAL AND FACTUAL BASIS FOR REMOVAL**</u>

*A.  **The Removal is Timely.***

8.      Under 28 U.S.C. § 1446(b), a Notice of Removal may be "filed within thirty days after receipt by the defendant, through service or otherwise, a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."

9.      Plaintiff filed her Complaint in the State Action on August 11, 2023; Defendant executed a waiver of service on August 28, 2023.  *See* Exhibits 1 & 8.

10.     This Notice of Removal is timely filed because it is filed within "30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." 28 U.S.C. § 1446(b)(1).

*B.  **The Court Has Federal Question Jurisdiction and Supplemental Jurisdiction.***

11.     The U.S. District Court has original jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.

3

**A:14**

12.     When claims "arising under" federal law are brought in state court, those claims are properly removable under 28 U.S.C. § 1441(a)-(b).

13.     Plaintiff's 42 U.S.C. § 1981 claim arises under the law of the United States. Therefore, pursuant to 28 U.S.C. §§ 1331, this Court has original jurisdiction over Plaintiff's Section 1981 discrimination claim.

14.     The U.S. District Court also has supplemental jurisdiction over non-federal question claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Title III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367.

15.     Plaintiffs remaining state law claims, including but not limited to, (1) Violation of Colorado Anti-Discrimination Act, (2) Negligent Infliction of Emotional Distress, and (3) Defamation per se, relate to Plaintiff's allegations of discrimination and form part of the same case or controversy, and are not novel. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy ...." 28 U.S.C. § 1367(a).

16.     This Court has supplemental jurisdiction over Plaintiff's remaining state law claims pursuant to 28 U.S.C. § 1367 and 28 U.S.C. § 1441(c) because these claims all relate to Plaintiff's allegations and therefore "form part of the same case or controversy." *See* 28 U.S.C. § 1367.

A:15

17.     Accordingly, Plaintiff's claims fall within the federal court's removal jurisdiction under 28 U.S.C. §§ 1441(a) and 1446(a).

18.     Contemporaneously with the filing of this Notice of Removal, Defendants have filed a copy of the same with the Clerk of the District Court, Arapahoe County, Colorado.  *See* 28 U.S.C. § 1446(d).  Written notice of the filing of this Notice of Removal will be served upon Plaintiff's counsel through the filing of the Notice to Plaintiff Jeanetta Vaughn of Removal to Federal Court in the original state court action, which will effect service on her counsel of record.

19.     In compliance with D.C.COLO.LCivR 81.1(b), undersigned counsel will promptly file with this Court a current docket sheet and copies of any pending motion, petition, and related response, reply, and brief.

20.     Defendants reserve the right to amend or supplement this Notice of Removal by adding any jurisdictional defenses that may independently support a basis for removal.

WHEREFORE, Defendants request that this matter be removed from the District Court, Arapahoe County, Colorado, to the U.S. District Court for the District of Colorado and this Court take jurisdiction over this action to its conclusion and final judgment.

5

**A:16**

Dated:  September 5, 2023.

s/ Naomi G. Beer
Naomi G. Beer
Sarah M. Mathews
April C. Connally
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
Telephone: (303) 572-6500
Email: beern@gtlaw.com
        mathewss@gtlaw.com
        april.connally@gtlaw.com

**Attorneys for Defendants Chase and Trina Pelech**

<u>CERTIFICATE OF SERVICE (CM/ECF)</u>

   I hereby certify that on Septmeber 5, 2023, I caused the foregoing document, titled **NOTICE OF REMOVAL**, including all attachments thereto, to be filed with the Clerk of Court of the United States District Court for the District of Colorado.

   I further hereby certify that on September 5, 2023, I caused true and correct copies of the foregoing document, including all attachments thereto, to be served on counsel for Plaintiff Jeanette Vaughn by electronic mail at the e-mail addresses listed below.

Iris Halpern
Crist Whitney
RATHOD | MOHAMEDBHAI, LLC
2701 Lawrence St., Suite 100
Denver, CO 80205
Telephone: (303) 578-4400
Email: ih@rmlawyers.com
   cw@rmlawyers.com

*Counsel for Plaintiff Jeanetta Vaughn*

         *s/ Naomi G. Beer*     
         Naomi G. Beer

**A:18**

# EXHIBIT 1

<table>
<tr><td>

DISTRICT COURT, ARAPAHOE COUNTY,
STATE OF COLORADO
7325 S. Potomac Street,
Centennial, CO 80112

**JEANETTA VAUGHN,**

   Plaintiff,

v.

**JP MORGAN CHASE & CO. d/b/a CHASE BANK; a corporation, and
TRINA PELECH; an individual**

   Defendant.

</td><td>

DATE FILED: August 11, 2023 1:21 PM
FILING ID: 1F8A4D2AF6365
CASE NUMBER: 2023CV31550

▲COURT USE ONLY▲

</td></tr>
<tr><td>

***Attorneys for Plaintiff:***

Iris Halpern (Reg. No. 53112)
Crist Whitney (Reg. No. 56608)
RATHOD | MOHAMEDBHAI, LLC
2701 Lawrence St., Suite 100
Denver, CO 80205
T: (303) 578-4400
Email: ih@rmlawyers.com; cw@rmlawyers.com

</td><td>

Case No.:

Division:

</td></tr>
</table>

**COMPLAINT AND JURY DEMAND**

Plaintiff Jeanetta Vaughn, by and through her undersigned counsel Iris Halpern and Crist Whitney of Rathod | Mohamedbhai LLC, respectfully alleges for her Complaint and Jury Demand as follows:

**<u>INTRODUCTION</u>**

On the morning of June 9, 2022, Jeanetta Vaughn entered the JP Morgan Chase & Co. Bank ("Chase") branch on 1101 South Buckley Road in Aurora, Colorado. Ms. Vaughn is a Black, churchgoing, mother of three who spent her career at the Department of Veteran's Affairs. She has

1

**A:20**

been a longtime Chase member. As Ms. Vaughn entered the bank that day and took a seat in the lobby, Branch Manager Trina Pelech, who is White, immediately approached her, loudly asking Ms. Vaughn if she could help her with anything. Ms. Vaughn calmly responded that she needed no assistance and was just there for personal banking purposes. Instead of accepting Ms. Vaughn's response, Ms. Pelech told Ms. Vaughn that she was "not welcome" at Chase and called the police on her, accusing Ms. Vaughn of trespassing. When the police arrived and informed Ms. Pelech that Ms. Vaughn felt discriminated against, Ms. Pelech's telling response was "that's always the excuse…" Ms. Pelech ordered the police to remove Ms. Vaughn from the premises anyway.

As a result of Defendants unlawful and degrading treatment of Ms. Vaughn, she now brings claims under the Colorado Anti-Discrimination Act, for a violation of her Constitutional Rights to be free of race discrimination under 42 U.S.C. §1981, and state court torts for emotional distress and defamation. It is no trivial matter to call the police on a Black person, falsely accusing him or her of criminal misconduct, merely for engaging in routine and mundane chores the rest of us do daily. Inherent in such actions is the very real threat of arrest and physical violence; and doing so invokes the ghosts of segregation not long past when White citizens frequently exploited law enforcement to relegate Black citizens to second-class status, entrenching racist hierarchies and weaponizing the police to exclude Black citizens from the public sphere. Such discrimination must no longer be condoned.

## I.      PARTIES, JURISDICTION, AND VENUE

1.      At all times relevant to this Complaint, Plaintiff Jeanetta Vaughn was a legal resident of and domiciled in the State of Colorado.

2

**A:21**

2.     Defendant Chase Bank is a New York Corporation with a principal office street address in Delaware and principal office mailing address in New York, which at all times relevant to this Complaint has been duly registered with the Colorado Secretary of State to do business in the state of Colorado and has conducted such business in the state.

3.     Defendant Chase Bank's registered agent located at 19661 E. 48th Place, Denver, Colorado 80249.

4.     Defendant Chase operates many bank branches across the state, including a bank branch located at 1101 South Buckley Road in Aurora, Colorado.

5.     Defendant Trina Pelech is a resident of Colorado and at all relevant times hereto, she was personally involved in committing the discriminatory actions against Ms. Vaughn complained of herein.

6.     This Court has jurisdiction over this matter pursuant to C.R.S. § 13-1-124.

7.     Venue is proper pursuant to C.R.C.P. 98 as the allegations contained herein occurred within the boundaries of Arapahoe County.

## II.     ADMINISTRATIVE EXHAUSTION

8.     Ms. Vaughn filed a charge of discrimination with the Colorado Civil Rights Division ("CCRD") within sixty days of the discriminatory acts committed by Chase Bank.

9.     Ms. Vaughn alleged in her charge of discrimination that she was the victim of race discrimination within the meaning of the public accommodation provisions of the Colorado Anti-Discrimination Act ("CADA") and described the circumstances.

10.    The CCRD issued a notice of right to sue, upon Ms. Vaughn's request, on November 29, 2022.

11.     The parties signed several tolling agreements, with the final tolling agreement expiring on August 11, 2023.

12.     As a result, Ms. Vaughn is timely filing her CADA claims within the tolling period.

13.     None of Ms. Vaughn's other claims require administrative exhaustion.

### III.    FACTUAL ALLEGATIONS

14.     Plaintiff Jeanetta Vaughn is over sixty years of age, a Colorado resident, and a previous longtime federal government worker.

15.     Ms. Vaughn is also a Black woman.

16.     Ms. Vaughn earned her Bachelor of Science in Education.

17.     Ms. Vaughn has worked as a teacher, substitute teacher, at a bank, in hospitals, and in the aerospace field.

18.     Ms. Vaughn was employed with the Department of Veteran's Affairs, and had been employed with the federal government for nearly twelve years.

19.     Ms. Vaughn is a wife to James Vaughn Sr., and a mother to her son as well as to Mr. Vaughn's two sons.

20.     Ms. Vaughn prays daily and attends church regularly.

21.     Since 2019, Ms. Vaughn has been a dependable member of Chase, utilizing its banking services on many occasions.

**Chase Bank and Trina Pelech Discriminate Against Jeanetta Vaughn**

22.     On the morning of June 9, 2022, Ms. Vaughn drove to the Chase branch located at 1101 South Buckley Road in Aurora, Colorado to withdraw money from her Chase account, as she has routinely done in the past, and to obtain counter checks.

4

**A:23**

23.     Ms. Vaughn entered the bank at 11:34am.

24.     As Ms. Vaughn walked into the branch that morning, she sat down to unlock her Chase card as she typically does for security reasons.

25.     Chase offers a personal banking service that allows customers to lock and unlock their debit card just in case the card is lost or stolen. This provides the Chase member additional security and allows them to instantly stop purchases or cash advances on their Chase card.

26.     Ms. Vaughn, out of caution, locks and unlocks her Chase card between usage. Ms. Vaughn locks her bank card as a safety measure just in case she loses it. She noticed that businesses no longer ask for ID to make a purchase so she locks her card to ensure someone else could not make purchases.

27.     There is a four-step process to unlock the card on the "Chase Mobile" phone application.

28.     Before she could proceed with any transactions, she would need to log into the "Chase Mobile" phone application to unlock her card.

29.     To avoid inconveniencing anyone, Ms. Vaughn sat in one of the branch's customer lobby chairs while she worked to unlock her card.

30.     At 11:35am, while Ms. Vaughn proceeded to log into the "Chase Mobile" app to unlock her account, Chase Branch Manager Trina Pelech, a White female, approached Ms. Vaughn.

31.     Ms. Pelech approached Ms. Vaughn less than ninety seconds after Ms. Vaughn sat down to unlock her card.

5

**A:24**

32.     Ms. Pelech loudly asked Ms. Vaughn whether she could help her with something, to which Ms. Vaughn responded that when she finished unlocking her card, she would get in line to speak with a bank teller.

33.     Instead of accepting Ms. Vaughn's response, Ms. Pelech raised her voice, told Ms. Vaughn that she did not need to be rude, and angrily told Ms. Vaughn that she was "not welcome" at the bank branch.

34.     Surprised by Ms. Pelech's tone, Ms. Vaughn said, "What are you talking about? I said I am doing business, trying to open up my account so I can get in line."

35.     Ms. Pelech did not ask Ms. Vaughn to see proof of membership.

36.     Instead, ignoring Ms. Vaughn, Ms. Pelech reiterated that, "You're not welcome here," and threatened to call the police.

37.     Shocked, Ms. Vaughn replied that she would sit and wait for the police to come so that they could record the events at the Chase branch.

38.     After Ms. Pelech threatened to call the police, Ms. Pelech claimed that Ms. Vaughn said, "go ahead, I'm going to videotape _you_."

39.     Ms. Vaughn, in fact, never videotaped Ms. Pelech.

40.     Ms. Vaughn also never indicated that she would videotape any bank operations or services.

41.     Ms. Pelech ordered Ms. Vaughn to leave the premises well before either of them ever discussed video recording the interaction.

42.     Ms. Pelech also stated that she would call the police on Ms. Vaughn before Ms. Vaughn mentioned anything about video recording.

6

A:25

43.     The interaction between Ms. Vaughn and Ms. Pelech lasted less than a minute.

44.     Their interaction was captured on the bank branch's video cameras.

45.     At no point during their interaction did the Chase video footage show Ms. Vaughn videotaping Ms. Pelech or Chase branch procedures.

46.     After Ms. Vaughn continued to sit patiently in the seat, Ms. Pelech huffed out of the lobby to call the police.

47.     According to police records, Ms. Pelech did so at 11:36am.

48.     While Ms. Pelech called the police, Ms. Vaughn proceeded to unlock her Chase card on the "Chase Mobile" app, texted her husband, James Vaughn Sr., to tell him what happened, and then called him, asking him to leave work and meet her at the bank.

49.     After being informed about this extremely alarming situation, Mr. Vaughn said that he would drive to the Chase branch immediately, despite being at work and on the clock.

50.     Also, around 11:40am, while Ms. Pelech called the police, Hayem Serra, a Chase employee, provided Ms. Vaughn with her own business card as well as the business card of Ms. Pelech, identifying Ms. Pelech as the Branch Manager and a Vice President.

51.     On Ms. Pelech's 911 call, Ms. Pelech admitted that Ms. Vaughn told her that when she was ready, she would approach the bank teller.

52.     Ms. Pelech then accused Ms. Vaughn of criminal trespass.

53.     On the 911 call, Ms. Pelech also admitted that the only reason she ordered Ms. Vaughn to leave the branch was because she was being "rude" and "aggressive," and for no other reason.

54.    Chase falsely told the Colorado Civil Rights Division during the agency's investigation of Ms. Vaughn's charge that Ms. Vaughn pulled out her phone camera and began recording the interaction after being ordered to leave the branch.

55.    Ms. Vaughn never recorded Ms. Pelech, nor did she imply she would until after Ms. Pelech threatened to call the police on her.

56.    Chase also falsely told the Colorado Civil Rights Division during the agency's investigation that, "Ms. Pelech cautioned Ms. Vaughn that if Ms. Vaughn did not stop recording, she would have to leave, or Ms. Pelech would be forced to call the police."

57.    However, Ms. Pelech admitted in her 911 call that she ordered Ms. Vaughn to leave the branch only because she thought Ms. Vaughn was being rude.

58.    There is no dispute that Ms. Vaughn was not recording Ms. Pelech or anyone else at that time.

**Police Officers Arrive and Interrogate Ms. Vaughn**

59.    Ms. Vaughn remained seated until two Aurora police officers, Officer Timothy Gramse and Officer Donald Hickox, entered the Chase branch at around 11:46am.

60.    The two officers informed Ms. Vaughn that they were responding to a report of trespassing.

61.    Ms. Vaughn calmly and fully complied with the police officers' requests and answered their questions.

62.    At first, Ms. Vaughn feared for her life as the officers approached her.

8

A:27

63.     Ms. Vaughn understood that as a Black woman she needed to keep calm and deescalate the situation because the dangerous, oftentimes violent, consequences to Black victims when White individuals call law enforcement on Black individuals and accuse them of crimes.

64.     Ms. Vaughn hid her fears and explained to the police officers why she was in the Chase branch lobby, reiterating that she was a member and that she came to the Chase branch to conduct her bank transactions.

65.     She told the officers that after she told Ms. Pelech she was unlocking her card and would into line, Ms. Pelech told her "that she did not have to be rude." She then stated that she asked Ms. Pelech what she was talking about because she was just doing business and trying to unlock her account.

66.     Ms. Vaughn confirmed with the officers that Ms. Pelech told her that, "You're not welcomed here," and threatened to call the police on her.

67.     Ms. Vaughn then told the officers that her husband was on the way, and she was waiting for him to arrive.

68.     Officer Gramse proceeded to speak with Ms. Pelech in a back office.

69.     Ms. Pelech told Officer Gramse that it was her job to approach customers who sat in the lobby and ask if she could help them.

70.     Ms. Pelech alleged that Ms. Vaughn ignored her, so she asked again. Ms. Pelech then claimed that Ms. Vaughn immediately said, "Leave me alone, I'm busy, when I'm ready, I'll come up."

71.     Ms. Pelech made this statement while mimicking how Black women supposedly speak, with her hand raised, her neck swinging, and her face fixed into a scowl. These types of gestures are typical of the "Angry Black Woman" trope.

72.     Ms. Pelech told Officer Gramse that she said to Ms. Vaughn, "You're being very rude and if you can't be decent then you are welcome to leave."

73.     Ms. Pelech claimed she informed Ms. Vaughn that she had the right to make Ms. Vaughn leave after Ms. Vaughn protested that she did not.

74.     Then Ms. Pelech claimed that Ms. Vaughn allegedly stated, "Go ahead, I will videotape you."

75.     She then alleged, physically enacting the act for Officer Gramse, that Ms. Vaughn stuck her phone up at face level and started recording her.

76.     Chase video camera footage clearly shows that Ms. Vaughn did not pick her phone up and record Ms. Pelech in any such a manner.

77.     After answering several of Officer Gramse questions, Ms. Pelech flatly replied again, referring to Ms. Vaughn, that, "She is not welcome here."

78.     Officer Gramse refused to arrest or remove Ms. Vaughn, explaining to Ms. Pelech that, "The last resort is putting my hands on her, charging her with trespassing and throwing her out of the bank especially if she is a customer here."

79.     Officer Gramse then said, "She doesn't seem to be a danger to me."

80.     Ms. Pelech agreed and said, "No, I don't believe she is a danger."

81.     This statement is contrary to the statements Ms. Pelech made on the 911 call when she described Ms. Vaughn as "aggressive."

10

**A:29**

82.     When Ms. Pelech again added that Ms. Vaughn was rude, Officer Gramse said, "Being rude in the bank is not---"

83.     At that point, Ms. Pelech cutoff Officer Gramse and wouldn't listen to him, but Office Gramse later told Ms. Vaughn that he informed Ms. Pelech, "Being rude in the bank is not a matter for law enforcement."

84.     When Ms. Pelech over-spoke Office Gramse, cutting him off mid-sentence, she argued that Ms. Vaughn could not videotape in the bank. Officer Gramse asked if that was a bank policy. Ms. Pelech said it was a bank policy because it is a secure place and they don't want people "taking video of our procedures and robbing us later."

85.     There were no postings or other information available in the bank branch indicating or explaining to customers that video recording is prohibited on the premises.

86.     At any rate, Ms. Vaughn only indicated that she might videotape Ms. Pelech after Ms. Pelech threatened to call the police on her.

87.     According to even Ms. Pelech's own testimony, Ms. Vaughn also never alleged she would record bank procedures, only that she would videotape Ms. Pelech if made her leave.

88.     Officer Gramse left the office and spoke to Ms. Vaughn again.

89.     Ms. Vaughn, by this time, felt completely humiliated as other customers and employees stared at her, and some bank tellers even laughed at her.

90.     Ms. Vaughn, despite the humiliation she felt, continued to converse with the police officers in a calm manner so the police officers did not turn aggressive on the chance that she made any comments that might offend them or escalate the situation.

11

**A:30**

91.    Officer Gramse explained that Ms. Pelech felt Ms. Vaughn was trespassing and as a last resort Ms. Vaughn could be charged with trespassing.

92.    Obviously frustrated and deeply hurt and upset by the experience, Ms. Vaughn told the officers to charge her with trespassing. Officer Gramse, however, said he did not want to do that.

93.    Ms. Vaughn asked Officer Gramse why the chairs in the lobby were even there. Officer Gramse replied that it was a good question.

94.    Ms. Vaughn then asked Officer Gramse what reason Ms. Pelech had for telling her to leave the bank. Officer Gramse replied that Ms. Pelech claimed Ms. Vaughn was videotaping.

95.    Ms. Vaughn explained to Officer Gramse that she had only informed to Ms. Pelech that she would record her because Ms. Pelech was going to call the police.

96.    Ms. Vaughn further explained that she may have gestured as if she would videotape Ms. Pelech, but she never videotaped anything because the police had their own body-cameras.

97.    Officer Gramse asked again why Ms. Vaughn was at the bank, stating "Well, anybody could come in and say they're a customer of the bank and they were going to conduct business…even a homeless person that comes in here because it is raining out or whatever…"

98.    Ms. Vaughn asked Officer Gramse why he did not ask her for her ID to prove that she has an account there. Mr. Gramse said, "I could do that." He finally took her name and date of birth and wrote it down.

99.    No one throughout this whole experience ever asked Ms. Vaughn for proof of Chase membership, including Ms. Pelech.

100.    Ms. Vaughn explained again why she was there and explained to the officers why she needed counter checks.

101.    Ms. Vaughn also explained that she called her husband because Ms. Pelech had called the police on her.

102.    Officer Gramse asked Ms. Vaughn, "I hope you don't feel we were being rude to you." Ms. Vaughn explained that she did not think they had been rude because she has family in law enforcement and understood their job. She also added that these were the types of situations officers were called into where they were wasting their time. Officer Hickox smiled and nodded emphatically.

103.    Ms. Vaughn asked Officer Gramse whether she was being asked to leave and if so, she wanted Ms. Pelech to tell the officers that she needed to be removed.

104.    Officer Gramse went to the back office and told Ms. Pelech that if she still wanted Ms. Vaughn to leave, she will leave when her husband arrived.

105.    Officer Gramse then told Ms. Pelech that he believed Ms. Vaughn felt singled out because she was African American.

106.    Ms. Pelech dramatically rolled her eyes and stated, "That's always the excuse..."

107.    Officer Gramse then asked her whether she had anything posted in the bank that said there was no videotaping in the bank. Ms. Pelech replied, "No, but I told her. Obviously, she knew, to get a rise out of me."

108.    Ms. Pelech reiterated to Officer Gramse that, "I do have the authority to make her leave. I have been given that authority."

13

**A:32**

109.    Ms. Pelech further stated, "If you're going to threaten to videotape us and I say you're not allowed to and you're going to keep pointing it at me, then you're going to have to go."

110.    However, during her call to 911, Ms. Pelech did not state that Ms. Vaughn had "threatened" to record her. Instead, she told the dispatcher that Ms. Vaughn had started to record her.

111.    Furthermore, Chase's own video cameras do not show Ms. Vaughn pointing her phone and recording Ms. Pelech at any point in time during the less than one minute interaction the two of them had with each other before Ms. Pelech went to call the police.

112.    Officer Gramse informed Ms. Pelech that, "Well, we're not going to make her leave right now. She says she is a customer. We're going to go wait in our car for her husband to get here and then if you tell her to leave, she said she'll leave."

113.    Officer Gramse reiterated to Ms. Pelech that Ms. Vaughn was sitting there to unlock her card and Ms. Pelech then said, "This did not have to happen. All she had to do was let me know what she was doing without the snarky attitude and threatening me with video. I can help people all day long but you're not going to video *me*."

114.    Officer Gramse returned and told Ms. Vaughn they will wait in their patrol cars until Mr. Vaughn arrived.

115.    Shortly afterwards, Mr. Vaughn arrived, and briefly spoke with the police officers outside.

116.    Officer Hickox explained to Mr. Vaughn that there seemed to be an issue between the two women and Ms. Pelech dragged the officers into it.

14

**A:33**

117.    Officer Gramse explained that this was a trespass call, but they were not looking to charge Ms. Vaughn with anything.

118.    Officer Hickox said, "I would just add this, if she does feel like she was singled out or…for a lack of a better term discriminated against I would request the…because they have surveillance in this lobby of what transpired before we ever got there. That's something she can take up with Chase."

119.    Mr. Vaughn nodded then came inside with the officers to where Ms. Vaughn waited.

120.    The two officers wrote down the information for Ms. Vaughn to access the officer's bodycam footage. Officer Gramse said, "I am sorry this happened."

121.    Mr. Vaughn then left the Chase branch followed by Ms. Vaughn.

**Chase Bank's Long History of Discrimination Against Black Customers**

122.    Chase has a pattern of discriminatory treatment against its Black customers, giving voice to the adverse consequences of "banking while Black."

123.    On December 18, 2021, Dr. Malika Mitchell-Stewart, a Black woman, attempted to deposit a $16,000 check. In response, Chase staff members accused her of fraud and questioned her employment as a doctor, denying her services.

124.    In 2019, a former NFL player named Jimmy Kennedy attempted to become a "private client" with Chase and was given "the run-around" more than once. He recorded his conversation with a Chase employee, who said that Mr. Kennedy was "bigger than the average person" and "also an African-American." The employee also said "[w]e're in Arizona…[t]hey don't see people like you a lot."

125.    In a similar instance, also at an Arizona Chase bank, a Chase manager told a Black employee not to help a Black woman who received a $372,000 wrongful death settlement after her son died. The Black employee wanted to help the Black woman properly invest her money, however, his boss told the Black employee, "You've got somebody who's coming from Section 8, never had a nickel to spend, and now she's got $400,000. What do you think's going to happen with that money? It's gone." The Chase manager further added, "This is not money she respects. She didn't earn it."

126.    Also, on April 25, 2019, Chase employees in White Plains, New York called the police on Mount Vernon, New York's Mayor Richard Thomas, a Black man, as the Mayor attempted to deposit a six-figure check and get access to the City's online banking records. Mayor Thomas believed that his race certainly played a role in the Chase employees calling the police.

127.    Chase, in fact, admitted to receiving four complaints of racial discrimination since September 2021 at *the very same branch* where the discrimination against Ms. Vaughn took place.

128.    Three of these complaints specify that they were made by Black customers.

129.    Black customers complained that they were discriminated against with regard to cashing a check, restrictions on their account, being asked additional identifying questions, and not receiving promotional credit for opening an account.

130.    Beyond Chase's customers, Chase has continued this discriminatory pattern with its own employees.

131.    In 2018, Chase came to a $24 million settlement with financial advisors who were discriminated against because they were Black by assigning them to poorer bank branches, understaffing them, and not including them in a program for wealthy clients.

16

**A:35**

## IV.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Colorado Anti-Discrimination Act, C.R.S. § 24-34-601 et seq.**
**Discrimination on the Basis of Race**
**Against Chase Bank**

132.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

133.    Plaintiff has exhausted remedies by filing charges of discrimination with the CCRD.

134.    The Colorado Anti-Discrimination Act, C.R.S. § 24-34-601(2)(a), makes it unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of race, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of race.

135.    Under C.R.S. § 24-34-601(1) a "place of public accommodation" means any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public.

136.    Jeanetta Vaughn is a Black woman. Based on her race, Ms. Vaughn is a member of a class of citizens protected by CADA.

137.    On June 9, 2022, Ms. Vaughn entered Chase Bank for personal banking purposes.

138.     She had every right to be at that Chase Bank branch.

139.    Within minutes of her entering the lobby and sitting down in a chair provided to customers, Trina Pelech approached Ms. Vaughn and began to grill her about her assistance needs.

17

**A:36**

140.    When Ms. Vaughn responded that she did not need assistance and explained that she needed to unlock her card before standing in the bank teller line, Ms. Pelech told her that she did not need to be rude then raised her voice and angrily told Ms. Vaughn that she was "not welcome" in the bank. She then threatened to call the police on her.

141.    Ms. Pelech did in fact call the police and accused Ms. Vaughn of being "aggressive," "trespassing," and implied that Ms. Vaughn had been recording the bank operations before the call, when it is undisputed that Ms. Vaughn only suggested she'd record Ms. Pelech after Ms. Pelech threatened to call the police on her.

142.    Ms. Vaughn was denied the full and equal enjoyment of this banking service when Ms. Pelech told her that she was "not welcome" at the bank and called the police on her, requiring her to leave before she could complete her personal banking business.

143.    Defendant denied Ms. Vaughn the full and equal enjoyment of this banking service because she is Black.

144.    Defendant's conduct described herein violated the anti-discrimination laws of the State of Colorado and constitutes prohibited discriminatory practices thereunder.

145.    Defendant's conduct described herein was done with malice or reckless indifference of Ms. Vaughn's protected rights under state law.

146.    As a direct result of Defendant's actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1981**
**Discrimination on the Basis of Race and/or Ethnicity/Alienage**
**Against All Defendants**

147.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

148.    Ms. Vaughn is a Black woman and a member of a protected class under 42 U.S.C. § 1981.

149.    Defendants discriminated against Ms. Vaughn in violation of 42 U.S.C. § 1981 based on her race.

150.    Defendants subjected Ms. Vaughn to adverse treatment because of her race, including the denial of equal access to the premises and the services provided by Chase Bank, explicit refusal of service, treating Ms. Vaughn at all times with pronounced hostility, threats, and calling the police on her, and forcibly removing her from the premises under duress.

151.    But for Ms. Vaughn's race, she would have not been denied the right to enjoy all benefits, privileges, terms, and conditions of her contractual relationship as a Chase member.

152.    The effect of the practices complained of above has been to deprive Ms. Vaughn of the right to enjoy all the benefits, privileges, terms, and conditions of her contractual relationship as a Chase member and to deprive Ms. Vaughn of the full and equal benefit of the laws, because of her race.

153.    The unlawful discriminatory practices complained of above were intentional.

154.    The unlawful discriminatory practices complained of above were done with malice or reckless indifference to the federally protected rights of Ms. Vaughn.

155.    As a direct result of Defendant's actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

### THIRD CLAIM FOR RELIEF
**Negligent Infliction of Emotional Distress**
**Against All Defendants**

156.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

157.    In Colorado, to establish a claim for negligent infliction of emotional distress ("NEID") a plaintiff must show that : (1) the defendant's negligence (2) created an unreasonable risk of physical harm that (3) caused the plaintiff to be put in fear for his or her own safety, (4) the plaintiff either (a) suffered physical injury or (b) was in the "zone of danger" created by defendant's negligent conduct, (5) the plaintiff's fear had "physical consequences" or resulted in "long-continued emotional disturbance," and (6) that the plaintiff's fear was the cause of the damages sought. *Draper v. DeFrenchi-Gordineer*, 282 P.3d 489, 497 (Colo. App. 2011) (citing *Colwell v. Mentzer Investments, Inc.*, 973 P.2d 631 638 (Colo. App. 1998); *Culpepper v. Pearl Street Building, Inc.*, 877 P.2d 877, 880 n. 3 (Colo. 1994); *Towns v. Anderson*, 579 P.2d 1163, 1165 (Colo. 1978)).

158.    Ms. Pelech's conduct, as Defendant's agent, was negligent because she called the police falsely claiming that Ms. Vaughn was acting "aggressively" and videotaping the inside of the Branch and therefore, was trespassing. However, Ms. Vaughn was neither acting aggressively, threateningly, videotaping, nor trespassing in this place of public accommodation. A reasonable person would have known that sitting in the lobby and checking one's account on one's phone for

a few minutes as one prepared to do business before standing in the bank teller line is not trespassing.

159.   Ms. Pelech's conduct created an unreasonable risk of physical harm because she called the police and lied about Ms. Vaughn acting aggressively, videotaping, and unlawfully trespassing, which Ms. Vaughn was not.

160.   Indicating to the police, who had weapons when they entered the Chase branch and had the power to take violent action, that Ms. Vaughn was acting aggressively and unlawfully was dangerous and posed an unreasonable risk of physical harm to Ms. Vaughn.

161.   Ms. Vaughn, as a Black woman aware of the violent actions that have been taken against Black people during police interactions, was put in fear for her own safety when the police were called and when they arrived.

162.   Ms. Vaughn was in the zone of danger because she was in immediate risk of physical harm from Ms. Pelech's negligent conduct. Ms. Pelech's call to the police was about Ms. Vaughn, so the police interaction was directed at Ms. Vaughn while she was in the Chase branch.

163.   Ms. Vaughn's fear resulted in long-continued emotional disturbance, causing her to experience ongoing anxiety and stress, as well as causing her to become afraid to go into banks and public spaces in general. Ms. Vaughn's fear also had physical consequences including difficulty sleeping, as she continues to relive this traumatic experience from the bank when she tries to sleep.

164.   Ms. Vaughn's fear from this interaction was the cause of the damages sought.

165.   As a result of Defendants' actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**Defamation per se**
**Against All Defendants**

166.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

167.     In Colorado, the elements of defamation are: (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *Williams v. Dist. Court*, 866 P.2d 908,911 n.4 (Colo. 1993).

168.     Additionally, (1) the defamed party must prove the falsity of the statement by clear and convincing evidence, rather than by a mere preponderance; (2) the defamed party must prove that the speaker published the statement with actual malice—that is, with actual knowledge that the statement was false or with reckless disregard for whether the statement was true; and (3) the defamed party must establish actual damages to maintain the action, even if the statement is defamatory per se. *McIntyre v. Jones*, 194 P.3d 519, 524 (Colo. App. 2008).

169.     Defamation per se is actionable without proof of special damages where a libelous statement is: (1) on its face and without extrinsic proof, unmistakably recognized as injurious and (2) specifically directed at the plaintiff or identity. *Gordon v. Boyles*, 99 P.3d 75, 78–79 (Colo. App. 2004).

170.     The traditional categories of slander per se are imputation of (1) a criminal offense; (2) a loathsome disease; (3) a matter incompatible with the individual's business, trade, profession, or office; or (4) serious sexual misconduct." *Id*.

22

**A:41**

171.    Contrary to her 911 call, Ms. Vaughn was not criminally trespassing or acting aggressively or in a threatening manner. Nor was Ms. Vaughn violating any written video recording policies of Chase Bank.

172.    Not only did Ms. Pelech admit this to the police, who recorded it, but Chase's own security footage establishes this as well. Thus, Ms. Pelech's statement is demonstrably false by clear and convincing evidence.

173.    Ms. Pelech knew that Ms. Vaughn was not trespassing, given that Ms. Vaughn was a member of Chase, and Ms. Vaughn told her so.

174.    Ms. Pelech falsely accused Ms. Vaughn of engaging in criminal misconduct and threatening "aggressive" behavior.

175.    These false statements resulted in an extended police interaction and the threat of arrest.

176.    As a result of Defendants' actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

## V.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including but not limited to the following:

1.  Actual economic damages as established at trial;

2.  Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

23

**A:42**

3.   Punitive damages for all claims as allowed by law for all such claims where applicable;

4.   Exemplary damages for all claims as allowed by law for all such claims where applicable;

5.   Prejudgment and post-judgment interest at the highest lawful rate;

6.   Appropriate tax off-set;

7.   Attorneys' fees and costs; and

8.   Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED: August 11, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Iris Halpern*
Iris Halpern
Crist Whitney
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400
ih@rmlawyers.com
cw@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

24

**A:43**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of August 2023, I electronically filed the foregoing **COMPLAINT AND JURY DEMAND** with the Clerk of Court using the Colorado Courts E-Filing system to the following:

Naomi Beer
Sarah Mathews
GREENBERG TRAURIG, LLP
1144 15th Street Suite 3300
Denver, CO 80202
Telephone: 303.572.6512
Email: beern@gtlaw.com
mathewss@gtlaw.com

*Attorneys for Defendant*

*s/ Iris Halpern*
Iris Halpern

# EXHIBIT 1

| | |
|---|---|
| DISTRICT COURT, ARAPAHOE COUNTY, STATE OF COLORADO 7325 S. Potomac Street, Centennial, CO 80112 | DATE FILED: August 11, 2023 1:21 PM FILING ID: 1F8A4D2AF6365 CASE NUMBER: 2023CV31550 |
| **JEANETTA VAUGHN,** Plaintiff, v. **JP MORGAN CHASE & CO. d/b/a CHASE BANK; a corporation, and TRINA PELECH; an individual** Defendant. | ▲COURT USE ONLY▲ |
| ***Attorneys for Plaintiff:*** Iris Halpern (Reg. No. 53112) Crist Whitney (Reg. No. 56608) RATHOD \| MOHAMEDBHAI, LLC 2701 Lawrence St., Suite 100 Denver, CO 80205 T: (303) 578-4400 Email: ih@rmlawyers.com; cw@rmlawyers.com | Case No.: Division: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff Jeanetta Vaughn, by and through her undersigned counsel Iris Halpern and Crist

Whitney of Rathod | Mohamedbhai LLC, respectfully alleges for her Complaint and Jury Demand

as follows:

## **INTRODUCTION**

On the morning of June 9, 2022, Jeanetta Vaughn entered the JP Morgan Chase & Co.

Bank ("Chase") branch on 1101 South Buckley Road in Aurora, Colorado. Ms. Vaughn is a Black,

churchgoing, mother of three who spent her career at the Department of Veteran's Affairs. She has

1

**A:46**

been a longtime Chase member. As Ms. Vaughn entered the bank that day and took a seat in the lobby, Branch Manager Trina Pelech, who is White, immediately approached her, loudly asking Ms. Vaughn if she could help her with anything. Ms. Vaughn calmly responded that she needed no assistance and was just there for personal banking purposes. Instead of accepting Ms. Vaughn's response, Ms. Pelech told Ms. Vaughn that she was "not welcome" at Chase and called the police on her, accusing Ms. Vaughn of trespassing. When the police arrived and informed Ms. Pelech that Ms. Vaughn felt discriminated against, Ms. Pelech's telling response was "that's always the excuse…" Ms. Pelech ordered the police to remove Ms. Vaughn from the premises anyway.

As a result of Defendants unlawful and degrading treatment of Ms. Vaughn, she now brings claims under the Colorado Anti-Discrimination Act, for a violation of her Constitutional Rights to be free of race discrimination under 42 U.S.C. §1981, and state court torts for emotional distress and defamation. It is no trivial matter to call the police on a Black person, falsely accusing him or her of criminal misconduct, merely for engaging in routine and mundane chores the rest of us do daily. Inherent in such actions is the very real threat of arrest and physical violence; and doing so invokes the ghosts of segregation not long past when White citizens frequently exploited law enforcement to relegate Black citizens to second-class status, entrenching racist hierarchies and weaponizing the police to exclude Black citizens from the public sphere. Such discrimination must no longer be condoned.

## I.     PARTIES, JURISDICTION, AND VENUE

1.     At all times relevant to this Complaint, Plaintiff Jeanetta Vaughn was a legal resident of and domiciled in the State of Colorado.

2

A:47

2.      Defendant Chase Bank is a New York Corporation with a principal office street address in Delaware and principal office mailing address in New York, which at all times relevant to this Complaint has been duly registered with the Colorado Secretary of State to do business in the state of Colorado and has conducted such business in the state.

3.      Defendant Chase Bank's registered agent located at 19661 E. 48th Place, Denver, Colorado 80249.

4.      Defendant Chase operates many bank branches across the state, including a bank branch located at 1101 South Buckley Road in Aurora, Colorado.

5.      Defendant Trina Pelech is a resident of Colorado and at all relevant times hereto, she was personally involved in committing the discriminatory actions against Ms. Vaughn complained of herein.

6.      This Court has jurisdiction over this matter pursuant to C.R.S. § 13-1-124.

7.      Venue is proper pursuant to C.R.C.P. 98 as the allegations contained herein occurred within the boundaries of Arapahoe County.

## II.      ADMINISTRATIVE EXHAUSTION

8.      Ms. Vaughn filed a charge of discrimination with the Colorado Civil Rights Division ("CCRD") within sixty days of the discriminatory acts committed by Chase Bank.

9.      Ms. Vaughn alleged in her charge of discrimination that she was the victim of race discrimination within the meaning of the public accommodation provisions of the Colorado Anti-Discrimination Act ("CADA") and described the circumstances.

10.     The CCRD issued a notice of right to sue, upon Ms. Vaughn's request, on November 29, 2022.

3

**A:48**

11.     The parties signed several tolling agreements, with the final tolling agreement expiring on August 11, 2023.

12.     As a result, Ms. Vaughn is timely filing her CADA claims within the tolling period.

13.     None of Ms. Vaughn's other claims require administrative exhaustion.

### III.     FACTUAL ALLEGATIONS

14.     Plaintiff Jeanetta Vaughn is over sixty years of age, a Colorado resident, and a previous longtime federal government worker.

15.     Ms. Vaughn is also a Black woman.

16.     Ms. Vaughn earned her Bachelor of Science in Education.

17.     Ms. Vaughn has worked as a teacher, substitute teacher, at a bank, in hospitals, and in the aerospace field.

18.     Ms. Vaughn was employed with the Department of Veteran's Affairs, and had been employed with the federal government for nearly twelve years.

19.     Ms. Vaughn is a wife to James Vaughn Sr., and a mother to her son as well as to Mr. Vaughn's two sons.

20.     Ms. Vaughn prays daily and attends church regularly.

21.     Since 2019, Ms. Vaughn has been a dependable member of Chase, utilizing its banking services on many occasions.

**Chase Bank and Trina Pelech Discriminate Against Jeanetta Vaughn**

22.     On the morning of June 9, 2022, Ms. Vaughn drove to the Chase branch located at 1101 South Buckley Road in Aurora, Colorado to withdraw money from her Chase account, as she has routinely done in the past, and to obtain counter checks.

4

**A:49**

23. Ms. Vaughn entered the bank at 11:34am.

24. As Ms. Vaughn walked into the branch that morning, she sat down to unlock her Chase card as she typically does for security reasons.

25. Chase offers a personal banking service that allows customers to lock and unlock their debit card just in case the card is lost or stolen. This provides the Chase member additional security and allows them to instantly stop purchases or cash advances on their Chase card.

26. Ms. Vaughn, out of caution, locks and unlocks her Chase card between usage. Ms. Vaughn locks her bank card as a safety measure just in case she loses it. She noticed that businesses no longer ask for ID to make a purchase so she locks her card to ensure someone else could not make purchases.

27. There is a four-step process to unlock the card on the "Chase Mobile" phone application.

28. Before she could proceed with any transactions, she would need to log into the "Chase Mobile" phone application to unlock her card.

29. To avoid inconveniencing anyone, Ms. Vaughn sat in one of the branch's customer lobby chairs while she worked to unlock her card.

30. At 11:35am, while Ms. Vaughn proceeded to log into the "Chase Mobile" app to unlock her account, Chase Branch Manager Trina Pelech, a White female, approached Ms. Vaughn.

31. Ms. Pelech approached Ms. Vaughn less than ninety seconds after Ms. Vaughn sat down to unlock her card.

5

**A:50**

32.     Ms. Pelech loudly asked Ms. Vaughn whether she could help her with something, to which Ms. Vaughn responded that when she finished unlocking her card, she would get in line to speak with a bank teller.

33.     Instead of accepting Ms. Vaughn's response, Ms. Pelech raised her voice, told Ms. Vaughn that she did not need to be rude, and angrily told Ms. Vaughn that she was "not welcome" at the bank branch.

34.     Surprised by Ms. Pelech's tone, Ms. Vaughn said, "What are you talking about? I said I am doing business, trying to open up my account so I can get in line."

35.     Ms. Pelech did not ask Ms. Vaughn to see proof of membership.

36.     Instead, ignoring Ms. Vaughn, Ms. Pelech reiterated that, "You're not welcome here," and threatened to call the police.

37.     Shocked, Ms. Vaughn replied that she would sit and wait for the police to come so that they could record the events at the Chase branch.

38.     After Ms. Pelech threatened to call the police, Ms. Pelech claimed that Ms. Vaughn said, "go ahead, I'm going to videotape *you*."

39.     Ms. Vaughn, in fact, never videotaped Ms. Pelech.

40.     Ms. Vaughn also never indicated that she would videotape any bank operations or services.

41.     Ms. Pelech ordered Ms. Vaughn to leave the premises well before either of them ever discussed video recording the interaction.

42.     Ms. Pelech also stated that she would call the police on Ms. Vaughn before Ms. Vaughn mentioned anything about video recording.

43. The interaction between Ms. Vaughn and Ms. Pelech lasted less than a minute.

44. Their interaction was captured on the bank branch's video cameras.

45. At no point during their interaction did the Chase video footage show Ms. Vaughn videotaping Ms. Pelech or Chase branch procedures.

46. After Ms. Vaughn continued to sit patiently in the seat, Ms. Pelech huffed out of the lobby to call the police.

47. According to police records, Ms. Pelech did so at 11:36am.

48. While Ms. Pelech called the police, Ms. Vaughn proceeded to unlock her Chase card on the "Chase Mobile" app, texted her husband, James Vaughn Sr., to tell him what happened, and then called him, asking him to leave work and meet her at the bank.

49. After being informed about this extremely alarming situation, Mr. Vaughn said that he would drive to the Chase branch immediately, despite being at work and on the clock.

50. Also, around 11:40am, while Ms. Pelech called the police, Hayem Serra, a Chase employee, provided Ms. Vaughn with her own business card as well as the business card of Ms. Pelech, identifying Ms. Pelech as the Branch Manager and a Vice President.

51. On Ms. Pelech's 911 call, Ms. Pelech admitted that Ms. Vaughn told her that when she was ready, she would approach the bank teller.

52. Ms. Pelech then accused Ms. Vaughn of criminal trespass.

53. On the 911 call, Ms. Pelech also admitted that the only reason she ordered Ms. Vaughn to leave the branch was because she was being "rude" and "aggressive," and for no other reason.

7

**A:52**

54.     Chase falsely told the Colorado Civil Rights Division during the agency's investigation of Ms. Vaughn's charge that Ms. Vaughn pulled out her phone camera and began recording the interaction after being ordered to leave the branch.

55.     Ms. Vaughn never recorded Ms. Pelech, nor did she imply she would until after Ms. Pelech threatened to call the police on her.

56.     Chase also falsely told the Colorado Civil Rights Division during the agency's investigation that, "Ms. Pelech cautioned Ms. Vaughn that if Ms. Vaughn did not stop recording, she would have to leave, or Ms. Pelech would be forced to call the police."

57.     However, Ms. Pelech admitted in her 911 call that she ordered Ms. Vaughn to leave the branch only because she thought Ms. Vaughn was being rude.

58.     There is no dispute that Ms. Vaughn was not recording Ms. Pelech or anyone else at that time.

**Police Officers Arrive and Interrogate Ms. Vaughn**

59.     Ms. Vaughn remained seated until two Aurora police officers, Officer Timothy Gramse and Officer Donald Hickox, entered the Chase branch at around 11:46am.

60.     The two officers informed Ms. Vaughn that they were responding to a report of trespassing.

61.     Ms. Vaughn calmly and fully complied with the police officers' requests and answered their questions.

62.     At first, Ms. Vaughn feared for her life as the officers approached her.

8

**A:53**

63.     Ms. Vaughn understood that as a Black woman she needed to keep calm and deescalate the situation because the dangerous, oftentimes violent, consequences to Black victims when White individuals call law enforcement on Black individuals and accuse them of crimes.

64.     Ms. Vaughn hid her fears and explained to the police officers why she was in the Chase branch lobby, reiterating that she was a member and that she came to the Chase branch to conduct her bank transactions.

65.     She told the officers that after she told Ms. Pelech she was unlocking her card and would into line, Ms. Pelech told her "that she did not have to be rude." She then stated that she asked Ms. Pelech what she was talking about because she was just doing business and trying to unlock her account.

66.     Ms. Vaughn confirmed with the officers that Ms. Pelech told her that, "You're not welcomed here," and threatened to call the police on her.

67.     Ms. Vaughn then told the officers that her husband was on the way, and she was waiting for him to arrive.

68.     Officer Gramse proceeded to speak with Ms. Pelech in a back office.

69.     Ms. Pelech told Officer Gramse that it was her job to approach customers who sat in the lobby and ask if she could help them.

70.     Ms. Pelech alleged that Ms. Vaughn ignored her, so she asked again. Ms. Pelech then claimed that Ms. Vaughn immediately said, "Leave me alone, I'm busy, when I'm ready, I'll come up."

71.     Ms. Pelech made this statement while mimicking how Black women supposedly speak, with her hand raised, her neck swinging, and her face fixed into a scowl. These types of gestures are typical of the "Angry Black Woman" trope.

72.     Ms. Pelech told Officer Gramse that she said to Ms. Vaughn, "You're being very rude and if you can't be decent then you are welcome to leave."

73.     Ms. Pelech claimed she informed Ms. Vaughn that she had the right to make Ms. Vaughn leave after Ms. Vaughn protested that she did not.

74.     Then Ms. Pelech claimed that Ms. Vaughn allegedly stated, "Go ahead, I will videotape you."

75.     She then alleged, physically enacting the act for Officer Gramse, that Ms. Vaughn stuck her phone up at face level and started recording her.

76.     Chase video camera footage clearly shows that Ms. Vaughn did not pick her phone up and record Ms. Pelech in any such a manner.

77.     After answering several of Officer Gramse questions, Ms. Pelech flatly replied again, referring to Ms. Vaughn, that, "She is not welcome here."

78.     Officer Gramse refused to arrest or remove Ms. Vaughn, explaining to Ms. Pelech that, "The last resort is putting my hands on her, charging her with trespassing and throwing her out of the bank especially if she is a customer here."

79.     Officer Gramse then said, "She doesn't seem to be a danger to me."

80.     Ms. Pelech agreed and said, "No, I don't believe she is a danger."

81.     This statement is contrary to the statements Ms. Pelech made on the 911 call when she described Ms. Vaughn as "aggressive."

10

**A:55**

82.     When Ms. Pelech again added that Ms. Vaughn was rude, Officer Gramse said, "Being rude in the bank is not---"

83.     At that point, Ms. Pelech cutoff Officer Gramse and wouldn't listen to him, but Office Gramse later told Ms. Vaughn that he informed Ms. Pelech, "Being rude in the bank is not a matter for law enforcement."

84.     When Ms. Pelech over-spoke Office Gramse, cutting him off mid-sentence, she argued that Ms. Vaughn could not videotape in the bank. Officer Gramse asked if that was a bank policy. Ms. Pelech said it was a bank policy because it is a secure place and they don't want people "taking video of our procedures and robbing us later."

85.     There were no postings or other information available in the bank branch indicating or explaining to customers that video recording is prohibited on the premises.

86.     At any rate, Ms. Vaughn only indicated that she might videotape Ms. Pelech after Ms. Pelech threatened to call the police on her.

87.     According to even Ms. Pelech's own testimony, Ms. Vaughn also never alleged she would record bank procedures, only that she would videotape Ms. Pelech if made her leave.

88.     Officer Gramse left the office and spoke to Ms. Vaughn again.

89.     Ms. Vaughn, by this time, felt completely humiliated as other customers and employees stared at her, and some bank tellers even laughed at her.

90.     Ms. Vaughn, despite the humiliation she felt, continued to converse with the police officers in a calm manner so the police officers did not turn aggressive on the chance that she made any comments that might offend them or escalate the situation.

11

**A:56**

91.     Officer Gramse explained that Ms. Pelech felt Ms. Vaughn was trespassing and as a last resort Ms. Vaughn could be charged with trespassing.

92.     Obviously frustrated and deeply hurt and upset by the experience, Ms. Vaughn told the officers to charge her with trespassing. Officer Gramse, however, said he did not want to do that.

93.     Ms. Vaughn asked Officer Gramse why the chairs in the lobby were even there. Officer Gramse replied that it was a good question.

94.     Ms. Vaughn then asked Officer Gramse what reason Ms. Pelech had for telling her to leave the bank. Officer Gramse replied that Ms. Pelech claimed Ms. Vaughn was videotaping.

95.     Ms. Vaughn explained to Officer Gramse that she had only informed to Ms. Pelech that she would record her because Ms. Pelech was going to call the police.

96.     Ms. Vaughn further explained that she may have gestured as if she would videotape Ms. Pelech, but she never videotaped anything because the police had their own body-cameras.

97.     Officer Gramse asked again why Ms. Vaughn was at the bank, stating "Well, anybody could come in and say they're a customer of the bank and they were going to conduct business…even a homeless person that comes in here because it is raining out or whatever…"

98.     Ms. Vaughn asked Officer Gramse why he did not ask her for her ID to prove that she has an account there. Mr. Gramse said, "I could do that." He finally took her name and date of birth and wrote it down.

99.     No one throughout this whole experience ever asked Ms. Vaughn for proof of Chase membership, including Ms. Pelech.

100.    Ms. Vaughn explained again why she was there and explained to the officers why she needed counter checks.

101.    Ms. Vaughn also explained that she called her husband because Ms. Pelech had called the police on her.

102.    Officer Gramse asked Ms. Vaughn, "I hope you don't feel we were being rude to you." Ms. Vaughn explained that she did not think they had been rude because she has family in law enforcement and understood their job. She also added that these were the types of situations officers were called into where they were wasting their time. Officer Hickox smiled and nodded emphatically.

103.    Ms. Vaughn asked Officer Gramse whether she was being asked to leave and if so, she wanted Ms. Pelech to tell the officers that she needed to be removed.

104.    Officer Gramse went to the back office and told Ms. Pelech that if she still wanted Ms. Vaughn to leave, she will leave when her husband arrived.

105.    Officer Gramse then told Ms. Pelech that he believed Ms. Vaughn felt singled out because she was African American.

106.    Ms. Pelech dramatically rolled her eyes and stated, "That's always the excuse..."

107.    Officer Gramse then asked her whether she had anything posted in the bank that said there was no videotaping in the bank. Ms. Pelech replied, "No, but I told her. Obviously, she knew, to get a rise out of me."

108.    Ms. Pelech reiterated to Officer Gramse that, "I do have the authority to make her leave. I have been given that authority."

13

**A:58**

109.    Ms. Pelech further stated, "If you're going to threaten to videotape us and I say you're not allowed to and you're going to keep pointing it at me, then you're going to have to go."

110.    However, during her call to 911, Ms. Pelech did not state that Ms. Vaughn had "threatened" to record her. Instead, she told the dispatcher that Ms. Vaughn had started to record her.

111.    Furthermore, Chase's own video cameras do not show Ms. Vaughn pointing her phone and recording Ms. Pelech at any point in time during the less than one minute interaction the two of them had with each other before Ms. Pelech went to call the police.

112.    Officer Gramse informed Ms. Pelech that, "Well, we're not going to make her leave right now. She says she is a customer. We're going to go wait in our car for her husband to get here and then if you tell her to leave, she said she'll leave."

113.    Officer Gramse reiterated to Ms. Pelech that Ms. Vaughn was sitting there to unlock her card and Ms. Pelech then said, "This did not have to happen. All she had to do was let me know what she was doing without the snarky attitude and threatening me with video. I can help people all day long but you're not going to video *me*."

114.    Officer Gramse returned and told Ms. Vaughn they will wait in their patrol cars until Mr. Vaughn arrived.

115.    Shortly afterwards, Mr. Vaughn arrived, and briefly spoke with the police officers outside.

116.    Officer Hickox explained to Mr. Vaughn that there seemed to be an issue between the two women and Ms. Pelech dragged the officers into it.

14

**A:59**

117.    Officer Gramse explained that this was a trespass call, but they were not looking to charge Ms. Vaughn with anything.

118.    Officer Hickox said, "I would just add this, if she does feel like she was singled out or…for a lack of a better term discriminated against I would request the…because they have surveillance in this lobby of what transpired before we ever got there. That's something she can take up with Chase."

119.    Mr. Vaughn nodded then came inside with the officers to where Ms. Vaughn waited.

120.    The two officers wrote down the information for Ms. Vaughn to access the officer's bodycam footage. Officer Gramse said, "I am sorry this happened."

121.    Mr. Vaughn then left the Chase branch followed by Ms. Vaughn.

**Chase Bank's Long History of Discrimination Against Black Customers**

122.    Chase has a pattern of discriminatory treatment against its Black customers, giving voice to the adverse consequences of "banking while Black."

123.    On December 18, 2021, Dr. Malika Mitchell-Stewart, a Black woman, attempted to deposit a $16,000 check. In response, Chase staff members accused her of fraud and questioned her employment as a doctor, denying her services.

124.    In 2019, a former NFL player named Jimmy Kennedy attempted to become a "private client" with Chase and was given "the run-around" more than once. He recorded his conversation with a Chase employee, who said that Mr. Kennedy was "bigger than the average person" and "also an African-American." The employee also said "[w]e're in Arizona…[t]hey don't see people like you a lot."

15

**A:60**

125.    In a similar instance, also at an Arizona Chase bank, a Chase manager told a Black employee not to help a Black woman who received a $372,000 wrongful death settlement after her son died. The Black employee wanted to help the Black woman properly invest her money, however, his boss told the Black employee, "You've got somebody who's coming from Section 8, never had a nickel to spend, and now she's got $400,000. What do you think's going to happen with that money? It's gone." The Chase manager further added, "This is not money she respects. She didn't earn it."

126.    Also, on April 25, 2019, Chase employees in White Plains, New York called the police on Mount Vernon, New York's Mayor Richard Thomas, a Black man, as the Mayor attempted to deposit a six-figure check and get access to the City's online banking records. Mayor Thomas believed that his race certainly played a role in the Chase employees calling the police.

127.    Chase, in fact, admitted to receiving four complaints of racial discrimination since September 2021 at _the very same branch_ where the discrimination against Ms. Vaughn took place.

128.    Three of these complaints specify that they were made by Black customers.

129.    Black customers complained that they were discriminated against with regard to cashing a check, restrictions on their account, being asked additional identifying questions, and not receiving promotional credit for opening an account.

130.    Beyond Chase's customers, Chase has continued this discriminatory pattern with its own employees.

131.    In 2018, Chase came to a $24 million settlement with financial advisors who were discriminated against because they were Black by assigning them to poorer bank branches, understaffing them, and not including them in a program for wealthy clients.

16

**A:61**

## IV.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of Colorado Anti-Discrimination Act, C.R.S. § 24-34-601 et seq.**
**Discrimination on the Basis of Race**
**Against Chase Bank**

132.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

133.    Plaintiff has exhausted remedies by filing charges of discrimination with the CCRD.

134.    The Colorado Anti-Discrimination Act, C.R.S. § 24-34-601(2)(a), makes it unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of race, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of race.

135.    Under C.R.S. § 24-34-601(1) a "place of public accommodation" means any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public.

136.    Jeanetta Vaughn is a Black woman. Based on her race, Ms. Vaughn is a member of a class of citizens protected by CADA.

137.    On June 9, 2022, Ms. Vaughn entered Chase Bank for personal banking purposes.

138.     She had every right to be at that Chase Bank branch.

139.    Within minutes of her entering the lobby and sitting down in a chair provided to customers, Trina Pelech approached Ms. Vaughn and began to grill her about her assistance needs.

17

**A:62**

140.    When Ms. Vaughn responded that she did not need assistance and explained that she needed to unlock her card before standing in the bank teller line, Ms. Pelech told her that she did not need to be rude then raised her voice and angrily told Ms. Vaughn that she was "not welcome" in the bank. She then threatened to call the police on her.

141.    Ms. Pelech did in fact call the police and accused Ms. Vaughn of being "aggressive," "trespassing," and implied that Ms. Vaughn had been recording the bank operations before the call, when it is undisputed that Ms. Vaughn only suggested she'd record Ms. Pelech after Ms. Pelech threatened to call the police on her.

142.    Ms. Vaughn was denied the full and equal enjoyment of this banking service when Ms. Pelech told her that she was "not welcome" at the bank and called the police on her, requiring her to leave before she could complete her personal banking business.

143.    Defendant denied Ms. Vaughn the full and equal enjoyment of this banking service because she is Black.

144.    Defendant's conduct described herein violated the anti-discrimination laws of the State of Colorado and constitutes prohibited discriminatory practices thereunder.

145.    Defendant's conduct described herein was done with malice or reckless indifference of Ms. Vaughn's protected rights under state law.

146.    As a direct result of Defendant's actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1981
### Discrimination on the Basis of Race and/or Ethnicity/Alienage
### Against All Defendants

147.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

148.    Ms. Vaughn is a Black woman and a member of a protected class under 42 U.S.C. § 1981.

149.    Defendants discriminated against Ms. Vaughn in violation of 42 U.S.C. § 1981 based on her race.

150.    Defendants subjected Ms. Vaughn to adverse treatment because of her race, including the denial of equal access to the premises and the services provided by Chase Bank, explicit refusal of service, treating Ms. Vaughn at all times with pronounced hostility, threats, and calling the police on her, and forcibly removing her from the premises under duress.

151.    But for Ms. Vaughn's race, she would have not been denied the right to enjoy all benefits, privileges, terms, and conditions of her contractual relationship as a Chase member.

152.    The effect of the practices complained of above has been to deprive Ms. Vaughn of the right to enjoy all the benefits, privileges, terms, and conditions of her contractual relationship as a Chase member and to deprive Ms. Vaughn of the full and equal benefit of the laws, because of her race.

153.    The unlawful discriminatory practices complained of above were intentional.

154.    The unlawful discriminatory practices complained of above were done with malice or reckless indifference to the federally protected rights of Ms. Vaughn.

19

**A:64**

155.    As a direct result of Defendant's actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress**
**Against All Defendants**

156.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

157.    In Colorado, to establish a claim for negligent infliction of emotional distress ("NEID") a plaintiff must show that : (1) the defendant's negligence (2) created an unreasonable risk of physical harm that (3) caused the plaintiff to be put in fear for his or her own safety, (4) the plaintiff either (a) suffered physical injury or (b) was in the "zone of danger" created by defendant's negligent conduct, (5) the plaintiff's fear had "physical consequences" or resulted in "long-continued emotional disturbance," and (6) that the plaintiff's fear was the cause of the damages sought. *Draper v. DeFrenchi-Gordineer*, 282 P.3d 489, 497 (Colo. App. 2011) (citing *Colwell v. Mentzer Investments, Inc.*, 973 P.2d 631 638 (Colo. App. 1998); *Culpepper v. Pearl Street Building, Inc.*, 877 P.2d 877, 880 n. 3 (Colo. 1994); *Towns v. Anderson*, 579 P.2d 1163, 1165 (Colo. 1978)).

158.    Ms. Pelech's conduct, as Defendant's agent, was negligent because she called the police falsely claiming that Ms. Vaughn was acting "aggressively" and videotaping the inside of the Branch and therefore, was trespassing. However, Ms. Vaughn was neither acting aggressively, threateningly, videotaping, nor trespassing in this place of public accommodation. A reasonable person would have known that sitting in the lobby and checking one's account on one's phone for

20

**A:65**

a few minutes as one prepared to do business before standing in the bank teller line is not trespassing.

159.    Ms. Pelech's conduct created an unreasonable risk of physical harm because she called the police and lied about Ms. Vaughn acting aggressively, videotaping, and unlawfully trespassing, which Ms. Vaughn was not.

160.    Indicating to the police, who had weapons when they entered the Chase branch and had the power to take violent action, that Ms. Vaughn was acting aggressively and unlawfully was dangerous and posed an unreasonable risk of physical harm to Ms. Vaughn.

161.    Ms. Vaughn, as a Black woman aware of the violent actions that have been taken against Black people during police interactions, was put in fear for her own safety when the police were called and when they arrived.

162.    Ms. Vaughn was in the zone of danger because she was in immediate risk of physical harm from Ms. Pelech's negligent conduct. Ms. Pelech's call to the police was about Ms. Vaughn, so the police interaction was directed at Ms. Vaughn while she was in the Chase branch.

163.    Ms. Vaughn's fear resulted in long-continued emotional disturbance, causing her to experience ongoing anxiety and stress, as well as causing her to become afraid to go into banks and public spaces in general. Ms. Vaughn's fear also had physical consequences including difficulty sleeping, as she continues to relive this traumatic experience from the bank when she tries to sleep.

164.    Ms. Vaughn's fear from this interaction was the cause of the damages sought.

165.    As a result of Defendants' actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

21

**A:66**

### FOURTH CLAIM FOR RELIEF
**Defamation per se**
**Against All Defendants**

166.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

167.    In Colorado, the elements of defamation are: (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *Williams v. Dist. Court*, 866 P.2d 908,911 n.4 (Colo. 1993).

168.    Additionally, (1) the defamed party must prove the falsity of the statement by clear and convincing evidence, rather than by a mere preponderance; (2) the defamed party must prove that the speaker published the statement with actual malice—that is, with actual knowledge that the statement was false or with reckless disregard for whether the statement was true; and (3) the defamed party must establish actual damages to maintain the action, even if the statement is defamatory per se. *McIntyre v. Jones*, 194 P.3d 519, 524 (Colo. App. 2008).

169.    Defamation per se is actionable without proof of special damages where a libelous statement is: (1) on its face and without extrinsic proof, unmistakably recognized as injurious and (2) specifically directed at the plaintiff or identity. *Gordon v. Boyles*, 99 P.3d 75, 78–79 (Colo. App. 2004).

170.    The traditional categories of slander per se are imputation of (1) a criminal offense; (2) a loathsome disease; (3) a matter incompatible with the individual's business, trade, profession, or office; or (4) serious sexual misconduct." *Id*.

22

**A:67**

171.    Contrary to her 911 call, Ms. Vaughn was not criminally trespassing or acting aggressively or in a threatening manner. Nor was Ms. Vaughn violating any written video recording policies of Chase Bank.

172.    Not only did Ms. Pelech admit this to the police, who recorded it, but Chase's own security footage establishes this as well. Thus, Ms. Pelech's statement is demonstrably false by clear and convincing evidence.

173.    Ms. Pelech knew that Ms. Vaughn was not trespassing, given that Ms. Vaughn was a member of Chase, and Ms. Vaughn told her so.

174.    Ms. Pelech falsely accused Ms. Vaughn of engaging in criminal misconduct and threatening "aggressive" behavior.

175.    These false statements resulted in an extended police interaction and the threat of arrest.

176.    As a result of Defendants' actions, Ms. Vaughn has suffered significant injuries, damages, and losses to be determined at trial.

### V.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including but not limited to the following:

1.  Actual economic damages as established at trial;

2.  Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

23

**A:68**

3.  Punitive damages for all claims as allowed by law for all such claims where applicable;

4.  Exemplary damages for all claims as allowed by law for all such claims where applicable;

5.  Prejudgment and post-judgment interest at the highest lawful rate;

6.  Appropriate tax off-set;

7.  Attorneys' fees and costs; and

8.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED: August 11, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Iris Halpern*
Iris Halpern
Crist Whitney
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400
ih@rmlawyers.com
cw@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

24

**A:69**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of August 2023, I electronically filed the foregoing **COMPLAINT AND JURY DEMAND** with the Clerk of Court using the Colorado Courts E-Filing system to the following:

Naomi Beer
Sarah Mathews
GREENBERG TRAURIG, LLP
1144 15th Street Suite 3300
Denver, CO 80202
Telephone: 303.572.6512
Email: beern@gtlaw.com
        mathewss@gtlaw.com


*Attorneys for Defendant*


*s/ Iris Halpern*
Iris Halpern

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Number:  1:23-cv-02266

JEANETTA VAUGHN,

     Plaintiff,

v.

JP MORGAN CHASE & CO. D/B/A CHASE BANK; A
CORPORATION, AND
TRINA PELECH; AN INDIVIDUAL

     Defendants.

_____

**MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**
_____

**TABLE OF CONTENTS**

CONFERRAL - D.C.COLO.CIV.R. 7.1(A) ................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

    I.       FACTUAL AND PROCEDURAL BACKGROUND .......................................... 2

           A.    Plaintiff Agreed To The DAA When Opening Her Account ................... 2
           B.    The DAA Contains a Binding Arbitration Provision ............................... 3
           C.    Plaintiff's Claims and Reliance on her Agreement With Chase ............... 4

    II.      ARGUMENT ................................................................................................... 5

           A.    This Court Should Compel Arbitration of Plaintiff's Claims
                Pursuant to the DAA. ............................................................................ 5

                1.    Plaintiff Entered Into a Valid Agreement to Arbitrate .................. 6
                2.    The DAA Contains a Broad Arbitration Clause That
                      Creates a Presumption of Arbitrability ......................................... 8
                3.    Each of Plaintiff's Claims Arise or Relate to the DAA ............... 10

                      a.    Section 1981 Claim .......................................................... 11
                      b.    CADA Claim ...................................................................... 12
                      c.    Negligent Infliction of Emotional Distress and
                          Defamation Per Se ............................................................. 13

           B.    Defendant Trina Pelech is Entitled to Enforce The Agreement to
                 Arbitrate. ............................................................................................... 14

    III.    THIS ACTION SHOULD BE STAYED PENDING ARBITRATION ............... 15

CONCLUSION ........................................................................................................ 15

i

**A:72**

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adair Bus Sales v. Blue Bird Corp.*,
  25 F.3d 953 (10th Cir. 1994) ............................................................................15

*Anonymous v. JP Morgan Chase & Co.*,
  2005 WL 2861589 (S.D.N.Y. Oct. 31, 2005) ...................................................8

*AT&T Techs, Inc. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986) ......................................................................................8, 10

*Avedon Engineering v. Seatex*,
  126 F.3d 1279 (10th Cir. 1997) ........................................................................6

*Barfield v. Com. Bank, N.A.*,
  484 F.3d 1276 (10th Cir. 2007) (analogizing Section 1981 case involving a
  bank to cases involving retail transactions) ...............................................11

*Brown v. Coleman Co., Inc.*,
  220 F.3d 1180 (10th Cir. 2000) ......................................................................10

*Cavlovic v. J.C. Penney Corp.,Inc.*,
  884 F.3d 1051 (10th Cir. 2018) ........................................................................9

*Chelsea Fam. Pharmacy, PLLC v. Medco Health Sols., Inc.*,
  567 F.3d 1191 (10th Cir. 2009) ........................................................................9

*Clark v. Safeway, Inc.*,
  478 F. Supp. 3d 1080 (D. Or. 2020) ...............................................................11

*Clowdis v. Colorado Hi-Tec Moving & Storage*, *Inc.*,
  2011 WL 5882191 (D. Colo. Nov. 3, 2011), *recommendation adopted*, 2012
  WL 895701 (D. Colo. Mar. 15, 2012) ..............................................................5

*Comanche Indian Tribe of Okla. v. 49, L.L.C.*,
  391 F.3d 1129 (10th Cir. 2004) ........................................................................5

*Coors Brewing Co. v. Molson Breweries*,
  51 F.3d 1511 (10th Cir. 1995) ..........................................................................5

*Cornell v. Harmony Homes, Inc.*,
  2007 WL 38132 (D. Colo. Jan. 4, 2007).......................................................5, 6

*Cummings v. FedEx Ground Package Sys., Inc.*,
  404 F.3d 1258 (10th Cir. 2005) ...................................................................8, 10

*Dean Witter Reynolds, Inc. v. Byrd*,
  470 U.S. 213 (1985)..........................................................................................15

ii

**A:73**

*Dill v. JPMorgan Chase Bank, N.A.*,
 2020 WL 4345755 (S.D.N.Y. July 29, 2020) ..........................................................................9

*Doe v. Coll. Bd.*,
 440 F. Supp. 3d 349 (S.D.N.Y. 2020)......................................................................................8

*Epic Sys. Corp. v. Lewis*,
 138 S. Ct. 1612 (2018)..............................................................................................................5

*Flores v. Bank of Am.*,
 2019 WL 2470923 (D. Colo. June 13, 2019) ..........................................................................6

*Frazier v. Western Union Co.*,
 377 F. Supp. 3d 1248 (D. Colo. 2019)......................................................................................6

*Hampton v. Dillard Dep't Stores, Inc.*,
 247 F.3d 1091 (10 Cir. 2001), *cert. denied*, 534 U.S. 1131 (2002)........................................11

*Hancock v. Am. Tel. & Tel. Co.*,
 701 F.3d 1248 (10th Cir. 2012) ...........................................................................................5, 7

*Island Peak Ranch, Ltd. Liab. Co. v. FIIK Inv. & Holdings, Inc.*,
 2008 U.S. Dist. LEXIS 51474 (D. Utah July 7, 2008) ..........................................................12

*Johnson v. JPMorgan Chase Bank, N.A.*,
 2018 WL 4726042 (C.D. Cal. Sept. 18, 2018) ........................................................................7

*KPA Promotion & Awards, Inc. v. JPMorgan Chase & Co.*,
 2021 WL 1317163 (S.D.N.Y. Apr. 8, 2021)......................................................................7, 10

*Lindley Constr., Inc. v. Bank of the W.*,
 2016 U.S. Dist. LEXIS 194470 (D. Wyo. July 18, 2016) .......................................................7

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Coors*,
 357 F. Supp. 2d 1277 (D. Colo. 2004)...................................................................................15

*Mitsubishi Motors v. Soler Chrysler–Plymouth, Inc.*,
 473 U.S. 614 (1985)...............................................................................................................10

*Morris v. Dillard Dep't Stores, Inc.*,
 277 F.3d 743 (5th Cir. 2001) .................................................................................................11

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
 460 U.S. 1 (1983)......................................................................................................................8

*Novak v. JP Morgan Chase Bank, NA*,
 2008 WL 907380 (E.D. Mich. Mar. 31, 2008) ........................................................................7

*P&P Indus., Inc. v. Sutter Corp.*,
 179 F.3d 861 (10th Cir. 1999) ............................................................................................9, 11

*Pace v. First Nat'l Bank of Osawatomie*,
 404 F.2d 52 (10th Cir. 1968) ....................................................................................................6

iii

A:74

*Pelligrino v. Morgan Stanley Smith Barney LLC*,
   2018 WL 2452768 (S.D.N.Y. May 31, 2018) ..........................................................8

*Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.*,
   157 F.3d 775 (10th Cir. 1998) ...............................................................................15

*Sanchez v. J.P. Morgan Chase Bank, N.A.*,
   2014 WL 4063046 (S.D. Fla. Aug. 15, 2014).........................................................7

*Sanchez v. Nitro–Lift Techs., L.L.C.*,
   762 F.3d 1139 (10th Cir. 2014) ...............................................................................9

*Scott v. JPMorgan Chase & Co.*,
   2014 WL 338753 (S.D.N.Y. Jan. 30, 2014), *aff'd*, 603 F. App'x 33 (2d Cir.
   2015) ........................................................................................................................7

*Sha-Poppin Gourmet Popcorn LLC v. JPMorgan Chase Bank, N.A.*,
   553 F. Supp. 3d 452 (N.D. Ill. 2021)......................................................................7

*Soc'y of Pro. Eng'g Employees in Aerospace v. Spirit Aerosystems, Inc.*,
   681 F.App'x 717 (10th Cir. 2017) .........................................................................10

*Spencer v. TICI LLC*,
   2023 WL 2214530 (D. Colo. Feb. 24, 2023) .........................................................14

*St. Charles v. Sherman & Howard*,
   2015 WL 1887758 (D. Colo. Apr. 24, 2015)..........................................................10

*Stark v. Resolution Tr. Corp.*,
   856 F. Supp. 1509 (D. Kan. 1994) ...........................................................................6

*Sunmonu v. Chase Bank, N.A.*,
   2019 WL 1258788 (D. Md. Mar. 19, 2019)...........................................................7, 9

*Taylor Anderson, LLP v. U.S. Bank Nat'l Ass'n*,
   2014 WL 1292804 (D. Colo. Mar. 31, 2014) ...........................................................6

*United States v. Bank of Am.*,
   2009 WL 2009022 (W.D.N.Y. Feb. 20, 2009) .........................................................7

*Vernon v. Qwest Communs. Int'l, Inc.*,
   857 F. Supp. 2d 1135 (D. Colo. 2012).....................................................................6

*Weller v. HSBC Mortg. Services, Inc.*,
   971 F. Supp. 2d 1072 (D. Colo. 2013).....................................................................15

*Whispering Pines W. Condo. Homeowners Ass'n v. Certain Underwriters at
   Lloyd's, London*,
   2020 U.S. Dist. LEXIS 39121 (D. Colo. Mar. 6, 2020) ...........................................9

iv

A:75

**State Cases**

*City & Cty. of Denver v. Dist. Court In & For City & Cty. of Denver*,
939 P.2d 1353 (Colo. 1997)................................................................................9

*David v. Mfrs. Hanover Tr. Co.*,
59 Misc. 2d 248 (App. Term 2d Dep't 1969)........................................................7

*English v. Griffith*,
99 P.3d 90 (Colo. App. 2004)............................................................................13

*L.S.S. v. S.A.P.*,
523 P.3d 1280, 1288 (Colo.App., 2022)...........................................................13

*Marquardt v. Perry*,
200 P.3d 1126 (Colo. App. 2008)........................................................................6

**Federal Statutes**

9 U.S.C. § 2...........................................................................................................5

9 U.S.C. § 3......................................................................................................5, 15

42 U.S.C. § 1981...................................................................................................4

**State Statutes**

Colo. Rev. Stat. § 24-34-601 (2016)...................................................................12

**Rules**

D.C. COLO. L. Civ. R. 7.1(a).................................................................................1

Fed. R. Civ. P. 12..................................................................................................1

v

**A:76**

Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1, JPMorgan Chase Bank, N.A. ("Chase")[1] and Trina Pelech (collectively, "Defendants"), through their counsel, move for an order compelling Plaintiff Jeanetta Vaughn to arbitrate her claims pursuant to binding contractual arbitration provisions and to stay this proceeding until that arbitration is complete (the "Motion").[2]

## CONFERRAL - D.C.COLO.CIV.R. 7.1(A)

On September 13, 2023, pursuant to D.C.COLO.L.Civ.R. 7.1(a), counsel for both parties conferred regarding the relief sought in this Motion. Plaintiff's counsel opposes this Motion.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This action should be stayed because a binding arbitration provision exists that covers this dispute. Federal courts across the country have repeatedly enforced the arbitration provision that Plaintiff agreed to here, and analogous agreements have been enforced in this Circuit. This Court can and should similarly enforce this same provision.

Plaintiff, a Chase accountholder, alleges she was attempting to make transactions drawn from her Chase bank account (the "Account") in a local Chase branch (the "Branch"). She claims the branch manager, Trina Pelech, unjustifiably called for police assistance because Plaintiff was videoing in the Branch against Chase policy. Plaintiff alleges Pelech's call to the police was discriminatory and impeded her transaction at the Branch to which she was entitled as a customer.

Plaintiff's relationship with Chase is governed by a Deposit Account Agreement (the "DAA") that she assented to when she opened the Account. The arbitration provision in the DAA is unequivocally broad: it binds Plaintiff to arbitrate "any dispute relating in any way to [her]

---

[1] Chase is incorrectly named as J.P. Morgan Chase Bank and Co.
[2] Defendants reserve all rights and defenses they may have with respect to the pleading and merits of Plaintiff's claims, including to file early dispositive motions under Fed. R. Civ. P. 12.

1

Account or transactions [and] [a]ny claims or disputes arising from or relating to this agreement." Plaintiff's claims fall squarely within this broad scope: her claims are expressly tied to the DAA and the alleged events at issue occurred in connection with a branch visit to perform a transaction and that transaction was not able to be performed.

Defendant Trina Pelech is also entitled to enforce Plaintiff's agreement to arbitrate either as a third-party beneficiary or because of her close nexus to the claims. The DAA makes clear on its face that "[i]f a third party is also involved in a Claim between you and us, then the Claim will be decided with respect to the third party in arbitration as well." Pelech falls squarely within this language: she is the Chase employee with whom Plaintiff interacted.

Because of the valid and binding nature of the DAA, and the federal policy favoring arbitration for dispute resolution, Defendants respectfully request that the Court compel arbitration on Plaintiff's claims for relief and stay this case pending arbitration completion.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Plaintiff Agreed To The DAA When Opening Her Account

Plaintiff Jeanetta Vaughn opened her Account with Chase on February 5, 2021, in-person at the Quincy and Buckley Chase Branch in Aurora, Colorado. Stover Decl. ¶ 5. Plaintiff needed to, and did, complete the "Click to Sign" account opening process to open her new Account and has a Personal Electronic Signature Card issued for her Account. *Id*. at ¶¶ 7, 9-11, 14. As part of these steps, Plaintiff was required to personally scroll through and acknowledge the terms of the DAA governing her new account by personally clicking a conspicuous "Acknowledge" button. *Id*.

2

**A:78**

at ¶¶ 17-21.[3] Each Personal Electronic Signature Card acknowledged receipt of the DAA and agreement to "be bound by the terms and conditions contained therein as amended from time to time." *Id.* at ¶ 21, *Id.* at Ex. A at 1.[4] Subsequent updates to the DAA were made available to Plaintiff after she opened her Account. Deck. Decl. ¶¶ 3, 5-9.

### B.  The DAA Contains a Binding Arbitration Provision

The DAA in place at the time Plaintiff opened her Account provides as follows:

> You and we agree that upon the election of either of us, ***any dispute relating in any way to your account or transactions*** will be resolved by binding arbitration as discussed below, and not through litigation in any court (except for matters in small claims court).
> . . .
> YOU HAVE A RIGHT TO OPT OUT OF THIS AGREEMENT TO ARBITRATE, AS DISCUSSED BELOW. UNLESS YOU OPT OUT OF ARBITRATION, YOU AND WE ARE WAIVING THE RIGHT TO HAVE OUR DISPUTE HEARD BEFORE A JUDGE OR JURY, OR OTHERWISE TO BE DECIDED BY A COURT OR GOVERNMENT TRIBUNAL . . .

*Id.* at ¶¶ 5, 9, Ex. A at 24 (emphasis added, caps in original). This arbitration provision covers claims or disputes arising from or related to the DAA, the Account, or transactions, noting:

> Claims or disputes between you and us ***about your deposit account***, ***transactions involving your deposit account***, safe deposit box, *and any related service with us are subject to arbitration*. ***Any claims or disputes arising from or relating to this agreement***, any prior account agreement between us, or the advertising, the application for, or the approval or establishment of your account are also included.  Claims are subject to arbitration, regardless of what theory they are based on or whether they seek legal or equitable remedies.  Arbitration applies to any and all such claims or disputes, whether they arose in the past, may currently exist, or may arise in the future. . . .

*Id.* Ex. A at 24 (emphases added). The DAA outlines procedures for arbitration. *Id.* at 24-25.

---

[3] The DAA confirms it is the agreement "that governs" the Account. *See* Deck. Decl. Ex. A at 5, Ex. B at 5, and Ex. C at 5 (noting the DAA is the "basic agreement" between the accountholder and Chase and "[b]y signing a signature card . . . or by using any of our deposit account services, you and anyone else identified as an owner of the account agree to the terms in this agreement."). Plaintiff regularly uses her Account, including recently. Stover Decl. ¶ 8.

[4] A visual depiction of the flow and sequence of Chase's "Click to Sign" account opening process in 2021 when Plaintiff opened her Account is annexed to the Stover Decl. at Ex. B.

Subsequent versions of the DAA have substantially similar binding arbitration provisions, including in the versions in effect when Plaintiff attempted her transaction on June 9, 2022, and when she filed her claims against Defendants. *Id*. at ¶¶ 4-8, Ex. B at 25-26, Ex. C at 25-26. Plaintiff ratified her acceptance of the DAA, as amended, as she continued to use her Account. Stover Decl. ¶ 21. The DAA permitted Plaintiff to "opt out" of arbitration by notifying Chase of such election within 60 days of opening her Account by calling a toll-free number or contacting a Chase banker. Garrett Decl. ¶ 2, Deck Decl. Ex. A at 24. Chase tracks DAA opt-out requests, and its records do not reflect any opt-out request from Plaintiff. Garrett Decl. ¶¶ 3-4.

### C.  Plaintiff's Claims and Reliance on her Agreement With Chase

Plaintiff filed her Complaint in the Arapahoe County District Court on August 11, 2023, asserting four causes of action against both Defendants: (1) violations of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-601 *et seq.*; (2) violations of 42 U.S.C. § 1981 on the basis of race; (3) negligent infliction of emotional distress; and (4) defamation *per se*. Defendants removed the action to this Court on September 5, 2023. Plaintiff concedes she is a Chase customer and that she visited the branch on June 9, 2022. Compl. ¶¶ 21-22. She alleges she sat down in the Chase lobby to "unlock" her Account from her Chase mobile application. *Id.* ¶ 29. However, before she could do so, and before approaching the teller line, Plaintiff avers Pelech called the police because Plaintiff was videoing in the Branch against Chase policy.[5] *Id.* ¶¶ 30-37. The police arrived and talked to Plaintiff and Pelech. *Id.* ¶ 59. Plaintiff alleges she told the police she was at the Branch to obtain counter checks drawn from her Account. *Id.* ¶ 100. One must have an account at Chase

---

[5] Plaintiff's version of facts as set forth in the Complaint is disputed. However, for the purpose of analyzing the issues in this Motion, Defendants only include Plaintiff's facts as alleged.

to obtain a counter check. Stover Decl. ¶ 30. As discussed below, Plaintiff's claims all fall squarely within the claims subject to, and governed by, the DAA's arbitration provision.

## II.  <u>ARGUMENT</u>

### A.  This Court Should Compel Arbitration of Plaintiff's Claims Pursuant to the DAA.

This Motion to Compel Arbitration is governed by the Federal Arbitration Act ("FAA"). The FAA provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Per that statutory mandate, the Supreme Court has held that the FAA established "a liberal federal policy favoring arbitration agreements" and that courts must "rigorously enforce" them "according to their terms." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018); *Comanche Indian Tribe of Okla. v. 49, L.L.C.*, 391 F.3d 1129, 1131 (10th Cir. 2004) (The FAA "manifests a liberal federal policy favoring arbitration.") (internal quotations omitted); *Coors Brewing Co. v. Molson Breweries,* 51 F.3d 1511, 1514 (10th Cir. 1995) ("There is a strong federal policy favoring arbitration for dispute resolution."). Therefore, if there is uncertainty as to whether a claim is arbitrable, "[a]ll doubts are to be resolved in favor of arbitrability." *Id.* (internal quotes omitted).

When a party brings a motion to compel arbitration, the court must determine: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement. *Cornell v. Harmony Homes, Inc.*, 2007 WL 38132, *2 (D. Colo. Jan. 4, 2007). If the answer to both of these questions is yes, then the court is required to compel arbitration and stay the action pending arbitration.  *See* 9 U.S.C. §§ 2, 3.

The Tenth Circuit resolves motions to compel arbitration under a summary-judgment-type framework. *See Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012); *Clowdis*

5

**A:81**

*v. Colorado Hi-Tec Moving & Storage*, *Inc.*, 2011 WL 5882191, at *4 & n.4 (D. Colo. Nov. 3, 2011), *recommendation adopted*, 2012 WL 895701 (D. Colo. Mar. 15, 2012). Under this standard, Defendants must present evidence sufficient to demonstrate an enforceable arbitration agreement. If Defendants meet this standard, "the burden shifts to Plaintiff to raise a genuine issue of material fact as to the making of the agreement." *Vernon v. Qwest Communs. Int'l, Inc.*, 857 F. Supp. 2d 1135, 1148 (D. Colo. 2012).

### 1.  Plaintiff Entered Into a Valid Agreement to Arbitrate.

"The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedon Engineering v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997). The Tenth Circuit "relies on state law principles of contract formation to determine whether parties have agreed to arbitrate an issue or claim." *Frazier v. Western Union Co.*, 377 F. Supp. 3d 1248, 1257 (D. Colo. 2019); *Cornell*, 2007 WL 38132, at *3 ("State contract law principles govern determination of whether a valid arbitration agreement exists."). Under Colorado law, a "contract is formed when an offer is made and accepted and the agreement is supported by consideration." *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008) (internal citations omitted). Colorado district courts have treated Deposit Agreements as valid contracts. *See Taylor Anderson, LLP v. U.S. Bank Nat'l Ass'n*, 2014 WL 1292804, at *1 (D. Colo. Mar. 31, 2014); *Flores v. Bank of Am.*, 2019 WL 2470923, at *3 (D. Colo. June 13, 2019).

Courts in this Circuit and across the country routinely hold that signing a signature card when opening a bank account, like Plaintiff did here, demonstrates assent. *See, e.g.*, *Pace v. First Nat'l Bank of Osawatomie*, 404 F.2d 52, 54 (10th Cir. 1968) (signature card treated as contract); *Stark v. Resolution Tr. Corp.*, 856 F. Supp. 1509, 1510 (D. Kan. 1994) (contract interpretation as

6

**A:82**

applied to signature card); *Lindley Constr., Inc. v. Bank of the W.*, 2016 U.S. Dist. LEXIS 194470, at *12 (D. Wyo. July 18, 2016) (noting that signature cards are a "written agreement"); *see also United States v. Bank of Am.*, 2009 WL 2009022, at *6 (W.D.N.Y. Feb. 20, 2009) (applying New York law, citing *David v. Mfrs. Hanover Tr. Co.*, 59 Misc. 2d 248, 248 (App. Term 2d Dep't 1969)) ("the terms set forth in [a] signature card executed by [a] plaintiff depositor and the statements of account which are referred to therein constitute[] a valid contract between the [] depositor and defendant bank").[6] Indeed, courts have regularly enforced the very same Chase DAA arbitration provision at issue in this case, where, as here, evidence was submitted that the depositors signed signature cards incorporating the DAA and/or received copies of the DAA.  *See, e.g.*, *KPA Promotion & Awards, Inc. v. JPMorgan Chase & Co.*, 2021 WL 1317163, at *1-2, *4 (S.D.N.Y. Apr. 8, 2021) (compelling arbitration where Chase established "that plaintiffs agreed to the terms of the DAA … when they opened accounts").[7]

  Here, Plaintiff agreed to arbitrate her claims during the account opening process for her Account. Specifically, when Plaintiff applied for her Account, she was offered services subject to the terms and conditions of the DAA and accepted Chase's offer by (1) completing the "Click to Sign" process and affirmatively clicking a button acknowledging her receipt and acceptance of the

---

[6] That Plaintiff electronically signed her signature card makes no difference to this Court's analysis. *Hancock*, 701 F.3d at 1257 (arbitration clause valid when "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers").

[7] *See also Scott v. JPMorgan Chase & Co.*, 2014 WL 338753, at *2-3, *10-11 (S.D.N.Y. Jan. 30, 2014) (similar), *aff'd*, 603 F. App'x 33 (2d Cir. 2015); *Sha-Poppin Gourmet Popcorn LLC v. JPMorgan Chase Bank, N.A.*, 553 F. Supp. 3d 452, 457 (N.D. Ill. 2021); *Sunmonu v. Chase Bank, N.A.*, 2019 WL 1258788, at *2 (D. Md. Mar. 19, 2019) (rejecting plaintiff's argument that "Chase Bank 'is unable to prove … the existence of a valid and binding agreement between the parties'" where evidence included signed signature cards "indicating [plaintiff's] assent" to the DAA); *Johnson v. JPMorgan Chase Bank, N.A.*, 2018 WL 4726042, at *3-4 (C.D. Cal. Sept. 18, 2018); *Sanchez v. J.P. Morgan Chase Bank, N.A.*, 2014 WL 4063046, at *2-3 (S.D. Fla. Aug. 15, 2014); *Novak v. JP Morgan Chase Bank, NA*, 2008 WL 907380, at *5 (E.D. Mich. Mar. 31, 2008).

DAA and (2) electronically signing a Personal Electronic Signature card stating she acknowledged receipt of and "agree[d] to be bound by the terms and conditions of the DAA." *See supra* at 2-5.

Plaintiff also assented to the DAA's arbitration provision by her continual use of her Chase account. Stover Decl. ¶¶ 8, 21; *Anonymous v. JP Morgan Chase & Co.*, 2005 WL 2861589, at *4 (S.D.N.Y. Oct. 31, 2005) (holding valid arbitration agreement because "plaintiff used [his] Chase card and made payments to Chase for that use for several months"). Moreover, Plaintiff was given an opportunity after Account opening to opt out of the DAA arbitration provision but declined to do so, further signaling her assent. Garrett Decl. ¶¶ 2-4; *Pelligrino v. Morgan Stanley Smith Barney LLC*, 2018 WL 2452768, at *3 (S.D.N.Y. May 31, 2018) (a failure to opt-out "'compel[s] the conclusion' that Plaintiff[s] are bound by the Arbitration Agreement").

### 2. The DAA Contains a Broad Arbitration Clause That Creates a Presumption of Arbitrability

Plaintiff's claims fall squarely within the scope of the broad arbitration provision she and Chase both agreed to and, therefore, individual arbitration should be compelled. *See AT&T Techs, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (". . .presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."); *Doe v. Coll. Bd.*, 440 F. Supp. 3d 349, 352 (S.D.N.Y. 2020)(same).

It is well-settled that to determine whether a dispute falls within the scope of an agreement's arbitration clause, a court should first classify the clause as either broad or narrow. *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005). In

considering this question, the Tenth Circuit has found the phrase "arising out of or relating to" is broad and disputes relating to the contract are arbitrable. *See, e.g.*, *Cavlovic v. J.C. Penney Corp.,Inc.*, 884 F.3d 1051, 1059 (10th Cir. 2018) (". . . this court previously held 'arising out of or relating to' is 'broad' language.") (citing *Chelsea Fam. Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1199 (10th Cir. 2009) and *P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999)); *Whispering Pines W. Condo. Homeowners Ass'n v. Certain Underwriters at Lloyd's, London*, 2020 U.S. Dist. LEXIS 39121, at \*6 (D. Colo. Mar. 6, 2020) (finding an arbitration clause including claims "*in whole or in part regarding any aspect of this Policy*" was broad) (emphasis in original); *see also City & Cty. of Denver v. Dist. Court In & For City & Cty. of Denver*, 939 P.2d 1353, 1366 (Colo. 1997) (en banc) (phrase "disputes regarding the contract" is a broad clause). This creates a presumption in favor of arbitrability. *Sanchez v. Nitro–Lift Techs., L.L.C.,* 762 F.3d 1139, 1151–52 (10th Cir. 2014).

That is plainly the case here, as the DAA covers "[a]ny claims or disputes arising from or relating to this agreement" and "any dispute relating in any way to your account or transactions," including any "[c]laims or disputes between you and us about your deposit account, transactions involving your deposit account, . . . and any related service with us." . *Supra* at 3-4. To be sure, courts that have considered the specific arbitration provision in the DAA have confirmed that it is "broad" and ordered arbitration of disputes between Chase and its customers relating to their accounts. *See, e.g.*, *Dill v. JPMorgan Chase Bank, N.A.*, 2020 WL 4345755 at \*6 (S.D.N.Y. July 29, 2020)(concluding that the "language of the DAA's arbitration provision is indisputably broad" and thus "create[s] a strong presumption of arbitrability"); *Sunmonu v. Chase Bank, N.A.*, 2019 WL 1258788 at \*2 (D. Md. Mar. 19, 2019)(the DAA "defines arbitrable claims broadly"); *see also*

*KPA Promotions*, 2021 WL 1317163, at *5 n.9 (noting "[w]ere the Court to address the scope of the arbitration provisions, . . . [t]he arbitration provision[] of the DAA . . . [is] plainly broad enough to encompass plaintiffs' claims").

Importantly, the presumption may be "overcome only if [the Court] can say 'with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Soc'y of Pro. Eng'g Employees in Aerospace v. Spirit Aerosystems, Inc*., 681 F.App'x 717, 721 (10th Cir. 2017) (unpublished) (*quoting AT&T Techs., Inc.*, 475 U.S. at 650). "When a contract contains a broad arbitration clause, matters that touch the underlying contract should be arbitrated." *Brown v. Coleman Co.*, Inc., 220 F.3d 1180, 1184 (10th Cir. 2000) (*citing Mitsubishi Motors v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 624 n. 13 (1985). Where there is a broad arbitration provision, a dispute can be removed from arbitration only where there is an express provision excluding a specific dispute or the "most forceful evidence of a purpose to exclude the claim for arbitration." *St. Charles v. Sherman & Howard*, 2015 WL 1887758, at *3 (D. Colo. Apr. 24, 2015) (citing *AT&T Techs.*, 475 U.S. at 650). "Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *See Cummings*, 404 F.3d at 1261. The DAA contains no limiting language precluding these claims from arbitration. Therefore, Defendants are entitled a presumption of arbitrability, and Plaintiff's claims should be evaluated under the lens of such presumption.

### 3.  Each of Plaintiff's Claims Arise or Relate to the DAA

The broad scope of the arbitration provision in the DAA encompasses all of Plaintiff's claims. Indeed, none of the claims alleged would exist absent the contractual relationship between

the parties established by the DAA. *P&P Indus., Inc.,* 179 F.3d at 871 ("[I]n determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted."). Thus, her claims qualify as disputes "arising out of" the DAA. Moreover, the Complaint alleges (and must allege in order to state a claim) "transactions involving [Plaintiff's] customer account" that fall under the DAA. Deck Decl., Ex. A at 24.

### a.  Section 1981 Claim

As applied to retail transactions (including the banking transaction here),[8] the Tenth Circuit has held that to plead a Section 1981 claim, the Plaintiff must show: (1) she is a member of a protected class; (2) Defendants intended to discriminate on the basis of race; and (3) the discrimination interfered with a Section 1981 protected activity. *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101 (10 Cir. 2001), *cert. denied*, 534 U.S. 1131 (2002). The Tenth Circuit has found that interference with a protected activity must go "beyond the mere expectation of being treated without discrimination while shopping . . . [there must be] the actual loss of a contract interest, not merely the possible loss of future contract opportunities." *Id*. at 1118. The statute does not confer protection to patrons who are merely window shopping, and not actually attempting to transact with the establishment. *Id*. at 1117-18; *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 753 (5th Cir. 2001) (granting summary judgment to store where there was no "tangible attempt to purchase, or to return, specified goods at the store, or to enter any other contractual agreement").[9]

---

[8] *See Barfield v. Com. Bank, N.A.*, 484 F.3d 1276, 1278 (10th Cir. 2007) (analogizing Section 1981 case involving a bank to cases involving retail transactions).

[9] *See also Clark v. Safeway, Inc.*, 478 F. Supp. 3d 1080, 1089 (D. Or. 2020) (collecting cases that "require that a plaintiff who brings a section 1981 claim be engaged in the act purchasing goods to establish a prima facie case.").

Plaintiff's allegations establish at least three bases for compelling arbitration per the DAA. First, Plaintiff alleges, as she must for her Section 1981 claim, an interference with the DAA: her inability to purchase counter checks, a transaction that can only be made by Chase accountholders. Stover Decl. ¶ 30. The interference with the DAA – allegedly impeding the ability to purchase counter checks – is a "dispute[] arising from or relating to" the DAA. Second, Plaintiff's alleged attempt to transact – purchase a counter check – necessarily is a "transaction[] involving the" Account. Indeed, Plaintiff *must* allege her claim involves a "transaction"; otherwise, she would not be able to state a viable claim under Section 1981. Third, these same allegations are "about" the Account. *See supra* at 4-5.

### b.  CADA Claim

Plaintiff similarly relies on her status as a Chase accountholder for her CADA claim. CADA makes it unlawful to deny one "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation" on the basis of race. Colo. Rev. Stat. § 24-34-601 (2016). To meet this element, the Complaint expressly states that "[b]ut for [Plaintiff's] race, she would have not been denied the right to *enjoy all benefits, privileges, terms, and conditions of her contractual relationship as a Chase member.*" Compl. ¶ 151 (emphasis added). Since Plaintiff expressly relies on her contractual relationship with Chase (via the DAA), the CADA claim arises from or relates to the DAA, is about the Account, and is about "transactions involving" the Account. *See supra* at 4-5. Plaintiff "cannot have it both ways" and should be estopped from repudiating the arbitration provision in the same agreement she agreed to with Chase on which she also relies to bring this claim. *Island Peak Ranch, Ltd. Liab. Co. v. FIIK Inv. & Holdings, Inc.*, 2008 U.S. Dist. LEXIS 51474, at *33 (D. Utah July 7, 2008)

("Plaintiffs' claims depend on the existence of an agreement relating to the 213 Account which as a matter of logical necessity comes within the Account's terms and conditions including the arbitration provision.").

     *c. Negligent Infliction of Emotional Distress and Defamation Per Se*

   Plaintiff's negligent infliction of emotional distress ("NIED") and defamation claims both arise out of the same nucleus of facts as her Section 1981 and CADA discrimination claims. To state a NIED claim, Plaintiff must allege Defendants acted "negligently." *English v. Griffith*, 99 P.3d 90, 95 (Colo. App. 2004). To meet this element, Plaintiff alleges that she was "sitting in the lobby and checking [her] account on [her] phone for a few minutes as [she] prepared to do business before standing in the bank teller line" but Pelech "falsely claim[ed]" she was trespassing. Compl. ¶ 158. This purported "false claim" regarding Plaintiff's purpose at the Branch is the "negligent act" on which Plaintiff relies to support her NIED claim.

   Plaintiff also alleges Defendants defamed her when Pelech told the 9-1-1 dispatch that Plaintiff was trespassing and "aggressive" in the Branch. Compl. ¶¶ 141, 171-75. To state a defamation claim, Plaintiff must allege Pelech made the statement with "actual knowledge or reckless disregard" that the statement was indeed false. *L.S.S. v. S.A.P.*, 523 P.3d 1280, 1288 (Colo.App.2022) (holding that actual malice standard applies to private individual's report to law enforcement). To satisfy this standard, Plaintiff alleges "Pelech knew that [Plaintiff] was not trespassing, given that [Plaintiff] was a member of Chase, and [Plaintiff] told her so." Compl. ¶ 173.

   Plainly, Plaintiff's NIED and defamation allegations necessarily rely on her customer relationship with Chase. Plaintiff attempts to use the benefit of her status as an accountholder and

her intention to transact at the Branch to bolster her claim that she was not trespassing (and therefore, that Pelech acted negligently and defamed her). Plaintiff's customer relationship with Chase, including the transaction that Plaintiff alleges she was preparing to complete, is governed by the DAA. Thus, yet again, her claims arise from or relate to the DAA, are about the Account, and are about "transactions involving" the Account.

**B.  Defendant Trina Pelech is Entitled to Enforce The Agreement to Arbitrate.**

Although Pelech is not a signatory to the DAA, she is nonetheless entitled to enforce its arbitration provision because she is a third-party beneficiary of the DAA. The DAA states, "[i]f a third party is also involved in a Claim between you and us, ***then the Claim will be decided with respect to the third party in arbitration as well***, and it must be named as a party in accordance with the rules of procedure governing the arbitration. . . 'we' includes JPMorgan Chase Bank, N.A., all its affiliates, and all third parties *who are regarded as agents or representatives of ours in connection with a Claim*." *See* Deck Decl., Ex. A at 25, Ex. B at 26, Ex. C at 26 (emphasis added). The text and purpose of the arbitration provision in the DAA make clear that the provisions are intended to benefit Pelech, who Plaintiff alleges to be a representative or agent of Chase. Compl. § 158. Under the same analysis as applied to Chase, the DAA pertains to the Account and transactions, and Plaintiff alleges Pelech impeded Plaintiff's ability to transact. *Spencer v. TICI LLC*, 2023 WL 2214530, at *5 (D. Colo. Feb. 24, 2023)*, report and recommendation adopted*, 2023 WL 2806856 (D. Colo. Apr. 6, 2023) ("[N]onsignatory parties may compel arbitration if the arbitration agreement recognizes them as intended parties or beneficiaries of the agreement.").

In addition, even if the DAA did not clearly allow Pelech to arbitrate Plaintiff's claims (and it does), Pelech can enforce the arbitration provision in the DAA because she has a "close nexus"

14

**A:90**

to the allegations in the Complaint related to the purported impediment to Plaintiff's ability to transact via her Account. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Coors*, 357 F. Supp. 2d 1277, 1280 (D. Colo. 2004) (non-signatories to arbitration may seek an order compelling arbitration when the claims are based on the same factual allegations and the claims against the non-signatories are inextricably intertwined with the arbitrable claims).

### III.    THIS ACTION SHOULD BE STAYED PENDING ARBITRATION

Where, as here, all claims must be arbitrated and a stay is requested, the FAA mandates the court "***shall*** . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added). The Tenth Circuit has confirmed a stay is mandatory if requested by a party following a successful motion to compel arbitration. *Adair Bus Sales v. Blue Bird Corp.*, 25 F.3d 953, 955 (10th Cir. 1994). While Chase submits all of Plaintiff's claims are arbitrable, the Court must compel arbitration for the arbitrable claims even if it deems some, but not all, of Plaintiff's claims to be arbitrable. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223-24 (1985).[10]

### CONCLUSION

For all the reasons set forth herein, this Court should grant the Motion in its entirety.

---

[10] If the Court finds certain claims not arbitrable, the Court has discretion to stay those claims pending the arbitration. *Weller v. HSBC Mortg. Services, Inc.*, 971 F. Supp. 2d 1072, 1082 (D. Colo. 2013). In determining whether to stay, the Court must consider whether the arbitrable claims have a preclusive effect on the nonarbitrable claims. *Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.*, 157 F.3d 775, 785 (10th Cir. 1998), and judicial efficiency. *Weller*, 971 F. Supp. 2d at 1083. Claims can have a preclusive effect where, as here, they arise out of the same nucleus of fact. *Id.* Here, the facts are intertwined such that a finding of fact as to some claims would undoubtedly affect or entirely preclude others. As such, Defendants request a stay of the entire action, even if some claims are deemed nonarbitrable.

Dated:  October 11, 2023.

*/s/ Naomi G. Beer*
Naomi G. Beer
April C. Connally
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
Telephone: (303) 572-6500
Email: beern@gtlaw.com
      april.connally@gtlaw.com

**Attorneys for Defendants Chase and Trina Pelech**

**A:92**

<u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I hereby certify that on October 11, 2023, I caused true and correct copies ot the foregoing document, titled, including all attachments thereto, to be filed with the Clerk of Court of the United States District Court for the District of Colorado and to be served on counsel for Plaintiff.

Iris Halpern
Crist Whitney
RATHOD | MOHAMEDBHAI, LLC
2701 Lawrence St., Suite 100
Denver, CO 80205
Telephone: (303) 578-4400
Email: ih@rmlawyers.com
        cw@rmlawyers.com

*Counsel for Plaintiff Jeanetta Vaughn*

*s/ Naomi G. Beer*
Naomi G. Beer

# Exhibit A

# DEPOSIT ACCOUNT AGREEMENT AND PRIVACY NOTICE



## Welcome to Chase

Thank you for opening your account with Chase; we look forward to serving you. We recommend keeping this agreement but we regularly update it, so you can always get the current agreement at chase.com, a branch or by request when you call us.

This is your Deposit Account Agreement (may also be referred to as Account Rules and Regulations), or contract, with us.

The Deposit Account Agreement also includes these separate documents that pertain to our personal and business accounts:

• Rates for interest-bearing accounts

• Personal accounts:

  – Additional Banking Services and Fees (including our Fee Schedule)

• Business accounts:

  – Additional Banking Services and Fees (including our Fee Schedule)

• Any additional disclosures, such as amendments or agreements, that we provide to you either when you open your account or when we change the terms of your account.

## How to Contact Us

We're here for you. See below for how to reach us.

| **Personal Accounts:** | | **Electronic Funds Transfers (EFTs):** |
|---|---|---|
| Main phone number: | 1-800-935-9935 | In case of errors or questions about your EFTs, or if you believe your debit card has been lost or stolen, call us at 1-866-564-2262 or write: |
| Spanish: | 1-877-312-4273 | |
| International calls: | 1-713-262-1679 | Chase |
| Website: | chase.com | PO Box 659809 |
| | | Internal Mail TX3-7849 |
| **Business Accounts:** | | San Antonio, TX 78265-9109 |
| Main phone number: | 1-800-242-7338 | |
| Spanish: | 1-888-622-4273 | **To Dispute Information Reported** |
| International calls: | 1-713-262-1679 | **to a Consumer Reporting Agency:** |
| Website: | chase.com/business | JPMorgan Chase Bank, N.A. |
| | | PO Box 182108 |
| **Chase Private Client:** | | Internal Mail OHW-1000 |
| Main phone number: | 1-888-994-5626 | Columbus, OH 43218 |
| International calls: | 1-405-235-4847 | |
| Website: | chase.com/privateclient | **All Other Written Correspondence:** |
| | | JPMorgan Chase Bank, N.A. |
| **Chase Mobile or Online Banking:** | 1-877-242-7372 | PO Box 659754 |
| | | San Antonio, TX 78265-9754 |
| **Deaf and Hard of Hearing:** | We accept operator relay calls | |

**A:95**

## Deposit Account Agreement Table of Contents

I. Definitions........................................................................................................................................5

II. Opening Your Account.....................................................................................................................5

A. Personal Accounts...........................................................................................................................5
1. Solely owned account.....................................................................................................................5
2. Joint accounts..................................................................................................................................5
3. "Payable on death" account..........................................................................................................6
4. "In trust for" (informal trust) account..........................................................................................6
5. Convenience account......................................................................................................................6
6. Power of attorney............................................................................................................................6
7. Uniform Transfers to Minors Act/Uniform Gifts to Minors Act account................................6
8. Representative payee/VA custodian account..............................................................................6
9. Other fiduciary accounts................................................................................................................7

B. Business Accounts...........................................................................................................................7

III. Using Your Checking or Savings Account.....................................................................................7

A. Adding Money to Your Account......................................................................................................7
1. Direct deposits; notice of electronic deposits.............................................................................7
2. Endorsements..................................................................................................................................7
3. Endorsement requirements............................................................................................................7
4. Our right to refuse deposits...........................................................................................................7
5. Our right to charge back deposited or cashed items..................................................................7
6. Transaction records and receipts..................................................................................................7
7. Night depository and large cash deposits....................................................................................8
8. Our responsibility for collecting deposits....................................................................................8
9. Depositing remotely created checks.............................................................................................8

B. Posting Order and Processing........................................................................................................8
1. Posting order...................................................................................................................................8
2. "Pending" transactions..................................................................................................................8

C. Overdrafts, Fees and Overdraft Protection..................................................................................9
1. Paying items presented against insufficient funds....................................................................9
2. Your responsibility to repay overdrafts........................................................................................9
3. Insufficient Funds and Returned Item fees.................................................................................9
4. Overdraft Protection.......................................................................................................................9

D. Electronic Funds Transfer Service Terms; Payments, Deposits and Transfers You Make or Receive by
Electronic Methods..........................................................................................................................10
1. Types of EFT services...................................................................................................................10
a. Debit and ATM cards...................................................................................................................10
b. Electronic transfers using your account number.....................................................................10
c. Online banking and Chase Mobile..............................................................................................10
d. Telephone banking......................................................................................................................10
e. Transfers for Overdraft Protection............................................................................................10
2. Important information and agreements about your card .........................................................11
a. Authorizations and holds............................................................................................................11
b. Overdrafts with your card...........................................................................................................11
c. Canceling your card.....................................................................................................................11
d. Our right to refuse transactions.................................................................................................11
e. Foreign exchange transactions...................................................................................................11

**A:96**

**f.** Debit or credit prompts at terminals ................................................................................................. 11
**g.** ATM safety and safeguarding your account information ........................................................ 11
**3.** Daily dollar limits on ATM withdrawals and card purchases .................................................... 12
**4.** Receipts and statements ................................................................................................................. 12
**5.** In case of errors or questions about your electronic funds transfers ...................................... 12
**6.** Our liability for failure to complete transactions ..................................................................... 12
**7.** Preauthorized (recurring) transfers and stop payments .......................................................... 12
**8.** Disclosure of account information to third parties ..................................................................... 13
**9.** Notice of your rights and liabilities .............................................................................................. 13
**10.** Fees ................................................................................................................................................... 13
**11.** Services not covered by this part; separate agreements ......................................................... 14

**E.** Other Ways to Use Your Money ......................................................................................................... 14
    **1.** When you can withdraw funds you've deposited ...................................................................... 14
    **2.** Withdrawals and transfers from your account ........................................................................... 14
    **3.** Autosave feature ........................................................................................................................... 14
    **4.** Transactions in a foreign currency .............................................................................................. 14
    **5.** Large cash withdrawals ................................................................................................................. 14
    **6.** Stop payments on a check ............................................................................................................ 14
    **7.** Account numbers on funds transfers ........................................................................................... 15
    **8.** Savings account withdrawals ....................................................................................................... 15
    **9.** Our right to require advance notice of withdrawals .................................................................. 15
    **10.** Check cashing ................................................................................................................................ 15
    **11.** Incomplete, future-dated, conditional or stale-dated checks ................................................ 15
    **12.** Multiple signatures ....................................................................................................................... 15
    **13.** Facsimile signatures ..................................................................................................................... 15
    **14.** Review of checks and signatures ................................................................................................. 15
    **15.** Substitute Checks and Your Rights ............................................................................................. 15

**IV. Funds Availability Policy** .................................................................................................................. 16

**V. Safeguarding Your Information** ......................................................................................................... 17
    **A.** Checks and Other Documents You Use ......................................................................................... 17
    **B.** Protecting Your Checks ................................................................................................................... 17
    **C.** Notice of Errors, Forgeries and Unauthorized Signatures ......................................................... 17

**VI. Managing and Maintaining Your Account** ...................................................................................... 18
    **A.** Interest on Checking and Savings Accounts ................................................................................ 18
    **B.** Linking Your Accounts; Statements .............................................................................................. 18
        **1.** Linked accounts ......................................................................................................................... 18
        **2.** Statements and notices ............................................................................................................. 18
        **3.** Combined statements ............................................................................................................... 18
        **4.** Options for receiving checks ..................................................................................................... 18
    **C.** Telephone and Electronic Communication ................................................................................. 19
    **D.** Other Fees for Your Account .......................................................................................................... 19
        **1.** Fees ............................................................................................................................................ 19
        **2.** Savings Withdrawal Limit Fee .................................................................................................. 19
    **E.** Setoff and Security Interest ........................................................................................................... 19
    **F.** Account Alerts and Text Banking ................................................................................................... 19

**VII. Maintaining Your Certificate of Deposit (CD) Account** ................................................................ 19

A:97

**VIII. Closing Your Account** ..................................................................................................................................**21**

**IX. Other Legal Terms** .......................................................................................................................................**21**

   **A.** Rules Governing Your Account ................................................................................................................ 21

   **B.** General Liability................................................................................................................................... 21

   **C.** Restricting Your Account; Blocking or Delaying Transactions........................................................... 21

   **D.** Changes to the Agreement .................................................................................................................... 22

   **E.** Our Responsibility to Obtain Personal Information ............................................................................. 22

   **F.** Prohibited Activities and Tax Reporting.............................................................................................. 22

   **G.** Death or Incompetence of Account Owner or Sole Signer.................................................................... 22

   **H.** Adverse Claims .................................................................................................................................... 22

   **I.** Authorization to Share Information....................................................................................................... 23

   **J.** Disputing Information Reported to a Consumer Reporting Agency ...................................................... 23

   **K.** Legal Process and Requests for Information ......................................................................................... 23

   **L.** Abandoned Property ............................................................................................................................. 23

   **M.** English Language — Other Language Preferences............................................................................... 23

   **N.** Referrals ............................................................................................................................................... 23

   **O.** Special Provisions for Pass-Through Accounts ................................................................................... 23

   **P.** Sub-accounts ........................................................................................................................................ 23

   **Q.** Permitted Time for Filing a Lawsuit..................................................................................................... 24

   **R.** Location of Legal Proceedings.............................................................................................................. 24

   **S.** Pre-judgment Interest Rate .................................................................................................................. 24

   **T.** Assignment of Agreement and Successors ........................................................................................... 24

   **U.** No Waiver ............................................................................................................................................. 24

**X. Arbitration; Resolving Disputes** ....................................................................................................................**24**

*Privacy Notice*

**A:98**

# Deposit Account Agreement

This agreement is the contract that governs your account.

Whether you have a personal or business deposit account, this document is the basic agreement between you and us (JPMorgan Chase Bank, N.A. or "Chase"). By signing a signature card or submitting an account application, or by using any of our deposit account services, you and anyone else identified as an owner of the account agree to the terms in this agreement. Customers of some of our business groups, such as Corporate Banking, will get a different agreement and their accounts will be governed by that agreement, not this one. If you have a product that is not a deposit account, such as a prepaid card or credit card, this agreement does not apply to that product. Also, other products or services, such as online banking or retirement accounts, may have additional agreements. A more specific agreement takes precedence over this one.

This agreement also refers to and includes other disclosures we may provide to you, including (1) product information, (2) rate information, (3) banking services and fees, and (4) other disclosures, agreements, and amendments that we may provide to you. All may contain information on fees that apply to your accounts. Products and services as well as associated fees, charges, interest rates and balance requirements may differ among different geographic locations. Not all products and services, including check cashing, are offered at all locations.

## I. Definitions

Here are some important terms that we use throughout this agreement:

**Account:** Any deposit account, such as a checking or savings account, you have with us that is covered by this agreement.

**ACH (Automated Clearing House):** ACH, which may also be referred to as automatic payments, are funds transferred to or from your account through an automated clearing house network. Common examples include direct deposits of payroll, pension or government benefits such as Social Security.

**ATM (Automated Teller Machine):** An electronic device that performs many banking services, which can include withdrawals and balance inquiries.

**Available balance:** The amount of money in your account that you can use right now. You can find this balance on receipts you receive at ATMs, from a banker at a branch, on chase.com or Chase Mobile.

**Business day:** Every day except Saturdays, Sundays and federal holidays. Some branches may close on a business day due to an emergency or to observe a state holiday.

**Check:** A written order to pay a specific amount of money drawn on, payable through, payable at or processed by a bank or other depository institution. If a check is sent or returned as an electronic image or as a substitute check, it is still considered a check.

**Debit card transaction:** Any purchase or bill payment using your debit card. A debit card transaction may be either an everyday (not recurring) purchase transaction or a recurring payment, such as a monthly bill.

**Direct deposit:** An automatic electronic deposit made through the ACH network to your account by someone else, such as an employer issuing payroll or a government paying benefits.

**Item:** Any check, ACH, funds transfer, online banking transaction, wire transfer, teller cash withdrawal, ATM withdrawal, debit card purchase, fee, charge or other amount that is added to or subtracted from your balance.

**Overdraft:** The amount by which any item(s) presented on your account on a business day exceeds the available balance.

**Overdrawn:** When your account has a negative balance.

**PIN:** A four-digit personal identification number that you either select or request from us for your debit or ATM card. Some merchants and all ATMs require a PIN when you use a debit card.

**Present balance:** The total amount of money recorded in your account, including funds not yet available for you to use. This includes pending transactions, authorization holds that are not yet posted or deposits that have not yet been made available. You can find this balance on receipts you receive at ATMs, from a banker at a branch, on chase.com or Chase Mobile.

## II. Opening Your Account

### A. Personal Accounts

THE TYPE OF ACCOUNT OWNERSHIP MAY DETERMINE HOW YOUR FUNDS ARE PAID IF YOU DIE, EVEN IF YOUR WILL STATES OTHERWISE. PLEASE CONSULT YOUR ESTATE PLANNING ADVISOR OR ATTORNEY ABOUT YOUR CHOICES.

If your account is a type listed under "Personal Accounts" in our product information, you agree not to use it for business purposes. Ownership of your account is determined by the most current signature card. However, we are authorized to rely on the account ownership information contained in our deposit system unless we are notified that the most current signature card and the deposit system contain different information.

**1. Solely owned account**
When only one individual is listed as the owner of an account, we will treat the account as a solely owned account.

**2. Joint accounts**
When two or more people are listed as owners of a personal account, the account is a "joint account" and each owner is a "joint owner."

Each joint owner has complete control over all of the funds in the account.

If your joint account becomes overdrawn, each joint owner is liable for the full amount the account is overdrawn, regardless of who initiated or benefited from the item(s) that caused the overdraft.

If one joint owner requests that we not pay items authorized by a different joint owner, we may block the account, but we are not required to do so. That means we will refuse to pay all items, including items authorized by the owner making the request. If we block the account, we may not release the block unless all joint owners agree

in writing to remove it. No request to block the account will affect items that we paid before the request. If we decide not to block the account, all joint owners remain responsible for items subtracted from the account.

Any joint owner may close the account without the consent from any other joint owners. We may choose whether or not to act upon other instructions of any joint owners, including adding another owner to the account, without the authorization of the other joint owners. We may also pay all or any part of the funds in the joint account to a court or government agency if we receive a garnishment, levy or similar legal process that identifies any of the joint owners.

### Joint account with rights of survivorship

If a joint account has rights of survivorship, and one joint owner dies, the account ownership will be transferred to the surviving joint owners. The estate of the deceased owner will have no rights to the account. If there is more than one surviving owner, the account will continue as a joint account with rights of survivorship among the remaining owners. If an account is designated "JAWROS" or "JTWROS," it has rights of survivorship.

### Joint account with no right of survivorship (also called "tenants in common")

If a joint account does not have rights of survivorship, and one joint owner dies, that owner's interest passes to the owner's estate. Either the surviving joint owners or the deceased owner's estate may withdraw the funds at any time, and we have no responsibility for determining the respective interests of the owners. If an account is designated "Tenants in common" or "JTIC," it does not have rights of survivorship.

### When survivorship rights apply

Except as otherwise stated in this paragraph, a joint account has rights of survivorship unless you clearly indicate on the signature card and in the account title that the account is created without these rights. Accounts in Louisiana do not have rights of survivorship. Accounts in Texas do not have rights of survivorship unless you clearly indicate on the signature card and in the account title that the account is created with these rights.

If a joint account also contains a "payable on death" or "in trust for" designation, the account always includes a right of survivorship and is payable to the beneficiary only upon the death of the last surviving owner, except as stated in the paragraph below.

### Marital account (Wisconsin only)

If one owner of a marital account dies, the survivor is entitled to 50% of the account funds and the estate of the deceased is entitled to the other 50%. If a marital account contains a payable on death designation, the POD beneficiary is entitled to the deceased spouse's 50% share. However, we have no responsibility to determine the respective interests of the owner and the POD beneficiary.

### Tenants by the entirety (Florida only)

A Florida joint account owned solely by two spouses is a "tenants by the entirety" account unless the signature card indicates otherwise. We are not required to determine whether an account is a tenants by the entirety account before responding to a garnishment or other legal process. We may assert our right of setoff or security interest in a tenants by the entirety account in order to collect debts of either owner

## 3. "Payable on death" account

If you establish your account payable on death to one or more beneficiaries, the account is a "POD" account. If we receive proof you've died, we will pay the balance of the account to the beneficiary or beneficiaries you designated. Multiple beneficiaries will be paid in equal shares unless the signature card provides otherwise. We do not offer POD accounts in all states.

## 4. "In trust for" (informal trust) account

If you establish your account as in trust for ("ITF") or as trustee for one or more beneficiaries without presenting formal trust documents, we may treat the account as an "ITF" account. If we receive proof you've died, we will pay the balance of the account to the beneficiary or beneficiaries you designated. Multiple beneficiaries will be paid in equal shares unless the signature card provides otherwise. We do not offer ITF accounts in all states.

## 5. Convenience account

If you have a convenience account, you are its sole owner, but you authorize an additional signer to write checks or authorize other items. You are solely responsible for the actions of the additional signer (legacy accounts only).

## 6. Power of attorney

A power of attorney is a document you sign that authorizes someone else, called the agent, to act on your behalf. If you sign a power of attorney, the agent can sign on your behalf and do anything you could do regarding the account, including withdrawing or spending all of the money in the account. Do not sign a power of attorney unless you trust the agent to act in your best interest. If you choose to add an agent, you must provide a power of attorney form that we agree to accept. We may rely on a copy of an original power of attorney. We are not required to investigate the facts relating to any power of attorney provided to us on your behalf, including whether your signature on the power of attorney is authentic or whether the agent continues to have authority. We may follow or refuse to follow the agent's instructions at any time, including if we suspect fraud or abuse on your account, unless state law requires otherwise. We may also refuse an agent's request to become a joint owner or a beneficiary of an account, but we have no liability to anyone if we do so. We have no liability when we follow or refuse to follow any instructions from an agent, for example, if your agent misuses the authority you have given them. An agent's power of attorney on an account is terminated when the account owner dies.

## 7. Uniform Transfers to Minors Act/Uniform Gifts to Minors Act account

If you are the custodian or successor custodian of an account under a state's Uniform Transfers/Gifts to Minors Act, you cannot pledge the account as collateral for a personal loan to you, or cash checks against it. You must transfer the funds in the account to the minor when the minor reaches the age of majority under the UTMA/UGMA law for the state where the UTMA was established. At our sole discretion we may limit transactions on the account if you fail to transfer funds to the beneficiary as required by applicable law. You agree that it is your responsibility as custodian to consult your own legal or tax advisor about the governing state law.

## 8. Representative payee/VA custodian account

If you open an account as a "representative payee" for someone who receives Social Security payments, or as a legal custodian, spouse payee or other custodian for someone who receives Veterans Administration payments, you agree not to permit any deposits to the account other than the designated payments. We are not required to determine whether you deposit other funds or whether any withdrawals or transfers from the account are for the support of the person for whose benefit the funds are paid. This person is called the beneficiary. If the beneficiary dies, you must promptly notify us and stop all further deposits to and withdrawals from the

A:100

account. If the government demands that we return deposits made after the beneficiary's death and the account does not have enough funds to pay the demand, we may take the funds from any account you or the beneficiary owns.

**9. Other fiduciary accounts**

If you open an estate account, trust account, guardianship or conservatorship account, or other similar type of account, we reserve the right to require any documents we reasonably request to satisfy us that you are authorized to open and use the account, including withdrawing the funds. We do not have to permit any withdrawal from the account until we receive all requested documents. We have no fiduciary duties to you as the trustee, executor, guardian or conservator, or to the beneficial owners of the account.

**B. Business Accounts**

If your account is a type listed under "Business Accounts" in our product information, you agree not to use it for personal purposes.

If our records list a business organization as the owner of an account, the account is payable to the business organization and not to any individual director, shareholder, member or partner. "Business organization" means a corporation, unincorporated association, limited liability company, partnership, or any other business, government or non-profit organization. We may rely on the accuracy and completeness of all resolutions, signature cards and other documents you deliver to us in connection with the account. If they state that a person is authorized to sign checks or otherwise initiate transactions on your account, that person is called a signer.

If the account owner is a sole proprietorship, that means that one person conducts the business as his or her own property, instead of through a business organization. A sole proprietor may also designate signers by appropriate documents. We may in some states allow a married couple to open an account as a sole proprietorship.

If you change your form of ownership or authorized signers, you must notify us when the change occurs.

A signer is authorized to endorse checks payable to the business. Endorsements "for deposit" may be written or stamped. A signer is also authorized to sign checks drawn on your account. We are authorized to pay checks without asking how the checks were issued or how the proceeds will be used, even if the check is payable to the person who signed the check.

A signer is authorized to instruct us to close accounts or do anything else involving any account, and to sign any agreements or documents relating to accounts or other business.

We may, although we are not required to, cash checks payable to or accept "less cash" deposits from a business organization.

If you open an attorney trust account, including an IOLTA or similar account, you authorize us to notify the appropriate state agency if the account is overdrawn or checks are dishonored, if the applicable state requires notice of those events.

## III. Using Your Checking or Savings Account

**A. Adding Money to Your Account**

**1. Direct deposits; notice of electronic deposits**

When we receive an electronic deposit to your account, the only notice you will receive from us is on your next statement. You may visit chase.com or Chase Mobile® and use Account Alerts, or call us to confirm that we have received a deposit.

If the bank that sent an electronic deposit to your account tells us it was a mistake, or was intended for another customer or account, we may deduct the amount from your balance without investigating.

**2. Endorsements**

An endorsement is a signature, stamp or other mark made on a check to transfer the check to another person. If a check you deposited doesn't have your endorsement, we may endorse it for you or treat the check as if we had endorsed it. Either way, the effect will be as if you had endorsed the check. Also, any deposited check that appears to contain your stamped or facsimile endorsement will be treated as if you had actually endorsed it. We are not bound by any conditional or restrictive endorsements on a check you cash or deposit, or by any endorsement "without recourse."

**3. Endorsement requirements**

To help ensure that checks you deposit or cash will be processed timely, your endorsement (and any other endorsement supplied by a co-payee) must be in the 1½ inch area that starts on the right side as viewed from the back. Payee or customer information must not be on any other part of the back of the check.

If you don't endorse your check properly and it causes us a loss, cost or expense, you have to pay that amount to us.

**4. Our right to refuse deposits**

We may refuse a deposit, or part of a deposit, at any time. We also may refuse a deposit after initially accepting it. We can reverse any amount we have added to your balance for a deposited check and send the check on a collection basis even after we have taken physical possession of the check. We will not be liable to you for refusing a deposit, even if it causes us to decline any transactions you have already made. If we refuse a deposit, we may take a check on a "collection basis," which means we will not add funds to your balance until we have actually been paid for the check.

**5. Our right to charge back deposited or cashed items**

If you deposit or cash a check or other item and (1) the paying bank returns it as unpaid; (2) the paying bank or the issuer of a check demands that we repay them because the check was altered, forged or unauthorized, is missing a signature or endorsement, or has a forged endorsement; or (3) the sending bank or the originator of an item demands that we return the item because it was unauthorized, sent to the wrong account number or procured by fraud, we may pay the return or demand, and subtract the funds from your balance in other accounts for which you are an owner, or charge part of the item to each, even if you have already withdrawn the funds. If we have reason to believe that any of the events in the previous sentence has occurred or may occur or that the check or other item should not have been paid or may not be paid for any other reason, we may place a hold on the funds or move them to a non-customer account until we determine who is entitled to them. If a deposited or cashed item is returned, we will charge you a Deposited Item Returned Fee or a Cashed Check Returned Fee. Refer to the Fee Schedule for specific fee information.

**6. Transaction records and receipts**

We may rely on the account number on any deposit slip, payment instruction, or similar record we receive, even if that account number is associated with a name that's different from the name you've provided. It's not our responsibility to detect any inconsistency between the account number you provide and the name.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2020 JPMorgan Chase & Co.

Return to Table of Contents

Page 7 of 25
Effective 11/8/2020

If you make a deposit, we may provide a receipt, but the amount on your deposit receipt is based entirely on the deposit slip you complete. We may confirm the funds you deposit and, after review, may adjust your account for any errors including any errors on your deposit slip.

We are permitted to adjust (debit or credit) your account, and we may notify you, if we:

- Determine a discrepancy exists between the declared and the actual amount of the funds in your account, or
- Misdirected a transaction to or from your account or made a transaction that we reasonably believe to be in error.

If we give you a receipt for a CD that you decide not to open or we give you a receipt for a deposit that you then cancel, the receipt is void and you may not claim those funds.

### 7. Night depository and large cash deposits

Any of our employees may open and count any deposit that a branch banker didn't count in front of you, including night depository deposits and large cash deposits, and you agree not to dispute that employee's determination of the amount you deposited.

If you use our night depository, you are responsible for any disappearance, theft or loss of any envelope, bag or money before we issue a written receipt for the deposit.

### 8. Our responsibility for collecting deposits

If you deposit or cash a check, or we send one for collection, we act only on your behalf. Our only responsibility is to exercise reasonable care. We will not be liable for the lack of care of any bank or third party we use to collect checks, or for checks lost during shipping. We may send checks to any bank or to the entity on which the check was written in our customary manner. We may have agreements with other banks regarding times and methods for collecting or returning items.

If we lose a check, you agree to use reasonable efforts to help us locate or replace it.

Although we attempt to identify and prevent fraudulent transactions, we have no duty to you to determine whether any check you deposit or cash is forged, counterfeit, altered, improperly endorsed or otherwise improper.

### 9. Depositing remotely created checks

A remotely created check is created by the payee and not signed by the account owner. It states that the account owner authorized the check. If you deposit a remotely created check, you guarantee it was authorized by the account owner for payment in the amount it shows.

## B. Posting Order and Processing

### 1. Posting order

Posting order is the order in which we apply deposits and withdrawals to your account. We provide you with visibility into how transactions are posted and in what order to help you better manage your account

When we transition from one business day to the next business day we post transactions to and from your account during our nightly processing. The order in which we generally post items during nightly processing for each business day is:

- First, we add deposits to your account.
- Second, we subtract everyday (not recurring) debit card transactions, online banking transactions, ATM withdrawals, teller cash withdrawals, checks you write that are either cashed or deposited by a Chase branch banker, and wire transfers. We subtract all of these transactions in chronological order by using the date and time of each transaction. If we do not know the time of day you made a transaction, such as for some everyday debit card transactions, then it is posted as if it was made at the end of the day. Multiple transactions without a timestamp are subtracted starting with those having the highest dollar amount and moving to the lowest.
- Third, we subtract all other items, including checks you wrote that are either cashed or deposited at an ATM, and recurring debit card transactions starting with those having the highest dollar amount and moving to the lowest. We reserve the right to use a different order in certain states, such as Nevada.
- Finally, fees are assessed last.

During the day, if you review your account, you will see that we show some transactions as "pending." These transactions impact your available balance, but have not yet posted to your account and do not guarantee that we will pay these transactions to your account if you have a negative balance at that time. We may still return a transaction unpaid if your balance has insufficient funds during that business day's nightly processing, even if it had been displayed as a "pending" transaction on a positive balance during the day. If a transaction that you made or authorized does not display as "pending," you are still responsible for it and it may still be posted against your account during nightly processing.

### 2. "Pending" transactions

Throughout the day we post debits and credits to your account that may appear as "pending" when we become aware of the transaction. The following are the most common types of debit transactions that may appear as "pending" and reduce your available balance by the amount of the transaction:

- ATM and Chase Banker Withdrawals, Transfers and Payments
- Automatic Payments
- Chase.com or Chase Mobile Online Transactions
- Checks Drawn on Your Account
- Debit Card Transactions
- Wire Transfers

**ATM and Chase Banker Withdrawals, Transfers and Payments:** For payments or cash withdrawals, we will apply the transactions and update your available balance as soon as the transaction is complete.

**Automatic Payments (ACH transactions):** We will generally apply transactions against your available balance as pending at the start of the business day of the effective date of the payment. These transactions will be applied in the order we receive them. If you initiate ACH transactions on the same day as the effective date, we will apply them in the order we receive them from the merchant.

**A:102**

**Chase.com or Chase Mobile Online Transactions:** For any payment or transfer, once you approve the transaction, we'll apply it to your account. For recurring or future dated payments, it is applied on the effective "send on" date.

**Checks Drawn on Your Account:** When cashed or deposited at a Chase ATM, branch, or online will be pending on your account at the time the item was cashed or deposited. Checks that are deposited at other banks will show as pending throughout the day as the other banks submit the item to us for payment. If the amount of the check identified in the notice exceeds your balance at the time we receive the notice, we may notify the other bank of that fact.

**Debit Card Transactions:** For more information on debit card transactions refer to the section *Important Information and Agreements About Your Card.*

**Wire Transfers:** Once we've begun processing the wire transfer and completed all of our internal reviews, we'll send the transaction to your account and update your available balance on the transfer's effective date.

While we make every effort to place transactions in a pending status on your account during the day, transactions may be unable to be displayed as pending before they are posted to your account. How these items are posted when they are completed and no longer display as pending is based on the posting order. Fees are applied against the account based on how items are posted. For details, refer to the section *Posting Order.*

## C. Overdrafts, Fees and Overdraft Protection

### 1. Paying items presented against insufficient funds

We may pay or decline to pay any item when it is presented if your available balance is less than the amount of that item plus all other items received but not yet paid. We will decline any requested ATM withdrawal unless your available balance at the time is equal to or more than the amount of the requested withdrawal. We look at your available balance only once when the item is presented to us to decide if you have enough funds to pay the item.

Even if we've paid overdraft items before, we are not required to do it in the future. Special rules for everyday debit card transactions, overdraft and fees for these transactions, are described in the *Electronic Funds Transfer Service Terms.* Withdrawals and debits at ATMs or with merchants may be subject to additional limitation described in the Additional Banking Services and Fees.

### 2. Your responsibility to repay overdrafts

You must immediately pay the amount of any overdraft along with any fees that apply. We may report you to consumer reporting agencies, close your account, or both. This could affect your ability to open accounts with us or other banks in the future. For certain business accounts, if you don't immediately pay the amount of overdraft, you may also be charged additional fees or interest during nightly processing.

You authorize us to use the money from any subsequent deposits to your account (including but not limited to a direct deposit of Social Security or any other state or federal benefit payment) to pay any overdraft and resulting fees in that account. The repayment of any overdraft or resulting fee from any other account is outlined in the section *Setoff and Security Interest.* For deposits you have authorized, you understand and agree that if you don't want your benefits applied in this way, you may change your direct deposit instructions at any time with the person or organization paying the benefits.

You agree to pay all costs and expenses we incur in collecting any overdraft. We may still pursue collection of the amount you owe (including suing you) after it is charged off.

It's your responsibility to avoid overdrawing your account.

### 3. Insufficient Funds and Returned Item fees

We will charge a fee during nightly processing for any item presented on a business day when your account is overdrawn, whether or not we pay the item. If we pay it, we will charge an Insufficient Funds Fee. If we return it, we will charge a Returned Item Fee (even if we later decide to pay that item after we had initially decided to return it). Special rules for everyday debit card transactions are described in the *Electronic Funds Transfer Service Terms.*

Refer to your product information and Fee Schedule for information about what fees apply and how fees are calculated for your account. We may limit the number of Returned Item and Insufficient Funds fees we charge for a business day. For business accounts, we may charge interest on any amount you are overdrawn that you haven't repaid promptly.

### 4. Overdraft Protection

Overdraft Protection allows you to link one of your accounts as your backup account to your checking account to help pay an overdraft. If your checking account does not have enough money, we will use the available funds from your backup account to authorize or pay transactions.

**Establishing or Canceling Overdraft Protection:** Any owner of both a qualifying checking account and the backup account may enroll in Overdraft Protection without the consent of other owners and both accounts must share at least one owner to maintain Overdraft Protection. Any owner of the checking account or the backup account may cancel Overdraft Protection (by terminating the service or closing the account) without the consent of other owners. A backup account can provide Overdraft Protection for more than one checking account, but a checking account can have only one backup account. A personal checking account may be linked to a Chase personal savings account; and a business checking account may be linked to a Chase business savings account or a business line of credit in good standing. We may cancel your Overdraft Protection service at any time. Your request to add or cancel Overdraft Protection will become effective within a reasonable time after approval.

**Transfers:** We will make one Overdraft Protection transfer per business day that will appear on your statement for both accounts. If you have enough available funds in your backup account, we will automatically transfer enough to bring your checking account balance to zero. If you do not have enough available funds in your backup account to bring your checking account balance to zero, but you have enough available funds to pay one or more transactions and/or your previous day's negative balance, we will transfer that amount. If the amount transferred does not bring your checking account balance to zero, your checking account will become overdrawn and you may be charged Insufficient Funds or Returned Item fees. If we authorize your transaction, we will leave the funds in your backup account until we pay the transaction, which may take several days. However, if you use those funds before the transaction is paid there will not be available funds to make the transfer and your checking account may become overdrawn and charged an Insufficient Funds Fee. The available balance for a savings account is determined at the time that we authorize a transaction or at the end of business day processing. The available balance for a business line of credit is determined at the end of the previous business day processing. We are not required to notify you if funds from the backup account cannot be transferred for Overdraft Protection (for example if the account is dormant, purged, restricted or not in good standing). Refer to the section *Restricting Your Account; Blocking or Delaying Transactions* for additional information.

Overdraft Protection transfers may result in Savings Withdrawal Limit Fees. See the *Savings Withdrawal Limit Fee* section for more information.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2020 JPMorgan Chase & Co.

Return to Table of Contents

Page 9 of 25
Effective 11/8/2020

**A:103**

## D. Electronic Funds Transfer Service Terms; Payments, Deposits and Transfers You Make or Receive by Electronic Methods

We provide a variety of electronic funds transfer (EFT) services for deposit accounts. These include payments, deposits and transfers that you make or receive by electronic methods, such as with your card, telephone, or chase.com.

### 1. Types of EFT services

### a. Debit and ATM cards

As a condition of opening certain accounts, you agree that we may automatically issue you a Chase debit or ATM card. However, activating your card is not required to keep your account open. We may deactivate any temporary ATM card when you activate your debit card.

You can use your card as follows:

**At ATMs to:**

- Withdraw cash;
- Transfer money;
- Check your balances;*
- Deposit cash or checks;*
- Make payments to qualifying Chase credit cards and loans;*
- Obtain a copy of recent account activity.*

Services marked with an asterisk (*) are available only at Chase ATMs, and all services may not be available at all Chase ATMs.

When you use a Chase ATM, you will have access to all of your personal checking, savings and credit card accounts, regardless of whether the accounts are linked to your card. When linking multiple accounts to your card, one checking account and one savings account will be designated as primary. We also offer cards with limited functions for your deposit accounts, such as deposit-only business cards and prepaid cards that can be linked to a checking or savings account. Subject to the limited functions provided for each card, limited-function cards are also considered "cards" under this agreement.

You can use a non-Chase ATM only if it is in a participating network. Your primary checking and savings accounts will be accessible on that network, and your other linked accounts may be accessible. Outside the U.S., only your primary checking account is usually accessible. We may charge a Non-Chase ATM Fee, and the ATM owner/network may also charge a fee. Any of these fees may be charged for any activity, including withdrawals, balance inquiries and transfers. We generally waive the Non-Chase ATM Fee for a balance inquiry or transfer if it is made in connection with a withdrawal at the same non-Chase ATM at the same time with the same card. On some accounts, we will refund ATM fees charged by the ATM owner/network; however, some ATM owners/networks do not identify these fees in the information they send to us and, as a result, we may not automatically refund the fee. If for any reason the refund is not processed, please contact us. If you choose to convert an international transaction to U.S. dollars at either an ATM or on a purchase, foreign currency commissions and fees included in the exchange rate charged by third parties are excluded from Chase reimbursements.

**You can use your debit card (but not your ATM card):**

**At participating merchants to:**

- Purchase goods and services. Purchases are subtracted from your primary checking account. If you have arranged with your merchant to make recurring payments, you must notify the merchant if your card number or expiration date has changed or your debit card is closed. We may also provide the merchant or the participating network your new account number and expiration date.
- Withdraw cash while making a purchase using your PIN if the merchant permits the cash-back option.
- Send or receive payments from another person, or receive payments from a business by providing your card number to third-party payment services.

**At participating financial institutions to:**

- Withdraw funds at a teller. Withdrawals are subtracted from your primary checking account. You will be charged a Non-ATM Cash Fee.

### b. Electronic transfers using your account number

You may authorize a third party to transfer funds to or from your account by providing your account number and your routing number. These transfers may use various payment networks and may take various forms, such as:

- Employer payroll, government benefits or other direct deposits;
- One-time or recurring charges to your account to a utility payment or to pay other bills; or
- A "check conversion" transfer, where a merchant or other payee creates an electronic transfer from your paper check. The merchant may keep your check or return it to you.

### c. Online banking and Chase Mobile

You may use chase.com or Chase Mobile to view your account information, make deposits (Chase Mobile only), transfer funds between your Chase accounts, pay qualifying Chase loans or credit cards, or make payments from your account to third parties. Enroll for these services on chase.com or by downloading the Chase Mobile app for select mobile devices. You must agree to the additional disclosures and specific terms for using these services when you enroll.

### d. Telephone banking

You may use our automated customer service system or speak to us to get your account information, transfer funds between your accounts with us, or pay qualifying Chase loans or credit cards. You must have a valid deposit or loan account and a valid password or PIN to use the automated system. Business account owners may also use a valid Taxpayer Identification Number (TIN).

### e. Transfers for Overdraft Protection

Transfers to and from your accounts for Overdraft Protection are also EFTs and subject to these terms.

DEPOSIT ACCOUNT AGREEMENT

**A:104**

## 2. Important information and agreements about your card

### a. Authorizations and holds

Most merchants ask us to authorize your purchase. When we give authorization to a merchant, we will reserve or place a hold on your available balance, generally for three business days, for the amount of the authorization. There may be delays of several days between the authorization and the date the transaction is presented for payment, and your transaction may post to your account after the authorization hold has lifted.

We may authorize or refuse to authorize a transaction based on a different amount than the authorization request, because some merchants request authorization for an amount that is unrelated to the actual amount of the purchase (such as self-service fuel).

For some types of purchases we may place a hold for a longer period. There are times—for example, at restaurants, hotels or car rental agencies—that merchants won't know the exact amount of your purchase when they request the authorization. If the authorization is more or less than your actual purchase amount, the hold may remain for a day or two even after your purchase amount has been subtracted from your available balance. We will pay the purchase amount from your balance whenever the merchant sends it to us, even if the hold has expired.

### b. Overdrafts with your card

For personal accounts, unless you have notified us that you DO want us to pay debit card overdrafts at our discretion, we generally won't authorize an everyday debit card transaction if your available balance isn't enough to pay that transaction, and we will not charge an Insufficient Funds Fee. For business accounts, if you have notified us NOT to pay overdrafts we generally won't authorize a debit card transaction if your available balance isn't enough to pay that transaction, and we will not charge an Insufficient Funds Fee.

When we give authorization to a merchant for your purchase, your available balance will decrease. But the authorization will not prevent certain items, such as ACH transactions and checks, from posting to your account, which can leave your account without enough funds. To avoid Insufficient Fund and Returned Item fees, be sure to keep enough funds in your account to avoid overdrawing your account, including enough funds for previously authorized debit card transactions not yet posted to your account.

We rely on transaction coding sent to us by the merchant or other third party to determine whether the transaction is everyday or recurring, which affects whether or not we would authorize these transactions at our discretion and whether we can assess you Insufficient Funds Fees. If any other transaction overdraws your account, we will assess fees described in the sections *Overdrafts, Fees and Overdraft Protection, Posting Order and Processing*, and the Fee Schedule.

### c. Canceling your card

We may cancel your card at any time without notice. You may cancel your card by calling us. If you do, please destroy it.

### d. Our right to refuse transactions

We can refuse to authorize any transaction when your card has been reported lost or stolen or when we reasonably believe there may be fraudulent, suspicious or illegal activity. If you lock your card, we will stop authorizing everyday debit card transactions and ATM withdrawals but may still authorize recurring debit card transactions. Any card we issue to you will be unlocked when you activate it.

### e. Foreign exchange transactions

The exchange rate applied to card transactions that occur in a different currency will be selected by the network that processes the transaction. The network will select from the range of rates available in wholesale currency markets or a rate mandated by the government that issues or controls the currency in that country on the date it processes the transaction. The processing date on which the exchange rate is applied may differ from the date you used your card. When the card transaction is posted to your account, we will charge a Foreign Exchange Rate Adjustment Fee on the card transaction amount after conversion to U.S. dollars.

The exchange rate we use may include a spread, commissions or other costs that we, our affiliates or vendors charge in providing foreign exchange to you. The exchange rate may vary among customers depending on your relationship, products with us, or the type of transaction being conducted, the dollar amount, type of currency, and the date and the time of the exchange. You should expect that these rates will be less favorable than rates quoted online or in publications.

### f. Debit or credit prompts at terminals

If a merchant asks "Debit or Credit?" when you make a purchase, you can choose either one and your purchase will be subtracted from your primary checking account.

- If you select Debit, you must also enter your PIN.
- If you select Credit, you may have to provide a signature except for some smaller amounts and when paying for self-service fuel.

### g. ATM safety and safeguarding your account information

**Be safe at ATMs.** Some ATM locations are recorded by a surveillance camera or cameras. We advise you to be aware of your surroundings before, during and after any ATM use. Here are some additional tips:

- Choose an ATM that is well lit.
- Don't use an ATM that looks unusual or altered.
- During the hours of darkness, consider having someone accompany you to the ATM.
- If you suspect the ATM isn't working properly or if you notice anything suspicious, cancel the transaction and find another machine.
- When using a Chase ATM with a separate entry door, you should close the door completely upon entering and should not permit entrance to any unknown person after regular banking hours.
- If you need emergency assistance as a result of criminal activity or medical emergency, contact 911.
- At a walk-up ATM, minimize transaction time by having your card ready to use. At a drive-up ATM, keep your car engine running and lock your doors.
- Stand between the ATM and anyone waiting to use the machine or cover your hand so others can't see your PIN or the transaction amount.
- As soon as your transaction is complete, remove your card from the ATM, and then put away your money, receipt, and card.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2020 JPMorgan Chase & Co.

Return to Table of Contents

Page 11 of 25
Effective 11/8/2020

- Contact the police or a security officer if you see any suspicious activity at the ATM. If you think you're being followed, go to a heavily populated, well lighted area, and immediately contact the police.
- Complaints concerning security at New York Chase ATMs should be reported to the Chase Security Department at 1-800-900-0001 or the New York State Department of Financial Services at 1-888-697-2861.

**Keep your PIN confidential.** Never give your PIN to anyone, and don't write it down. In addition, to keep your card information safe:

- Use a PIN that others can't easily figure out.
- To change your PIN (or if you forget your PIN), request a new PIN at chase.com, call us or visit any Chase branch.

**Protect your debit card or ATM card as you would a credit card or cash.**

**Notify us immediately if your card is lost or stolen,** or if you discover any other error. The sooner you report a problem, the sooner we can take precautions to ensure your card isn't misused.

## 3. Daily dollar limits on ATM withdrawals and card purchases

To protect your balance, we place daily dollar limits on ATM withdrawals and card purchases, even if your available balance is higher than the daily limit. Your limits are contained in the product information you received when you opened your account.

However, we may:

- Allow transactions that exceed your limits.
- Temporarily reduce your limits without notice, for security purposes.
- Change your limits (we'll notify you if we do).

Your card will be restricted if we consider your account to be inactive or dormant.

## 4. Receipts and statements

You can receive or have the option to receive a receipt at ATMs, from a banker at a branch, online through chase.com, and at merchant locations each time you make a transaction. However, for certain small dollar transactions at merchant locations, you may not receive a receipt.

See *Statements and notices* for information about periodic statements.

To confirm that you have received a direct deposit, review your balance and recent transactions through chase.com, Chase Mobile, at an ATM, or call us.

## 5. In case of errors or questions about your electronic funds transfers

If you think your statement is wrong, or if you need more information about a transaction listed on it, see the *How to Contact Us* section.

**For personal accounts only, the following procedures apply:**

We must hear from you NO LATER than 60 days after we sent you the FIRST statement on which the error appeared. Please provide us with the following:

- Your name and account number;
- A description of the error or the transaction you are unsure about, and why you think it is an error or want more information; and
- The amount of the suspected error.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. However, if we need more time, we may take up to 45 days to investigate your complaint or question. If we do this, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If your first account deposit is less than 30 days before the date of the suspected error, the 10-business-day period is extended to 20 business days. If your first account deposit is less than 30 days before the date of the suspected error or the transaction occurred at a point-of-sale location or outside the U.S., the 45-day period is extended to 90 days.

If you call us, we may require that you send us your complaint or question in writing within 10 business days. If we do not receive it within 10 business days, we may not credit your account.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**For business accounts,** our practice is to follow the procedures described above, but we are not legally required to do so. For example, we are not required to give provisional credit, or to finalize the claim during the periods stated above. We require you to notify us no later than 30 days after we sent you the first statement on which the error appeared. We may require you to provide us with a written statement that the disputed transaction was unauthorized.

## 6. Our liability for failure to complete transactions

If we do not complete a transaction from your personal account on time or in the correct amount, we will be liable for your losses or damages. However, we are not liable for any failed transaction if you do not have enough money in your balance to cover a transaction, if the ATM or device does not have enough cash or is not working properly, if circumstances beyond our control prevent the transaction, if the merchant requests authorization for an amount greater than the purchase amount, or if there are other exceptions stated in this agreement or as provided by law. We are not liable for failure to complete a transaction on a business account if we send you notice that the transaction was not completed.

## 7. Preauthorized (recurring) transfers and stop payments

You may use your account or debit card to make recurring payments. If these recurring payments vary in amount, the payee will tell you the amount and date of the next payment at least 10 days before the payment due date. You may choose to get this notice from your payee only when the payment would differ by more than a certain amount from the previous payment or when the amount would fall outside certain limits that you set.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2020 JPMorgan Chase & Co.

Return to Table of Contents

Page 12 of 25
Effective 11/8/2020

A:106

You can stop some payments before the scheduled payment date in the following ways:

1. If you provided your card number for the recurring transfer, you must contact us by telephone or at the branch and give us the exact card number. We will close the card and you can replace it with a new card and card number upon request.

2. If you provided your account number and routing number for ACH direct debits to your account (both recurring and one-time payments), you must contact us by telephone or at the branch and give us your account number and the exact name of the payee. We will also need the exact amount of the payment, a range of amounts or an instruction to block all payments from the named payee. We will charge a Stop Payment Fee. We are not responsible for stopping payment on ACH transactions if you do not provide this information or if you provide inconsistent information. We may refuse a payment to a payee with a similar name that we believe to be the same payee; however, we are not liable if we don't refuse the payment. If you see a "pending" payment for a different amount or for a different payee than the stop payment you placed, contact us before the end of the business day so we can try to refuse payment. We may send you a written confirmation of your stop payment. We may rely on the information in the confirmation unless you notify us immediately of any errors. We may stop multiple transactions that have the amount and exact payee name you provided unless you cancel your stop payment request.

For personal accounts, your ACH stop payment is effective until we have determined that the ACH transaction is no longer occurring, or for 18 months, whichever is longer.

For business accounts, your ACH stop payment will either be effective:

- Until we have determined that the ACH transaction is no longer occurring, or for 18 months, whichever is longer, or
- One calendar year with automatic renewal annually for up to six additional years. We will list scheduled renewals on your business account statement 60 to 90 days in advance. The stop payment will be renewed, and you will be charged a Stop Payment Automatic Renewal Fee, unless you notify us not to renew by following the instructions in the statement.

3. If you set up your recurring or one-time bill payments or transfers through chase.com or Chase Mobile, you can use that service to cancel pending and future payments.

4. If you previously set up recurring account transfers in the branch, you can only cancel those pending and future transfers in the branch.

We will generally process a stop payment request as soon as we receive it. If you place a stop payment three or more business days before the transfer is scheduled, and we still pay, we will be responsible for your losses or damages.

For business accounts, you can enroll in ACH Debit Block on chase.com to block and return ACH debit transactions. The terms of the service are governed by the Fraud Protection Services Agreement.

## 8. Disclosure of account information to third parties

Information about your account or the transactions you made will be disclosed to third parties:

- As necessary to complete transactions;
- In connection with the investigation of any claim you initiate;
- To comply with government agency, arbitration or court orders (including subpoenas);
- With your written permission;
- As permitted by our Privacy Notice.

## 9. Notice of your rights and liabilities

**For personal accounts only:**

Tell us AT ONCE if you believe your card, PIN or code has been lost or stolen. Calling us is the best and fastest way of keeping your possible losses to a minimum.

If you tell us within two business days, you can lose no more than $50 if someone used your card, PIN or code without your permission. If you do NOT tell us within two business days after you learn of the loss or theft of your card, PIN or code and we can prove we could have stopped unauthorized transactions if you had told us, you could lose as much as $500. If your statement shows electronic funds transfers that you did not make, tell us right away. If you do not tell us within 60 days after the statement was sent or otherwise made available to you, you may not get back any money you lost after the 60 days if we can prove that we could have prevented the transactions if you had told us in time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, let us know. We will extend the time periods.

**For business accounts only, you agree:**

- To assist us in the investigation of claims for unauthorized transactions and related prosecution by completing the appropriate statements and reports reasonably requested by us;
- To notify us promptly in writing if any user of a card is no longer employed by you or authorized to conduct business on your behalf;
- That by allowing anyone to use your card, or by failing to exercise ordinary care (such as storing your PIN with your card or selecting your birthday as your PIN), you will be responsible for all authorized and unauthorized transactions;
- That all of the provisions of the Deposit Account Agreement, including liability limitations and the requirement that you give us notice of unauthorized items within 30 days, apply to your FFT services.

**Special Provisions for Card Transactions (Zero Liability Protection) for personal and business accounts:**

You are not liable for any unauthorized transactions, including transactions made at merchants, over the telephone, at ATMs or on the Internet, if you notify us promptly.

However, these special provisions do not apply where you were grossly negligent or fraudulent in the handling of your account or card, where you have given someone else your card, card number or PIN, or where you delay reporting unauthorized transactions for more than 60 days (30 days for business accounts).

## 10. Fees

Fees for all EFT services are disclosed in our Fee Schedule and product information.

**A:107**

## 11. Services not covered by this part; separate agreements

For personal accounts, EFT services described in the *Electronic Funds Transfer Service Terms* do not include wire transfers and any transactions that are not covered by Consumer Financial Protection Bureau Regulation E.

For business accounts, wire transfers and other services not specifically described in the *Electronic Funds Transfer Service Terms* are governed generally by the Deposit Account Agreement or by separate agreements.

We may offer additional EFT services besides those described in the *Electronic Funds Transfer Service Terms* that have separate agreements and disclosures.

## E. Other Ways to Use Your Money

### 1. When you can withdraw funds you've deposited

Generally, for checking and savings accounts, you may withdraw funds the next business day after the business day you deposit them. But in some cases you may not. Please see the *Funds Availability Policy* for details.

If funds from a deposit become available and you can withdraw them, that does not mean the check or other item you've deposited is authorized, is "good," has "cleared," or has been paid by the paying bank. It's also possible that the check will be returned months after we've made the funds available to you and you've withdrawn them. No one, including our employees, can guarantee to you that a check will not be returned.

### 2. Withdrawals and transfers from your account

We may subtract from your available balance the amount of any check or other item that we receive throughout the day that you or any person you authorize created or approved. We may require you or any person you authorize to provide us with identification, documentation or information that's acceptable to us before allowing the transaction. If check writing is not an available feature of your account, we will not issue you checks, and you are not permitted to write checks drawn on your account. We will not pay checks if you attempt to do so.

### 3. Autosave feature

You can set up automatic transfers from your checking account to your other accounts. Use the Chase Mobile app or chase.com to set up, review, change or cancel your transfers.

We will not be liable to you for our failure to transfer funds under any Autosave feature that you select, for any reason, including system outages or defects. In particular, we will not be liable for any interest, gains or dividends you might have earned or not earned in any account as a result of your use of Autosave.

### 4. Transactions in a foreign currency

Any transaction we conduct for you in a foreign currency, such as sending or receiving a wire transfer to or from another country, depositing a foreign check, or exchanging foreign currency in our branches, will use an exchange rate. Currency exchange is only available at a limited number of branches and in certain currencies. The foreign exchange rates we use are determined by us in our sole discretion. The exchange rate we use will include a spread and may include commissions or other costs that we, our affiliates, or our vendors may charge in providing foreign currency exchange to you. The exchange rate may vary among customers depending on your relationship, products with us, or the type of transaction being conducted, the dollar amount, type of currency, and the date and time of the exchange, and whether the transaction is a debit or credit to your account. You should expect that these rates will be less favorable than rates quoted online or in publications.

We are not required to accept for deposit checks that are drawn on a non-U.S. bank or payable in a foreign currency. We may accept those checks on a collection basis without your specific instruction to do so. We can reverse any amount we've added to your balance and send the check on a collection basis even after we've taken physical possession of the check. Our Funds Availability Policy does not apply to any foreign check, whether we accept it for deposit or on a collection basis. The actual amount you receive for checks payable in a foreign currency will be determined at the exchange rate for such items that's in effect when we're paid for the check. If a check is returned later for any reason, we will subtract the amount of the check and any charges from other banks from your balance. We will use the applicable exchange rate in effect at the time of the return, which may be different from the exchange rate originally used for the deposit.

### 5. Large cash withdrawals

We may place reasonable restrictions on when and how you make any large cash withdrawal. We may also require that you sign a document releasing us from any liability if you are robbed or assaulted. We may refuse the withdrawal request if you do not agree with these conditions.

### 6. Stop payments on a check

If you request us to stop payment on a check, we will charge either a Stop Payment Fee or an Online or Automated Phone Stop Payment Fee depending on how you request your stop payment. However, the stop payment will not be effective if we have already certified, paid or otherwise become responsible for the check. For example, we can't stop payment on a check we've already cashed or a deposited check where the funds have already been withdrawn. Refer to the *Electronic Funds Transfer Service Terms* for how to place a stop payment on recurring electronic payments.

You may request a stop payment by calling us, in person, or through chase.com or Chase Mobile. We use automated systems to identify items, so we need specific information to process the request. In order for us to identify the item, you must give us the account number on which the check is drawn and either:

- The exact check number or a range of check numbers,
- The payee name and the exact amount of the check, or
- The payee name and range of amounts of the check.

We are not responsible for stopping payment on checks if you do not provide this information or if you provide inconsistent information. We may refuse a payment to a payee with a similar name that we believe to be the same payee; however, we are not liable if we don't refuse the payment. We may send you a written confirmation of your stop payment. We may rely on the information in the confirmation unless you notify us immediately of any errors. When the stop payment order expires, we may pay the item and have no duty to notify you.

For personal accounts, your stop payment request lasts for one year even if the check is presented more than once unless you cancel your stop payment request. However, you may place a new stop payment order, which will be effective for one calendar year from the day you place the additional order. An additional fee will be charged.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2020 JPMorgan Chase & Co.

Return to Table of Contents

Page 14 of 25
Effective 11/8/2020

A:108

For business accounts, you may place a stop payment for either:

- One calendar year with automatic renewal annually for up to six additional years. We will list scheduled renewals on your business account statement 60 to 90 days in advance. The stop payment will be renewed, and you will be charged a Stop Payment Automatic Renewal Fee, unless you notify us not to renew by following the instructions in the statement, or
- One calendar year (this option is not available for stop payments initiated on chase.com or Chase Mobile).

Generally, we will complete your request as soon as we receive your instructions.

We may allow you to place a stop payment on a cashier's check, teller's check or certified check if you provide us a sworn statement—in a form we deem acceptable—that the check is lost, stolen or destroyed. Even if we agree to attempt to stop payment on a cashier's check, teller's check (official check) or certified check, if the check is presented for payment, we may pay it and you will be liable to us for that item, unless otherwise required by applicable law. After you place a stop payment, we are not required to refund the check amount or issue a replacement check until at least 90 days after the original check's issue date. We are not required to refund the check amount or issue a replacement check if the check is presented for payment within 90 days after the issue date.

### 7. Account numbers on funds transfers
If you instruct us to send a funds transfer, such as a wire or ACH transfer, we and every other bank involved in the transfer may rely on any bank number or account number you provide. If the funds transfer instruction gives both a bank number or account number and a name, and the name identifies a different person from the bank or account owner identified by number, we and other banks that handle the funds transfer may still rely exclusively on the number. We have no duty to detect any inconsistency between the bank number or account number and the name.

### 8. Savings account withdrawals
In this agreement, a savings account means an account, including a money market account (and excluding NOW accounts), for which we reserve the right to require seven days' prior written notice to withdrawal. See the section *Our right to require advance notice of withdrawals*. During any monthly statement period, you may make transfers and withdrawals, regardless of the number of transfers and withdrawals or the way in which transfers and withdrawals are made. You agree not to make withdrawals by negotiable or transferable instruments (checks or drafts) for the purpose of making transfers to third parties from savings accounts. If you make more than six withdrawals or transfers per monthly statement period, you will incur a fee, see the *Savings Withdrawal Limit Fee* section.

### 9. Our right to require advance notice of withdrawals
For all savings accounts and all personal interest-bearing checking accounts, we reserve the right to require seven days' prior written notice of withdrawal.

### 10. Check cashing
If a person who is not our depositor or loan customer tries to cash your check at any of our branches, we may charge them a fee or refuse to cash it. We may also require that they provide us identification we deem acceptable.

### 11. Incomplete, future-dated, conditional or stale-dated checks
You agree not to write a check that's incomplete, future-dated or tries to limit the time or method of payment with a condition, such as "Void after 180 days" or "Valid only for $1,000 or less." We have no duty to discover, observe or comply with these conditions and may pay such checks. If we pay a conditional check, the conditions do not apply to us.

We may choose to pay or not to pay a stale-dated check (dated more than six months before it is presented), regardless of how old it is. If we pay it, you will be responsible for the check.

### 12. Multiple signatures
We are not required to comply with any multiple-signature requirement, either on personal or business accounts, even if your signature card specifies that multiple signatures are required or you have otherwise instructed us to do so. A multiple-signature requirement is for your internal control purposes only.

### 13. Facsimile signatures
We may pay a check bearing any form of facsimile or computer-generated signature. If you use a facsimile or computer-generated signature, or provide a signature card authorizing any such signature, you will be solely responsible for any check bearing a similar signature, regardless of your negligence or whether the signature was the same one you previously used.

### 14. Review of checks and signatures
Check payment is highly automated, and we pay millions of checks every day. Although we inspect some checks, you agree that reasonable commercial standards don't require us to do so. If we return a check because we believe it doesn't match your signature on file with us, we're not liable to you even if you authorized the check. If the numeric amount on a check doesn't match the amount written out in words, we may select either one when paying it. We have no duty to prevent a check from being presented more than once.

### 15. Substitute Checks and Your Rights
**What is a substitute check?**

To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks, with a reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

**What are your rights as a consumer regarding substitute checks?**

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, insufficient Funds Fees).

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC                                                                   Page 15 of 25
© 2020 JPMorgan Chase & Co.                          Return to Table of Contents                          Effective 11/8/2020

A:109

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if applicable) within 10 business days after we receive your claim and the remainder of your refund (plus interest if applicable) no later than 45 calendar days after we receive your claim. We may reverse the refund (including interest) if we later determine the substitute check was correctly posted

**How do you make a claim for a refund?**

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us. You must contact us within 40 calendar days of the date that we mailed or otherwise delivered the substitute check or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

**Your claim must include:**

- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- The following information to help us identify the substitute check: the check number, the name of the person to whom you wrote the check, and the amount of the check.

**Depositing substitute checks**

You may receive a substitute check, such as when a check you deposited is returned unpaid. If you deposit a substitute check and we suffer a loss, cost or expense as a result, you will have to pay us that amount.

## IV. Funds Availability Policy

**When Your Deposit Is Received:**

If you make a deposit with a banker at a branch on a business day, we will consider that day to be the day of your deposit. If you make a deposit on a business day before our cutoff time at a Chase ATM, we will consider that day to be the day of your deposit. However, if you make a deposit on a day that is not a business day, or make an ATM deposit after the ATM cutoff time, we will consider the deposit to have been made on the next business day.

- For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays and federal holidays.
- For deposits and transfers at most ATMs, the cutoff time is 11 p.m. Eastern Time (8 p.m. Pacific Time). For ATMs with an earlier cutoff, the ATM screen will notify you of the cutoff time.
- Deposits placed in a night depository are considered received when we remove them from the night depository; we will remove deposits no later than the next business day.
- Branches in some locations may be closed on business days in observance of a state holiday or because of an emergency, and deposits made at a night depository when those branches are closed will be considered received on the next business day when the branch is open.
- We will not accept cash deposits by mail. Check deposits made by mail should be addressed to:

National Bank By Mail
PO Box 6185
Westerville, OH 43086

All deposits made by mail and addressed to any other Chase facility may be forwarded to the National Bank By Mail facility in Westerville, Ohio, and will be considered received on the date the deposit is received by that facility.

**For all accounts other than Chase Analysis Business Checking (with or without interest):** Wire transfers, electronic direct deposits and cash deposits will be available on the day we receive your deposit. Except as described later in this policy, when you make other deposits, the funds are available on the first business day after the day we receive your deposit.

In most cases when you deposit checks drawn on a Chase account:

- Deposits made with a banker at a branch will be available on the same day we receive your deposit;
- Some or all deposits made at an ATM will be available on the same day we receive your deposit.

Once funds are available, you may withdraw them or use them to pay checks and other items. For online banking deposits, different terms may apply.

**For Chase Analysis Business Checking (with or without interest):**

**Same-day availability:** Wire transfers, electronic direct deposits, and cash deposits made with a banker at a branch or at an ATM will be available on the day we receive your deposit.

**Next business day availability:** Funds from the following deposits are available on the first business day after the day we receive your deposit:

- U.S. Treasury checks that are payable to you;
- Checks that are drawn on us.
- The following items, if you make the deposit with a banker at a branch:
  a. State and local government checks that are payable to you, if you use the "Next Day Funds Availability" deposit slip available at any branch upon request;
  b. Cashier's, certified, and teller's checks that are payable to you, if you use the "Next Day Funds Availability" deposit slip available at any branch upon request;
  c. Federal Reserve Bank checks, Federal Home Loan Bank checks, and postal money orders that are payable to you.

DEPOSIT ACCOUNT AGREEMENT

**A:110**

**Second business day availability:** Funds from all other deposits are available no later than the second business day after the day we receive your deposit. Available funds may be withdrawn in cash or used to pay checks and other items.

For online banking deposits, different terms may apply.

**Longer Delays May Apply:**

**For all accounts other than Chase Analysis Business Checking (with or without Interest):** In some cases, we may not make all of the funds that you deposited by check available by the first business day after the day of your deposit. Funds may not be available until the second business day after the day of your deposit. However, the first $225 of these deposits will be available on the first business day after the day of your deposit, unless we delay availability for one of the circumstances listed below. If you will need the funds from a deposit right away, you should ask us when the funds will be available, but further review of the deposit after we receive it may still result in delayed availability.

**For all accounts:** We may delay availability for the full amount of the check, including the first $225, up to the seventh business day after the day of your deposit under the following circumstances:

- We believe a check you deposited will not be paid;
- You deposited checks totaling more than $5,525 in any one day;
- You redeposited a check that has been returned unpaid;
- You have overdrawn your account repeatedly in the last six months; or
- There is an emergency, such as failure of communications or our systems.

If your check deposit is made with one of our employees or at an ATM and we decide at that time to delay your ability to withdraw funds, we will tell you then. If we decide to delay availability of your funds after you complete your deposit, we will mail you a deposit hold notice by the business day after we decide to take that action.

**Special Rules for CDs and Retirement Money Market Accounts:**
Generally, funds you deposit will be available within one business day except when you deposit checks that total more than $5,525 in a business day. The amount exceeding $5,525 will be available no later than the seventh business day after the day of your deposit. However, we are not required to let you withdraw principal from a CD before it matures.

**Special Rules for New Accounts:**
If you are a new customer, the following special rules may apply during the first 30 days your account is open:

- Funds from deposits of the first $5,525 of a business day's total deposits of cashier's, certified, teller's, traveler's, and federal, state, and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you. The excess over $5,525 will be available on the seventh business day after the day of your deposit. If your deposit of these checks (other than U.S. Treasury checks) is not made with a banker at a branch, the first $5,525 will not be available until the second business day after the day of your deposit; and
- Funds from all other check deposits will be available no later than the seventh business day after the day of your deposit.

**Holds on Other Funds:**
If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available on the day they would have been available if you had deposited the check.

## V. Safeguarding Your Information

### A. Checks and Other Documents You Use
We are not responsible for losses or delays that result from improper printing on checks or other account documents that you obtain through someone other than us. We may refuse to accept for deposit or to pay checks that we cannot process or photograph using our customary equipment.

### B. Protecting Your Checks
You must protect your checks and other account documents and information from theft and unauthorized use. You must write your checks in a way that prevents someone else from completing, altering or adding to them without your authorization. If you become aware that any checks or other documents and information, such as statements, have been lost or stolen, you must notify us immediately. If you fail to do any of these things, such as leaving your checks where they can easily be stolen, we are not responsible for any losses that may result.

### C. Notice of Errors, Forgeries and Unauthorized Signatures
You must notify us in writing within 30 days after we mail a statement or otherwise make a statement available (for example, paperless statements) if:

- A check that you did not authorize or that is altered is listed on the statement;
- Your account statement contains any errors; or
- You did not receive your scheduled statement.

This 30-day notice requirement does not limit our rights to attempt to collect on unauthorized or altered checks from other banks.

You must notify us in writing of any unauthorized, improper or missing endorsements within six months after the account statement is mailed or made available.

You must provide us with all information we need to investigate the alleged error or item. You must also file any police reports and provide any supporting affidavits and testimony we reasonably request.

If you do not comply with the requirements above, we are not required to reimburse you for any claimed loss, and you cannot bring any legal claim against us in any way related to the check or errors. In addition, if you fail to notify us of any unauthorized check within 30 days (14 days in New York) after we mail, or in any other way make available, a statement that lists an unauthorized check, we are not required to reimburse you for unauthorized checks initiated by the same wrongdoer(s) that we

A:111

pay after that time. These requirements do not apply to personal account transactions covered by the *Electronic Funds Transfer Service Terms*. You also have certain rights under federal law for substitute checks; please see *Substitute Checks and Your Rights* for more information.

# VI. Managing and Maintaining Your Account

## A. Interest on Checking and Savings Accounts

When you open a checking or savings account that pays interest, we will provide you a rate sheet stating the current interest rate and Annual Percentage Yield for your account. The rate sheet is considered a part of this agreement.

Your account has a variable interest rate. That means we may change the interest rate and Annual Percentage Yield as often as we choose, without limits and without notice. Interest begins to accrue on the business day we receive credit for your deposit. For cash, wire transfers and electronic direct deposits, interest begins to accrue on the business day of your deposit.

We use the daily balance method for calculating interest. This method applies a daily periodic rate to the balance in your account each day, which may be based on your present balance or collected balance as explained in the product information for your account. The collected balance is the balance of all deposits in your account on which we have received credit for the deposited funds (determined by the availability schedule of our Federal Reserve Bank for checks and similar items). We reserve the right not to pay interest on any deposited item that is returned to us unpaid.

Interest is credited and compounded monthly. However, Retirement Money Market accounts with interest distributions will not compound, and interest will be credited on the distribution date. Unless otherwise stated in your product disclosure, interest is computed on a 365-day basis. We pay interest only in whole cents. Therefore, at the end of each interest payment period (usually monthly), any fractional amount of interest less than half of one cent will be rounded down and any fractional amount of interest equal to half of one cent or more will be rounded up to the next whole cent.

## B. Linking Your Accounts; Statements

### 1. Linked accounts

You may link your qualifying accounts to your checking account to help you avoid some fees and get relationship rates. An account may be linked to only one checking account.

We may automatically link accounts or we may provide some of the benefits you would be eligible for had you requested your accounts to be linked. If we don't, you may ask us to link your accounts. Your account information may be made available to any other owner on any of the linked accounts. If the checking account to which your other accounts are linked closes for any reason, it is your responsibility to request any remaining eligible accounts to be linked. If we determine your accounts are no longer eligible for linking, we may delink them and we are not required to notify you if we do.

If you choose to link your accounts to other accounts for which you serve as trustee or custodian (fiduciary), your account may receive a financial benefit, which could be a violation of your fiduciary duties. We are not responsible for your decision to link fiduciary accounts. You should carefully consider this decision and consult with your legal advisor if necessary. Refer to your product information to determine which qualifying accounts are eligible to be linked, any additional requirements and the benefits from linking accounts.

### 2. Statements and notices

We will make a monthly account statement available for checking and savings accounts during each statement period. The statement period may or may not be a calendar month, but in most cases it won't be more than 32 days or less than 28. The specific dates covered by your account statement will be on your statement.

You will receive statements by mail unless you choose paperless statements or if your account has had no activity other than interest we paid. If you receive paper statements, we will mail them through U.S. mail to the current address listed in our records. We may change your mailing address if we receive an address change notice. Checking and savings statements are also generally available through chase.com or Chase Mobile unless the product information indicates otherwise.

We have made the statement available to you on the day we mail your paper statement or notify you that the paperless statement is available, even if your current address or email is invalid.

We may send you other notices related to your account. If you are enrolled in chase.com or Chase Mobile, some notices may only be available electronically. We send some notices only in paper form. You agree that sending the statement or notice to one owner of an account qualifies as sending it to all owners, even if all owners don't have access to the mailing address of record for the account.

### 3. Combined statements

Checking, savings and CD accounts with at least one common owner may be combined on a single statement, either with or without your request. However, we may send you separate statements at any time for any reason without prior notice. If accounts are included on a combined statement and you don't want that, notify us and we'll separate the statements. That change will affect only future statements.

Linked accounts do not have to be on a combined statement to receive the benefits of linking, and combining accounts on a single statement does not mean that the accounts are linked.

Each owner of each account listed on the statement can request a copy of a statement and will be able to view all account activity for all accounts on that statement through chase.com or Chase Mobile.

### 4. Options for receiving checks

We offer three choices for how you can view or receive copies of checks you've written or authorized:

- "Check safekeeping" means we keep images of your checks, which are available through chase.com. We do not include your paid checks or images of them with your statement. Some accounts require check safekeeping.

- "Image statement" means you will receive images of the front of your paid checks on your account statement.

- "Check enclosure" means we return legal copies of your paid checks with your account statement. This feature is not offered on all accounts.

A:112

If you have multiple personal checking accounts on a single statement and one of them uses check enclosure, all others will use check safekeeping. You agree that when we send a statement we have made the check available to you, even if we do not send originals or images with the statement. We will destroy original checks after a reasonable period of time we determine.

If for any reason we can't provide a copy of your check, you agree that we will not be liable for more than the face amount of the check. We cannot provide originals or images of checks that are sent to us as electronic transfers. Additionally, other banks may send us electronic images instead of original checks, so we can provide a copy of the image, but not the original check.

### C. Telephone and Electronic Communication

We may record and/or monitor any of our telephone conversations with you. If we do record, we do not have to keep the recordings, unless the law says we must. We may use your voice to verify your identity.

When you give us your mobile number, we have your permission to contact you at that number about all of your Chase or J.P. Morgan accounts. Your consent allows us to use text messaging, artificial or prerecorded voice messages and automatic dialing technology for informational and account service calls, but not for telemarketing or sales calls. It may include contact from companies working on our behalf to service your accounts. Message and data rates may apply. You may contact us anytime to change these preferences. If you give us your email address, you agree that we may send servicing messages (such as fraud alerts and hold alerts) related to your accounts to that address.

We may send communications electronically, such as by email or text message, rather than through U.S. mail or other means, unless the law says otherwise.

### D. Other Fees for Your Account

#### 1. Fees

You agree to pay all fees applicable to your account. We provided you a schedule of fees when you opened your account, and we will notify you of any changes. We may subtract these fees from your balance, even if the fee makes your balance negative. Refer to the Fee Schedule for specific fee information.

#### 2. Savings Withdrawal Limit Fee

The Savings Withdrawal Limit Fee is a Chase fee and applies for each withdrawal or transfer out of a Chase savings account over six per monthly statement period. All withdrawals and transfers out of your savings account count toward this fee, including those made at a branch or at an ATM. Refer to your product information for fees that apply for your account.

### E. Setoff and Security Interest

If you owe a debt to us or any of our affiliates (either now or in the future) that is due or overdue, you grant us a right of setoff to, and a security interest in, all of your accounts to secure the debt and, as a consequence, we may use funds in any of your accounts to pay all or part of that debt. If your account is a joint account, we may use the funds in the joint account to pay the debt of any account owner. Our security interest will be governed by Uniform Commercial Code Article 9, whether Article 9 applies by its terms or not. We do not have to give you any prior notice to apply the funds except as required by law. You expressly agree that our rights extend to any federal or state benefit payments (including Social Security benefits) that had been deposited to your account. The right of setoff does not apply if the debt is created under a personal credit card plan. Any term that may exist in another agreement that governs your debt that may also provide for such rights provided here will be governed by that agreement.

If any federal benefits or other payments are deposited to your account after you become ineligible to receive them, and we are obligated to return those funds to the payor, we may reduce your account balance by that amount.

### F. Account Alerts and Text Banking

If you receive or otherwise use Account Alerts or text banking, you agree to the following terms. If you are enrolled with chase.com, the terms of the Online Service Agreement control the terms of these services instead.

- We may use a telephone number, email address or other delivery point we have in our records for you or other contact information that you provide to us for these services so we can send you certain information about your account. You may be automatically enrolled to receive certain Account Alerts via email. To manage your Alerts preferences or cancel Account Alerts, use chase.com or Chase Mobile or call us.
- We will send Account Alerts or text banking messages through your service provider, who will act as your agent and deliver them to you. Delivery of alerts may be delayed for various reasons, including service outages affecting your phone, wireless, or Internet provider, technology failures; and system capacity limitations.
- We do not charge for Account Alerts or text banking, but message and data rates may apply. **To cancel text banking services, send STOP to 24273 at any time.** For help or information on text banking, send HELP to 24273 or contact us at 1-877-242-7372.
- Account Alerts and text banking are provided for your convenience and do not replace your monthly statement, which is the official record of your account. Anytime you review your balance, keep in mind it may not reflect all transactions, including recent debit card transactions or checks you have written.
- You understand we may not encrypt information when it is sent to you through these services. This information may include personal or confidential information about you, such as account activity or the status of your account.

You understand we are not liable for losses or damages from any disclosure of account information to third parties, non-delivery, delayed delivery, misdirected delivery or mishandling of, or inaccurate content in Account Alerts or information sent through text banking. If we suffer a loss, cost or expense because you provide an incorrect telephone number, email address or other delivery point, or you violate applicable laws, you have to pay that amount to us.

## VII. Maintaining Your Certificate of Deposit (CD) Account

A certificate of deposit, or CD, is a deposit account with us for a specified period of time. This disclosure covers both retirement and non-retirement CD products. By opening your CD, you agree to keep the amount deposited (principal) on deposit.

Here are a few things you should know about CDs:

**Term:** The term is the number of days, months or years you agree to leave your money in the account.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2020 JPMorgan Chase & Co.

Return to Table of Contents

Page 19 of 25
Effective 11/8/2020

A:113

**Maturity date and grace period:** The maturity date is the last day of your CD's term. The grace period is the 10 days after the maturity date for CDs with a term of 14 days or longer. On the maturity date or during the grace period you can change the term of your CD, make additional deposits (for non-retirement CDs only), or withdraw your CD principal without paying an early withdrawal penalty.

**CD ladders:** Chase may offer a CD ladder, which is a group of four CDs opened at the same time for the same amount but with different terms. When each CD matures, its term will change to the longest term of the original group. For example, in a 12-month ladder, we will open four CDs with original terms of 3, 6, 9 and 12 months. When each CD matures, its new term will be 12 months. The result will be four 12-month CDs with a CD maturing every three months.

**Automatically renewable CD:** An automatically renewable CD will renew on the maturity date for the same term unless 1) you have a different renewal term as part of a CD ladder; 2) you change or close the account or 3) we notify you otherwise. Once your CD renews, any reference to the maturity date means the last day of the new term. For the renewal term, your CD will earn interest for the term and amount at the CD standard rate unless you qualify for the CD relationship rate. If your CD is closed during the grace period, it will not earn interest on or after the maturity date.

**Single maturity CD:** A single maturity CD will not automatically renew on the maturity date and won't earn or be paid interest on or after that date.

**Interest:** We use the daily balance method to calculate interest on your CD. This method applies a periodic rate each day to your balance. Interest begins to accrue on the business day of your deposit. Interest for CDs is calculated on a 365-day basis, although some business CDs may calculate interest on a 360-day basis. The Annual Percentage Yield (APY) disclosed on your deposit receipt or on the maturity notice assumes interest will remain on deposit until maturity. On maturities of more than one year, interest will be paid at least annually.

You may withdraw any paid or credited interest without penalty during your CD's term or at maturity. On the maturity date, interest will become principal of the renewed CD. A withdrawal will reduce earnings.

**Early withdrawal penalties: There is a penalty for withdrawing principal prior to the maturity date.**

**For Personal CDs:**
- If the term of the CD is less than 6 months, the early withdrawal penalty is 90 days of interest on the amount withdrawn, but not more than the total amount of interest earned during the current term of the CD.
- If the term of the CD is 6 months to less than 24 months, then the early withdrawal penalty is 180 days of interest on the amount withdrawn, but not more than the total amount of interest earned during the current term of the CD.
- For terms 24 months or more, the early withdrawal penalty is 365 days of interest on the amount withdrawn, but not more than the total amount of interest earned during the current term of the CD.
- If the withdrawal occurs less than seven days after opening the CD or making another withdrawal of principal, the early withdrawal penalty will be calculated as described above, but it cannot be less than seven days' interest.
- The amount of your penalty will be deducted from principal.

**For Business CDs:**
- If the term of the CD is less than 12 months, the early withdrawal penalty is equal to $25 plus 1% of the amount withdrawn
- For terms of 12 months or more, the early withdrawal penalty is equal to $25 plus 3% of the amount withdrawn.
- If the withdrawal occurs less than seven days after opening the CD or making another withdrawal of principal, the early withdrawal penalty will be calculated as described above, but it cannot be less than seven days' interest.
- The amount of your penalty will be deducted from principal.

**Waiving early withdrawal penalties for Personal CDs:**
We will waive early withdrawal penalties under the circumstances described below, unless these withdrawals occur less than seven days after the account was opened or a previous withdrawal was made.

For non-retirement CDs:
- Death of a CD owner or a grantor of a revocable family/living trust;
- Disability of a CD owner;
- A court's determination that a CD owner is incompetent; and
- Re-titling of a CD to transfer ownership of funds into a living trust without moving funds from the bank and where no change in term or rate occurs.

For retirement CDs:
- If the retirement CD owner is withdrawing an excess annual retirement contribution amount and any corresponding earnings.

We will also waive early withdrawal penalties for retirement CDs under the circumstances described below, regardless of when the early withdrawal is made in relation to the CD opening or a previous withdrawal.

- Death or disability of a retirement CD owner;
- A court's determination that a retirement CD owner is incompetent; and
- If the retirement CD owner is age 59½ or older and the funds are taken as an IRS-reportable distribution via cash, check, or deposit or transfer to a non-retirement account. This waiver does not apply if the transfer is to a retirement account at another financial institution.

**Waiving early withdrawal penalties for Business CDs owned by a sole proprietorship:**
We will waive early withdrawal penalties under the circumstances described below, unless these withdrawals occur less than seven days after the account was opened or a previous withdrawal was made.

- Death of a CD owner or a grantor of a revocable family/living trust;
- Disability of a CD owner;
- A court's determination that a CD owner is incompetent; and
- Re-titling of a CD to transfer ownership of funds into a living trust without moving funds from the bank and where no change in term or rate occurs.

DEPOSIT ACCOUNT AGREEMENT

A:114

## VIII. Closing Your Account

Either you or we may close your account (other than a CD) at any time for any reason or no reason without prior notice. We are not required to close your account at your request if you have pending transactions, the account is overdrawn, your account is subject to legal process (such as a garnishment, attachment, execution or levy) or any type of holds (such as collateral hold, decedent hold or deposit hold). In those cases, we will limit the types of transactions that you can make until pending transactions are paid or returned, the balance is no longer negative and any legal restriction/hold has been released. After we restrict your account in preparation for closing, we will not pay any additional interest on the account. We may automatically close your account if the balance is $0 or negative. Either you or we may close your CD account on any maturity date without cause.

We may send you written notice that we have closed or will close your account and return the balance less any fees, claims, setoffs or other amounts if the balance is greater than $1. After your account is closed, we have no obligation to accept deposits or pay any outstanding checks, but we may reopen your account if we receive a deposit. We will have no liability for refusing to honor any check drawn on a closed account. We have the right to advise consumer reporting agencies and other third party reporting agencies of accounts closed for misuse, such as overdrafts.

This agreement continues to apply to your account and issues related to your account even after it closes.

## IX. Other Legal Terms

### A. Rules Governing Your Account

This agreement, all accounts and services provided to you, and any dispute relating to those accounts and services are governed by federal law and, when not superseded by federal law, the law of the state where your account is located.

Here's how we determine where your account is located:

- If you applied for the account in person at one of our banking offices, then the account is located in the state where you applied.
- If you applied in person for a business account with one of our representatives somewhere other than at one of our banking offices (your place of business, for example), your account is located in the state where the representative's business office is located.
- If you applied for the account by mail, digitally, or through other remote means, and your address as recorded in our records was in a state where we had a branch at the time, then the account is located in that state, which for joint accounts will be based on the address of the owner whose name was listed first.
- In all other cases your account will be governed by Ohio law.

Business trust accounts for professionals regulated by a state (or a self-regulatory body under a state's laws) are located in the designated state.

### B. General Liability

Any provision of this agreement that limits the bank's liability does not negate the bank's duty (if any) under applicable law to act in good faith and with reasonable care. If any provision of this agreement is determined to limit the bank's liability in a way prohibited by applicable law, the provision will nevertheless be enforced to the fullest extent permitted under that law.

We will not be liable for anything we do when following your instructions. In addition, we will not be liable if we do not follow your instructions if we reasonably believe that your instructions would expose us to potential loss or civil or criminal liability, or conflict with customary banking practices. **WE WILL NOT BE LIABLE FOR INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES REGARDLESS OF THE FORM OF ACTION AND EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF WE FAIL TO STOP PAYMENT ON AN ITEM, OR PAY AN ITEM BEARING AN UNAUTHORIZED SIGNATURE, FORGED SIGNATURE, OR FORGED ENDORSEMENT OR ALTERATION, OUR LIABILITY, IF ANY, WILL BE LIMITED TO THE FACE AMOUNT OF THE ITEM.**

If this agreement conflicts with any statements made by one of our employees or by our affiliates' employees, this agreement will govern.

### C. Restricting Your Account; Blocking or Delaying Transactions

There are many reasons we may decline or prevent transactions to or from your account, but we generally do it to protect you or us, or to comply with legal requirements. We may decline or prevent any or all transactions to or from your account. We may refuse, freeze, reverse or delay any specific withdrawal, payment or transfer of funds to or from your account, or we may remove funds from your account to hold them pending investigation, including in one or more of the following circumstances:

- Your account is involved in any legal or administrative proceeding;
- We receive conflicting information or instructions regarding account ownership, control or activity;
- We suspect that you may be the victim of a fraud, scam or financial exploitation, even though you have authorized the transaction(s);
- We suspect that any transaction may involve illegal activity or may be fraudulent;
- We are complying in our sole judgment, with any federal, state or local law, rule or regulation, including federal asset control and sanction rules and anti-money-laundering rules, or with our policies adopted to assure that we comply with those laws, rules or regulations; or
- We reasonably believe that doing so is necessary to avoid a loss or reduce risk to us.

We also may limit cash deposits to, or withdrawals from, your account (or all of your accounts collectively) in a single transaction or total withdrawals or deposits during any period of time, or who may make deposits, in order to reduce risk and/or enhance our efforts to comply with applicable law.

We can assign and transfer your account information and documentation to a replacement account number at our discretion. We may make this assignment when your account is reported compromised by you or any signer. If we issue your a replacement account number, this Deposit Account Agreement governing you and your account will continue to apply, without interruption, as if you retained the discontinued account number.

We will have no liability for any action we take under this section and we may take such action without advanced notice.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2020 JPMorgan Chase & Co.

Return to Table of Contents

Page 21 of 25
Effective 11/8/2020

**D. Changes to the Agreement**

We may change the terms of this agreement, including fees and features of your account, at any time. If any change would adversely affect you, we will notify you in advance, unless the change is necessary to comply with a legal requirement.

For CDs, changes that would adversely affect you will be effective on the next maturity date.

If we transfer your account to a different business unit within the bank, we may give notice in the same manner and provide you a different deposit agreement to govern your account. You agree that notice of these changes may be provided to any joint owner.

We are not required to send you notice of interest rate and Annual Percentage Yield changes for variable rate accounts or notice of changes in printing fees for documents (such as checks).

We may direct you to a branch or chase.com for the content of any changes or the revised agreement unless the law requires a different method. By maintaining your account after the effective date of any change, you agree to the change.

This agreement takes the place of any understandings, agreements, representations, and warranties, both written and oral, made prior to or when you entered into this agreement.

**E. Our Responsibility to Obtain Personal Information**

Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or business who opens an account. We require the following information or documents as a condition to your opening an account:

- For a personal account: your name, residential address; date of birth; and Social Security number, driver's license or other identifying documents
- For a business account: your business name, taxpayer identification number and business address; the name, residential address, date of birth and Social Security number of each signer, so we can verify the signer's identity; and documents to verify the business's existence.

Our policies may require additional information about you or any person associated with you or with the account when or after you open the account to assure that we comply with "Know Your Customer" requirements. We may restrict or close your account if we are unable to obtain information in order to satisfy our "Know Your Customer" requirements. By opening an account with us, you confirm that neither you nor any beneficial owner of any account is covered by any sanctions programs administered or enforced by the U.S. Department of the Treasury, Office of Foreign Asset Control.

**F. Prohibited Activities and Tax Reporting**

We strictly prohibit the use of any account to conduct transactions (including, without limitation, the acceptance or receipt of credit or other receipt of funds through an electronic funds transfer, or by check, draft or similar instrument, or the proceeds of any of the foregoing) that are related, directly or indirectly, to unlawful Internet gambling. The term "unlawful Internet gambling," as used in this Notice, shall have its meaning set forth in 12 C.F.R. Section 233.2(bb). You agree not to conduct any transactions through the account that directly or indirectly involve or are related to unlawful Internet gambling, including, without limitation, the acceptance or receipt of any funds or deposits in connection therewith.

You also agree not to use your account for any other illegal activity. We may refuse any gambling transaction, whether lawful or not.

Transactions in your account are also subject to applicable clearinghouse and Federal Reserve rules and regulations. You will not use your account to send or receive a payment on behalf of anyone who is not a U.S. citizen or resident using The Clearing House Association's Real-Time Payment network.

You agree that you are responsible for your tax obligations and any funds in, or to be deposited in, your accounts are not proceeds from any criminal activity (including, but not limited to, tax crimes). Funds in, and any income derived from, your accounts will be disclosed to the relevant tax authorities, if required by law. All information that has been provided is complete and accurate, including any information pertaining to your country of citizenship, residence, principal place of business and any other relevant information to determine legal and tax status. You agree to notify us and/or provide us with any changes related to your tax affairs as we may request in order to comply with our regulatory obligations.

**G. Death or Incompetence of Account Owner or Sole Signer**

Tell us immediately if any account owner dies or is declared incompetent by a court. We may act as if all owners are alive and competent until we receive notice otherwise.

After we receive notice of death or incompetence, we may freeze your balance, refuse to accept transactions, and reverse or return deposits. We are also not required to release your funds until we receive any documents we reasonably request to verify your death or incompetence, as well as who is entitled to the funds. If you die while residing outside the United States, we may require a personal representative to be appointed by a court in a United States jurisdiction. If we have any tax liability because of paying your balance to your estate, the estate will be responsible for repaying us the amount of that tax. If an account owner authorizes any transaction, but it's not presented for payment until after that owner dies, we are authorized to pay the transaction. If you owe us a debt at the time of your death, we are permitted to exercise our right of setoff (our right to apply funds in one account to the debt associated with another account) or security interest rights against the funds credited to your balance after your death. We have these rights even if a surviving joint owner, a "payable on death" payee, or a beneficiary of an "in trust for" or "trustee for" account has rights to the account.

After we receive notice of death or incompetence of the sole signer on a business organization's account, we may freeze the balance, refuse to accept transactions, and reverse or return deposits. We are also not required to release the organization's funds until we receive any documents we reasonably request to verify the death or incompetence of the signer and to establish a new person's authority to act on behalf of the organization in transacting on or closing the organization's account.

**H. Adverse Claims**

If there are conflicting instructions or there is any dispute regarding your account, we may take any action, including refusing to disburse any funds in the account to any person until all persons claiming an interest consent in writing to a resolution of the dispute; or a court of proper jurisdiction authorizes or directs the payment; or the person with a conflicting claim withdraws his or her claim in writing. We may also place funds in a court (this is called an interpleader action) for resolution. If any person notifies us of a dispute, we do not have to decide if the dispute has merit before we take further action. We may take these actions without any liability and without advance notice, unless the law says otherwise.

A:116

**I. Authorization to Share Information**

You authorize us to share information about you and your account with affiliates and third parties, unless the law or our Privacy Notice prohibits us from doing so. Please see our *Privacy Notice* for your choices about information sharing.

**J. Disputing Information Reported to a Consumer Reporting Agency**

If you believe that we have reported inaccurate or incomplete information about your account to a consumer reporting agency, you have the right to file a dispute with that consumer reporting agency. You may also submit a dispute directly to us by writing to the address in the *How to Contact Us* section. Provide your name, address and phone number; the account number; the specific information you are disputing; an explanation of why it is inaccurate or incomplete; and any supporting documentation.

**K. Legal Process and Requests for Information**

If we receive any legal process relating to you or your account, you authorize us to comply with it. "Legal process" means any document that appears to have the force of law that requires us to hold or pay out funds from your account, including a garnishment, attachment, execution, levy or similar order. We do not have to determine whether the legal process was validly issued or enforceable. If a hold is in effect, we will continue to charge any applicable fees even though the account cannot be closed. We also may remove your Overdraft Protection if a hold is placed, but you may ask us to relink your accounts after the hold is removed. As permitted by law, we will deduct from your balance a Legal Processing Fee or costs and expenses we incur in complying with the order, or both.

If any action, including administrative proceedings, garnishment, tax levies, restraining orders or another action is brought against you or your account, you will be liable to us for any loss, cost or expense (including attorneys' fees) resulting from our compliance with any legal process.

If we receive any subpoena, court order or request for information or documents from a government entity or arbitration panel relating to your account, we are authorized to comply with it.

**L. Abandoned Property**

Each state has laws that govern when accounts are considered abandoned and when we are required to send a customer's funds to the state.

**M. English Language — Other Language Preferences**

The terms of this agreement and the products and services we provide are governed by the English language. As a courtesy, we make some of our forms, disclosures and documents, including this agreement, available in languages other than English. However, many important bank documents, and some products and services related to this account, are provided only in English. If there is any difference in meaning between the English and non-English version of any of our documents, the English version applies and is available upon request.

**N. Referrals**

If you request it, our employees may at times provide contact information about third parties, such as lawyers, accountants, or contractors who offer products or services to the public. Some of these third parties may be our customers. We provide this information only as a courtesy and convenience to you and the third party, but in some cases we may be compensated for a referral. We do not make any warranties or representations about the third parties or their products or services. If you choose to do business with any third party, that decision is yours alone, and we are not responsible for the third party's performance or to help resolve any dispute between you and the third party. Our employees may also receive compensation when you purchase a Chase product based on their referral.

**O. Special Provisions for Pass-Through Accounts**

If you have opened a deposit account on behalf of the beneficial owner(s) of the funds in the account (for example as a trustee, agent, nominee, guardian, executor, custodian or funds held in some other capacity for the benefit of others), those beneficial owners may be eligible for "pass-through" insurance from the FDIC. This means the account could qualify for more than the standard maximum deposit insurance amount (currently $250,000 per depositor in the same ownership capacity). If the account has transactional features, you as the account holder must be able to provide a record of the interests of the beneficial owner(s) in accordance with the FDIC's requirements as specified below. The FDIC has published a guide that describes the process to follow and the information you will need to provide in the event Chase fails. That information can be accessed on the FDIC's website at www.fdic.gov/deposit/deposits/brokers/part-370-appendix.html.

In addition, the FDIC published an Addendum to the guide, section VIII, which is a good resource to understand the FDIC's alternative recordkeeping requirements for pass-through insurance. The Addendum sets forth the expectations of the FDIC for pass-through insurance coverage of any deposit accounts, including those with transactional features. The Addendum will provide information regarding the records you keep on the beneficial owners of the funds, identifying information for those owners, and the format in which to provide the records to the FDIC upon bank failure. You must be able to provide this information in a timely manner in order to receive payment for the insured amount of pass-through deposit insurance coverage as soon as possible. You will have an opportunity to validate the capability to deliver the required information in the appropriate format so that a timely calculation of deposit insurance coverage can be made; further instructions relating to this opportunity will be communicated at a later time.

You agree to cooperate fully with us and the FDIC in connection with determining the insured status of funds in such accounts at any time. In the event of a bank failure, you agree to provide the FDIC with the information described above in the required format within 24 hours of a bank failure. As soon as a receiver is appointed, a hold will be placed on your account and that hold will not be released until the FDIC determines that you have provided the necessary data to enable the FDIC to calculate the deposit insurance. You understand and agree that your failure to provide the necessary data to the FDIC may result in a delay in receipt of insured funds and may result in legal claims against you from the beneficial owners of the funds in the account. If you do not provide the required data, your account may be held or frozen until the information is received, which will cause a delay when the beneficial owners could receive funds. Despite other provisions in this Agreement, this section survives after a receiver is appointed for us, and the FDIC is considered a third party beneficiary of this section.

**P. Sub-accounts**

For accounting purposes, all checking accounts consist of two sub-accounts: 1) a transaction sub-account where all deposits, withdrawals and fees are posted, and 2) a savings holding sub-account, where available balances above a certain level are transferred daily. Funds will be retransferred to your transaction sub-account to meet your transactional needs; however, all balances in the holding sub-account will be transferred to the transaction sub-account with the sixth transfer in any calendar month or monthly statement period.

Both sub-accounts are treated as a single account for purposes of your deposits and withdrawals, earning interest, access and information, tax reporting, fees, etc.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2020 JPMorgan Chase & Co.

Return to Table of Contents

Page 23 of 25
Effective 11/8/2020

**A:117**

**Q. Permitted Time for Filing a Lawsuit**

You must file any lawsuit or arbitration against us within two years after the cause of action arises, unless federal or state law or an applicable agreement provides for a shorter time. This limit is in addition to limits on notice as a condition to making a claim. If applicable state law does not permit contractual shortening of the time during which a lawsuit must be filed to a period as short as two years, you and we agree to the shortest permitted time under that state's laws.

We abide by federal and applicable state record retention laws and may dispose of any records that we retained or preserved for the period set forth in these laws. Any action against us must be brought within the period that the law requires us to preserve records, unless applicable law or this agreement provides a shorter limitation period. Any action against us on an automatically renewable CD must be brought within the time that the law requires us to preserve records based on the stated maturity date in the most recent record of the CD.

**R. Location of Legal Proceedings**

If you file any lawsuit or other legal proceeding against us that is connected in any way to your accounts or services, you agree to do so in an appropriate court in the state where your account is located. If we file any lawsuit or legal proceeding that is connected in any way to your accounts or services, you consent to jurisdiction and venue in an appropriate court in the state where your account is located. If either party chooses to have disputes resolved by arbitration, the section *Arbitration; Resolving Disputes* governs the process and location of the arbitration proceedings.

**S. Pre-judgment Interest Rate**

If either you or we are awarded a judgment against the other in connection with your account, the rate of interest earned before judgment on the judgment amount will be the rate of interest the account earned during that period unless state law requires a different rate. If the account is not interest-bearing, the rate will be the lowest generally available rate for a personal interest-bearing checking account.

**T. Assignment of Agreement and Successors**

This agreement will be binding on your personal representative, executors, administrators and successors, and on our successors and assigns.

You may not assign, transfer or grant a security interest in your account to anyone other than us without our written consent. No assignment will be valid or binding on us, and we will not be considered to have knowledge of it, until we consent and note the assignment in our records. However, by noting the assignment, we do not have any responsibility to assure that the assignment is valid. Any permitted assignment of your account is subject to our setoff rights.

**U. No Waiver**

If we fail to exercise any right, that does not mean that we waive that right or any other right, and we may still enforce all of our rights in the future.

## X. Arbitration; Resolving Disputes

You and we agree that upon the election of either of us, any dispute relating in any way to your account or transactions will be resolved by binding arbitration as discussed below, and not through litigation in any court (except for matters in small claims court).

This arbitration agreement is entered into pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA").

YOU HAVE A RIGHT TO OPT OUT OF THIS AGREEMENT TO ARBITRATE, AS DISCUSSED BELOW. UNLESS YOU OPT OUT OF ARBITRATION, YOU AND WE ARE WAIVING THE RIGHT TO HAVE OUR DISPUTE HEARD BEFORE A JUDGE OR JURY, OR OTHERWISE TO BE DECIDED BY A COURT OR GOVERNMENT TRIBUNAL. YOU AND WE ALSO WAIVE ANY ABILITY TO ASSERT OR PARTICIPATE IN A CLASS OR REPRESENTATIVE BASIS IN COURT OR IN ARBITRATION. ALL DISPUTES, EXCEPT AS STATED BELOW, MUST BE RESOLVED BY BINDING ARBITRATION WHEN EITHER YOU OR WE REQUEST IT.

**What claims or disputes are subject to arbitration?**

Claims or disputes between you and us about your deposit account, transactions involving your deposit account, safe deposit box, and any related service with us are subject to arbitration. Any claims or disputes arising from or relating to this agreement, any prior account agreement between us, or the advertising, the application for, or the approval or establishment of your account are also included. Claims are subject to arbitration, regardless of what theory they are based on or whether they seek legal or equitable remedies. Arbitration applies to any and all such claims or disputes, whether they arose in the past, may currently exist or may arise in the future. All such claims or disputes are referred to in this section as "Claims."

The only exception to arbitration of Claims is that both you and we have the right to pursue a Claim in a small claims court instead of arbitration, if the Claim is in that court's jurisdiction and proceeds on an individual basis.

**Can I (customer) cancel or opt out of this agreement to arbitrate?**

You have the right to opt out of this agreement to arbitrate if you tell us within 60 days of opening your account. If you want to opt out, call us at 1-800-935-9935 or see a banker. Otherwise this agreement to arbitrate will apply without limitation, regardless of whether 1) your account is closed; 2) you pay us in full any outstanding debt you owe; or 3) you file for bankruptcy.

**What about class actions or representative actions?**

Claims in arbitration will proceed on an individual basis, on behalf of the named parties only. YOU AND WE AGREE NOT TO:

1. SEEK TO PROCEED ON ANY CLAIM IN ARBITRATION AS A CLASS CLAIM OR CLASS ACTION OR OTHER COMPARABLE REPRESENTATIVE PROCEEDING;

2. SEEK TO CONSOLIDATE IN ARBITRATION ANY CLAIMS INVOLVING SEPARATE CLAIMANTS (EXCEPT FOR CLAIMANTS WHO ARE ON THE SAME ACCOUNT), UNLESS ALL PARTIES AGREE;

3. BE PART OF, OR BE REPRESENTED IN, ANY CLASS ACTION OR OTHER REPRESENTATIVE ACTION BROUGHT BY ANYONE ELSE; NOR

4. SEEK ANY AWARD OR REMEDY IN ARBITRATION AGAINST OR ON BEHALF OF ANYONE WHO IS NOT A NAMED PARTY TO THE ARBITRATION.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2020 JPMorgan Chase & Co.

Return to Table of Contents

Page 24 of 25
Effective 11/8/2020

If these terms relating to class or representative procedures are legally unenforceable for any reason with respect to a Claim, then this agreement to arbitrate will be inapplicable to that Claim, and the Claim will instead be handled through litigation in court rather than by arbitration. No arbitrator shall have authority to entertain any Claim on behalf of a person who is not a named party, nor shall any arbitrator have authority to make any award for the benefit of, or against, any person who is not a named party.

### Does arbitration apply to Claims involving third parties?

Arbitration applies whenever there is a Claim between you and us. If a third party is also involved in a Claim between you and us, then the Claim will be decided with respect to the third party in arbitration as well, and it must be named as a party in accordance with the rules of procedure governing the arbitration. No award or relief will be granted by the arbitrator except on behalf of, or against, a named party. For purposes of arbitration, "you" includes any person who is listed on your account, and "we" includes JPMorgan Chase Bank, N.A., all its affiliates, and all third parties who are regarded as agents or representatives of ours in connection with a Claim. (If we assign your account to an unaffiliated third party, then "we" includes that third party.) The arbitration may not be consolidated with any other arbitration proceeding.

### How does arbitration work?

The party filing a Claim in arbitration must select either: JAMS or the American Arbitration Association ("AAA") as the arbitration administrator. That organization will apply its code of procedures in effect at the time the arbitration claim is filed. If there is a conflict between that code of procedures and this arbitration provision and/or this agreement, this arbitration provision and this agreement will control. In the event that JAMS or the AAA is unable to handle the Claim for any reason, then the matter shall be arbitrated instead by a neutral arbitrator selected by agreement of the parties (or, if the parties cannot agree, selected by a court in accordance with the FAA), pursuant to the AAA rules of procedure.

The arbitrator will decide the Claim in accordance with all applicable law, including recognized principles of equity and statutes of limitations, and will honor all claims of privilege recognized by law. The arbitrator will have the power to award to a party any damages or other relief provided for under applicable law. A single arbitrator will conduct the arbitration and will use applicable substantive law, including the Uniform Commercial Code, consistent with the FAA and the applicable statutes of limitations or conditions precedent to suit, and will honor claims of privilege recognized at law. The arbitrator can award damages or other relief provided for by law to you or us, but not to anyone else. The arbitrator's authority is limited to the Claims between you and us.

### Is the arbitrator's decision final? Is there an appeal process?

The arbitrator's decision will be final and binding on the parties. A party can file a written appeal to the arbitration administrator within 30 days of award issuance. The appeal must request a new arbitration in front of three neutral arbitrators designated by the same arbitration administrators. The panel will reconsider all factual and legal issues, following the same rules of procedure, and will make decisions based on majority vote. Any final arbitration award will be binding on the named parties and enforceable by any court having jurisdiction.

### Who will pay for costs?

We will pay any costs that are required to be paid by us under the arbitration administrator's rules of procedure. Even if not otherwise required, we will reimburse you up to $500 for any initial arbitration filing fees you have paid. We will also pay any fees of the arbitrator and arbitration administrator for the first two days of any hearing. If you win the arbitration, we will reimburse you for any fees you paid to the arbitration organization and/or arbitrator. All other fees will be allocated according to the arbitration administrator's rules and applicable law. If you consider that you are unable to afford any fees that would be yours to pay, you may request that we pay or reimburse them, and we will consider your request in good faith.

### How do I (customer) file an arbitration claim?

Rules and forms may be obtained from, and Claims may be filed with, JAMS (1-800-352-5267 or www.jamsadr.com) or the AAA (1-800-778-7879 or www.adr.org). Arbitration hearings will take place in the federal judicial district that includes your address at the time the Claim is filed, unless the parties agree to a different place.

DEPOSIT ACCOUNT AGREEMENT
JPMorgan Chase Bank, N.A. Member FDIC
© 2020 JPMorgan Chase & Co.

Return to Table of Contents

Page 25 of 25
Effective 11/8/2020

*Privacy Notice*

## CHASE ◯

Rev. April 2020

| FACTS | WHAT DOES CHASE DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>▪ Social Security number and income<br>▪ account balances and transaction history<br>▪ credit history and payment history |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Chase chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Chase share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes** – such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes** – to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes** – information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes** – information about your creditworthiness | Yes | Yes |
| **For our affiliates to market to you** | Yes | Yes |
| **For nonaffiliates to market to you** | Yes | Yes |

| To limit our sharing | ▪ Call 1-888-868-8618 - our menu will prompt you through your choice(s). We accept operator relay calls.<br>▪ Chase Sapphire® customers please call 1-800-493-3319.<br>▪ **Visit us online: chase.com/privacypreferences.**<br><br>**Please note:**<br>If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice.<br><br>However, you can contact us at any time to limit our sharing. |
|---|---|

| Questions? | ▪ Call 1-888-868-8618 - our menu will prompt you through your choice(s). We accept operator relay calls.<br>▪ Chase Sapphire® customers please call 1-800-493-3319. |
|---|---|

© 2020 JPMorgan Chase & Co.

**A:120**

**Page 2**

## Who we are

| | |
|---|---|
| **Who is providing this notice?** | The JPMorgan Chase & Co. family of companies. A partial list of its U.S. consumer financial companies is located at the end of this document. |

## What we do

| | |
|---|---|
| **How does Chase protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. We authorize our employees to get your information only when they need it to do their work, and we require companies that work for us to protect your information. |
| **How does Chase collect my personal information?** | We collect your personal information, for example, when you<br>• open an account or make deposits or withdrawals from your account<br>• pay your bills or apply for a loan<br>• use your credit or debit card<br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes – information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| **What happens when I limit sharing for an account I hold jointly with someone else?** | Your choices will apply to everyone on your account. |

## Definitions

| | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Our affiliates include companies with a Chase or J.P. Morgan name and financial companies such as J.P. Morgan Securities LLC* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Nonaffiliates we share with can include companies such as retailers, auto dealers, auto makers and membership clubs* |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• *Our joint marketing partners include categories of companies such as insurance companies* |

## Other important information

**State laws:**

VT: Accounts with a Vermont mailing address are automatically treated as if they have limited the sharing as described on page 1. For joint marketing, we will only disclose your name, contact information and information about your transactions.

NV: We are providing you this notice pursuant to Nevada law. If you prefer not to receive marketing calls from us, you may be placed on our Internal Do Not Call List by calling 1-800-945-9470, Chase Sapphire® customers please call 1-800-493-3319, or by writing to us at P.O. Box 734007, Dallas, TX 75373-4007.

For more information, contact us at the address above, or email Privacy.Info@JPMChase.com, with "Nevada Annual Notice" in the subject line. You may also contact the Nevada Attorney General's office: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; telephone number: 1-702-486-3132; email BCPINFO@ag.state.nv.us

CA: Accounts with a California mailing address are automatically treated as if they have limited the sharing with nonaffiliates as described on page 1. CA residents are provided a CA notice for additional choices.

**Who is providing this notice?**

JPMorgan Chase Bank, N.A.        Chase Insurance Agency, Inc.        J.P. Morgan Securities LLC

Separate policies may apply to customers of certain businesses, such as J.P. Morgan Private Bank.

**A:121**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Number: 1:23-cv-02266

JEANETTA VAUGHN,

     Plaintiff,

v.

JP MORGAN CHASE & CO. D/B/A CHASE BANK; A
CORPORATION, AND
TRINA PELECH; AN INDIVIDUAL

     Defendants.

---

## DECLARATION OF DENE STOVER

I, Dene Stover, of lawful age, being duly sworn, declare as follows:

1.     I am a Vice President and Branch Manager for JPMorgan Chase Bank, N.A. ("Chase"). I have worked at Chase for over eight years and currently serve as the Branch Manager at Chase's Quincy and Buckley branch in Aurora, Colorado.

2.     In my capacity as Vice President and Branch Manager, I am familiar with certain of Chase's business operations, the policies, procedures, and practices relating to the opening of Chase consumer deposit accounts, and certain of Chase's general banking practices. I have access to documents and information in the normal course of business regarding certain of Chase's banking operations and certain of Chase's accountholders, including Plaintiff Jeanetta Vaughn. The facts set forth in this Declaration are based on my personal knowledge, my review of Chase's business records maintained in the ordinary course of business, and the knowledge I have gained over the years and as a Vice President and Branch Manager with Chase. If called to testify in this matter, I could competently testify as to the facts set forth herein.

1

**A:122**

## Ms. Vaughn's Account

3.      Attached hereto as **Exhibit A** is a true and correct excerpted copy of the account opening documents for the Total Checking account ending in 8273 (the "Account"), which was opened by Ms. Vaughn on February 5, 2021.  Exhibit A contains portions of a business record made in the ordinary course of business at Chase.

4.      Exhibit A includes a true and correct copy of the Personal Electronic Signature Card issued for the Account (the "Electronic Signature Card").  An excerpted copy of the Deposit Account Agreement and Privacy Notice ("DAA") that Ms. Vaughn would have had to agree to in opening the Account (as discussed in more detail below) follows the Electronic Signature Card in Exhibit A, as do certain other forms completed in opening the Account.  Excerpted from Exhibit A are copies of the pieces of personal identification Ms. Vaughn provided when opening her Account and certain other disclosures from the Account opening process.[1]

5.      As reflected in the top right-hand corner of the Electronic Signature Card at Exhibit A, Ms. Vaughn's Account was opened in-person in the Quincy and Buckley branch where I currently provide Branch Manager oversight.

6.      As reflected in the top right-hand corner of the Electronic Signature Card, Jasmine Culbreath was the Chase representative who opened Ms. Vaughn's Account on February 5, 2021.  Ms. Culbreath previously worked at the Quincy and Buckley branch where I currently serve as Branch Manager.

7.      At the time that Ms. Vaughn's Account was opened in-person at the Quincy and Buckley branch in 2021, Chase had a personal checking and/or savings account opening procedure

---

[1] Appropriate redactions have been made to the contents of Exhibit A to protect Ms. Vaughn's confidential and/or personal information.

2

**A:123**

in place that was followed in assisting her with opening her Account. This procedure is referred to as the "Click to Sign" process, which is still in place today and which is described further below.

8.      Based on my review of Chase's monthly business records made in the ordinary course of business at Chase, Ms. Vaughn regularly used her Account since its opening and has continued to use her Account in recent months.

### Ms. Vaughn Opened Her Account Via the "Click to Sign" Process

9.      I have reviewed Exhibit B to this Declaration, submitted contemporaneously with this Declaration. I can confirm that Exhibit B is representative of what a customer would see in opening a new consumer account, like the Account Ms. Vaughn opened in 2021, at Chase in-person in the branch.

10.      Customers who opened a new checking account in-person at a Chase branch in 2021 would have needed to complete the "Click to Sign" process to open their new account and have a Personal Electronic Signature Card issued for that new account. This necessarily would have required the customer to agree to the terms of the DAA governing that new account at the time of account opening, as the account opening process would not have proceeded to the next step without them personally providing such an acknowledgement, as discussed further below.

11.      The issuance of an Electronic Signature Card for Ms. Vaughn and the contemporaneous opening of her Account confirms that Ms. Vaughn completed the "Click to Sign" account opening process, including agreeing to the DAA.

### A General Overview of Chase's "Click to Sign" Electronic Account Opening Process

12.      The "Click to Sign" process is done on a computer located in the branch in which the customer has visited requesting to open a new account. This process commences with the Chase representative verifying the identity of the customer, the customer providing personal

3

**A:124**

information that the Chase representative opening the account will themselves enter into the computer system (that he/she has logged into with his or her unique username and confidential password), and the Chase representative assisting the customer with the selection of Chase products and services to enroll in.  The Chase representative will then pass control of the computer monitor, keyboard, and mouse to the customer, with the customer entering the last four digits of their identification information (*e.g.*, driver's license, passport) to reflect this change in control and before commencing any customer disclosure review.

### Completion of the E-Signature Disclosure

13.     Once control has been passed by the representative to the customer, they will be required to complete the E-Signature Disclosure form.  To complete this E-Signature Disclosure, the customer must decide to obtain documentation electronically or on paper, indicate their decision by clicking the box corresponding to their choice, and then click to sign their name electronically.  The customer must then click the "Confirm" button to complete the signing of the E-Signature Disclosure form.  This button is positioned within a light yellow rectangular box running across the top of the screen.  The "Confirm" button is a gray rectangular box, with "Confirm" written in black text.  The customer cannot proceed to the next step until they click "Confirm."

14.     Ms. Vaughn completed the above-described E-Signature Disclosure Form when opening her Account, a copy of which is included in the Account opening documents at Exhibit A.  Based on my review of Exhibit A, Ms. Vaughn herself completed the sign-up process electronically and necessarily completed the "Click to Sign" process by completing the steps described below.

4

**A:125**

**Customer Information Verification**

15.     The next step requires the customer to read and verify the personal identification information that was already entered into the computer system by the Chase representative.  On the top of the first page of this step, there is a light yellow rectangular box running across the top of the screen that states: "This is a disclosure Document. You must read it and click the Accept button at the end of the Document before you can continue to the next Document."

16.     To complete this step, the customer must click "Acknowledge" to proceed.  This button is positioned on the righthand side of the screen and viewable only after the customer has personally scrolled through the entire document containing the customer's personal identification information, as previously entered in the system, for them to confirm.  The "Acknowledge" button is a gray rectangular box approximately the size of a thumb, with the word "Acknowledge" written in bold black text.  The customer cannot proceed to the next step until they personally click "Acknowledge."

**Assent to the Deposit Account Agreement**

17.     The next step requires the customer to read and acknowledge the terms of the DAA governing their new account(s) at Chase.

18.     On the top of the first page of this step, there is a light yellow rectangular box running across the top of the screen that states: "This is a disclosure Document. You must read it and click the Accept button at the end of the Document before you can continue to the next Document."

19.     To complete this step, the customer must click "Acknowledge" to proceed.  This button is positioned on the righthand side of the screen and viewable only after the customer has personally scrolled through the entire DAA.  The "Acknowledge" button is a gray rectangular box

5

**A:126**

approximately the size of a thumb, with the word "Acknowledge" written in bold black text.  The customer cannot proceed to the next step until they personally click "Acknowledge" and thus acknowledge their acceptance of the terms of the DAA.

20.     Thereafter, the "Click to Sign" process requires the customer to read and acknowledge the Additional Banking Services and Fees for Personal Accounts Deposit Agreement.  As with the DAA, the customer cannot proceed to the next step until they personally click "Acknowledge."  The customer must also then complete the Overdraft and Overdraft Fee Information for Your Chase Checking Account form.  To complete this step, the customer must decide whether to authorize overdrafts on their account, indicate their decision by clicking the red box corresponding to their choice, and then click to sign their name electronically.  The customer cannot proceed to the next step until they so personally click.

**Execution of Personal Electronic Signature Card**

21.     The next step requires the customer to complete their personal electronic signature card, which will be in the same form as the Electronic Signature Card annexed at Exhibit A.  Near the bottom of the first page thereof, after a large blank white space, there is a statement that reads: "ACKNOWLEDGEMENT - By signing this Signature Card, . . . I acknowledge receipt of the Bank's Deposit Account Agreement or other applicable account agreement . . . and agree to be bound by the terms and conditions contained therein as amended from time to time."

22.     On the top of the second page thereof, the customer must answer a question regarding their tax return, indicate their response by clicking the red box corresponding to their answer, and then click to sign their name electronically.  Signature card issuance will not be completed until the customer clicks to sign their name electronically.

6

**A:127**

23.     The signature that appears on Ms. Vaughn's Electronic Signature Card attached as Exhibit A is consistent with having completed the above step.

### Completing the "Click to Sign" Process

24.     The customer must then make a series of clicks to officially complete the "Click to Sign" process.

25.     On the top of the first page of this step, there is a light green rectangular box running across the top of the screen that states: "This package is complete. Download this document, Click here to exit." To proceed, the customer must click the button that reads: "Click here to exit." This button is positioned within the box and the text is underlined and is written in dark green text.

26.     The customer will then be prompted to click a button that reads: "Continue." This button is positioned on the righthand side of a pop-up screen in a bright blue box, and the text is written in white.

27.     The customer must then click a button that reads: "Done Signing." This button is positioned on the righthand side of a pop-up screen in a bright blue box, and the text is written in white. The customer is then prompted to return the keyboard and mouse to the Chase representative who has been assisting them with opening their account.

### Concluding Remarks Regarding the "Click to Sign" Process as to Ms. Vaughn

28.     In 2021, when Ms. Vaughn opened her Account, it would not have been possible to open her Account in-person at a branch without having completed the foregoing "Click to Sign" steps. Put differently, the Chase system would not allow any step described above to be bypassed, whether by the customer or the Chase representative (such as myself or Ms. Culbreath) assisting with account opening.

7

**A:128**

29.     Based on my review of Exhibit A, my understanding of Chase's "Click to Sign" process, and my experience and knowledge gleaned over my career at Chase, Ms. Vaughn acknowledged the terms of and agreed to be bound by the DAA that was in effect at the time she opened her Account.

## Counter Checks

30.     I have assisted customers purchase counter checks at Chase branches.  Based on my experience as a customer-facing Chase employee, one needs to maintain an account at Chase in order to purchase counter checks.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on __Dec 9th__, 2023

Dene Stover
Vice President and Branch Manager
JPMorgan Chase Bank, N.A.

8

**A:129**

**UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO**

Civil Action Number: 1:23-cv-02266-CNS-NRN

JEANETTA VAUGHN

          Plaintiff,

v.

JP MORGAN CHASE & CO. D/B/A CHASE BANK; A CORPORATION;
TRINA PELECH, AN INDIVIDUAL;

          Defendants.

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
TO COMPEL ABRITRATION AND STAY PROCEEDINGS**

---

Nowhere in Defendant JP Morgan Chase & Co's Deposit Account Agreement ("Chase Bank" and "DAA" respectively) does the bank mention discrimination, civil rights, or any other similar concept, let alone defamation or tort-based actions. Plaintiff Jeanetta Vaughn's agreement to arbitrate, as Defendant Chase Bank itself concedes, was expressly and unambiguously limited to disputes with respect to her "deposit account, transactions involving [her] deposit account, safe deposit box, and any related services with us..." Defendant Chase Bank can hardly argue that discriminating against an individual, calling the police on an individual in the attempt to have that individual arrested, and falsely and defamatorily accusing an individual of a crime constitutes a "service" relating to a "deposit account, transactions involving [a] deposit account, safe deposit box, and any related services with us…" Certainly, no reasonable individual would interpret

1

**A:130**

"account services" to include such conduct, nor does the bank's DAA describe or enumerate such "services" as part of the repertoire of services it purports to offer.

Defendant Chase Bank's Motion to Compel Arbitration must be rejected. Like a hand from the grave, Defendant Chase Bank seeks after the fact to modify its arbitration agreement and to expand its scope well beyond the plain meaning of the provisions. Chase Bank is no stranger to similar abuses in the past. To allow Chase Bank to arbitrarily interpret its DAA to include discrimination, tort, and defamation claims contrary to the language of the DAA's arbitration provisions effectively precludes tens of millions of Chase's clients from pursuing their current or future claims in court, even though they had no possible reason to believe they were signing away their rights to do so. And whatever arguments Chase Bank might muster, the Court has even less legal authority to compel Ms. Vaughn's claims against Defendant Trina Pelech to arbitration. Nowhere in the DAA are actions of the type taken by Ms. Pelech even tangentially discussed. Ms. Pelech is not a third-party beneficiary to the contract within the meaning of Colorado law. Permitting companies to immunize their current and former employees from every possible individual claim against them undermines important public policy, eliminating guardrails against violations of law and reducing motive for compliance. For these reasons and others described below, Defendants' motion to compel arbitration should be squarely rejected, and this case set for discovery and trial.

## FACTUAL BACKGROUND OF MS. VAUGHN'S CLAIMS

Plaintiff Jeanetta Vaughn alleges in her Complaint as follows: On the morning of June 9, 2022, Jeanetta Vaughn, a sixty-one-year-old Black woman, walked into a Chase branch on 1101 South Buckley Road in Aurora Colorado to withdraw money from her Chase account and to obtain

personal counter checks. Complaint, ¶¶ 14-22. Ms. Vaughn took a seat in the lobby to unlock her account using the Chase Mobile phone application. *Id*. at ¶¶ 24-27. As she proceeded to unlock her account, she was approached, within moments, by Trina Pelech, who is a White, female, Chase branch manager. *Id*. at ¶ 30; *see* **Ex. 1**, *Chase Video Footage*.[1] Ms. Pelech loudly asked Ms. Vaughn whether she could help her with something, to which Ms. Vaughn responded that she did not need assistance and calmly explained that she needed to unlock her card. *Id*. at ¶ 32. Instead of accepting Ms. Vaughn's response, Ms. Pelech raised her voice angrily and told Ms. Vaughn that she was not welcome there and threatened to call the police. *Id.* at ¶ 36. Shocked, Ms. Vaughn replied that she declined to leave and would sit and wait for the police to come so that they could record the events at the Chase branch on their bodycams. *Id*. at ¶ 37.

Ms. Vaughn remained seated until two Aurora police officers entered the Chase branch. *Id.* at ¶ 59. The officers told Ms. Vaughn that they were responding to a report of trespassing. *Id.* at ¶ 60. One of the officers then spoke with Ms. Pelech who alleged that Ms. Vaughn said, "Leave me alone, I'm busy, when I'm ready, I'll come up" when Ms. Pelech approached her. *Id*. at ¶ 70. On the bodycam footage, Ms. Pelech made this statement while mimicking how Black women supposedly speak, with her hand raised, her neck swinging, and her face fixed into a scowl. *Id.* at ¶ 71; **Ex. 2**, *Officer Video Footage*.[2]

Ms. Pelech further told the officers that Ms. Vaughn was being rude and that she told Ms. Vaughn that she was not welcome there. *Id*. at ¶ 73; *see* **Ex. 2**, *Officer Video Footage*. The officer told Ms. Pelech, "The last resort is putting my hands on her, charging her with trespassing and

---

[1] The video and audio exhibits referenced herein will be conventionally submitted to the Court.
[2] The video and audio exhibits referenced herein will also be conventionally submitted to the Court.

throwing her out of the bank especially if she is a customer here." Complaint, at ¶ 78. Both the officer and Ms. Pelech agreed that Ms. Vaughn was not a danger, which is contrary to the 911 call Ms. Pelech made describing Ms. Vaughn as aggressive. *Id*. at ¶¶ 79-81; *see* **Ex. 2**, *Officer Video Footage*. Before ending the first conversation with Ms. Pelech, the officer told her, "Being rude in the bank is not a matter for law enforcement." Complaint, at ¶¶ 82-83. After explaining Ms. Pelech's position with Ms. Vaughn, the officer spoke with Ms. Pelech again and told her that he believed Ms. Vaughn felt singled out because she was African American. *Id*. at ¶ 105. Ms. Pelech dramatically rolled her eyes and stated, "That's always the excuse…" *Id*. at ¶ 106; **Ex. 2**, *Officer Video Footage*. The officer informed Ms. Pelech that they were not going to make her leave because she was a customer, "We're going to go wait in our car for her husband to get here and then if you tell her to leave, she said she'll leave." Complaint, at ¶ 112. Before being forced to leave by Ms. Pelech, one of the officers told Ms. Vaughn's husband that if Ms. Vaughn felt discriminated against, they should take it up with Chase. *Id*. at ¶ 118. Officer Gramse apologized for what happened and Ms. Vaughn was then forced to leave the Chase branch. *Id*. at ¶¶ 120-121.

Based on these actions by Defendants, Ms. Vaughn has brought four claims for relief, three of the four of which she brings against both Defendants, and one against only Defendant Chase Bank. First, Ms. Vaughn brings claims of race discrimination in public accommodation under C.R.S. § 24-34-601 *et seq.* the Colorado Anti-Discrimination Act ("CADA"). *Id.* at ¶¶ 132-146. Ms. Vaughn brings similar institutional claims under 42 U.S.C. § 1981 predicated on discrimination on the basis of race, ethnicity, and alienage for violations of her constitutional rights, as well as claims against Defendant Pelech in her individual capacity. *Id.* at ¶¶ 147- 155. Finally, Ms. Vaughn brings negligent infliction of emotional distress and defamation per se claims

4

**A:133**

against both Defendants, including both against Defendant Pelech in her individual capacity. *Id.* at ¶¶ 156-176. None of these claims fall within the scope of the services referred to in Ms. Vaughn's Deposit Account Agreement, which describes procedures and services for: opening accounts, using checking and savings accounts, a funds available policy, safeguarding financial information, managing and maintaining accounts, maintaining certificates of deposits, closing accounts, and other legal terms, none of which discuss or describe nondiscrimination, public accommodations, or other general tort claims. ECF No. 19-3, *Motion*, at 3-5.

The DAA signed by Ms. Vaughn when she opened her account is twenty-eight pages long. *See* ECF 19-3. It minutely covers all the services provided by Defendant Chase Bank. *See id.* at 1-28. The DAA does not include a broad general arbitration clause, but rather, limits the arbitration to disputes arising from the agreement and services provided by Chase Bank while servicing accounts. It states:

> **X. Arbitration; Resolving Disputes**
>
> You and we agree that upon election of either of us, any **dispute relating in any way to your account or transactions** will be resolved by binding arbitration as discussed below. And not through litigation in any court (except for matters in small claims court).
> …
>
> **What claims or disputes are subject to arbitration?**
>
> Claims or disputes between you and us **about your deposit account, transactions involving your deposit account, safe despite box, and any related services with us** are subject to arbitration. Any claims or **disputes from or relating to this agreement, any prior account agreements between us, or the advertising, the application for, or the approval or establishment of your account** are also included…

*Id.* (emphasis added). The DAA in place during the dates relevant to Ms. Vaughn's case includes identical language in its arbitration provisions. *See* ECF No. 19-4, *Motion*, at 26. The

language in the arbitration provision makes no mention of arbitrating claims outside of disputes over accounts, transactions with those accounts, safety deposit boxes, and similar services, including disputes relating to the DAA or prior agreements. Ms. Vaughn's claims are not based on a violation of the DAA, or the services described or guaranteed therein.

## LEGAL ARGUMENT

Defendants argue that Ms. Vaughns claims – against both of them – are each and everyone subject to arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2. *See* ECF No. 19, *Motion*, at 11-21. But notwithstanding the recent trend to broadly construe the scope of the FAA, there are nonetheless limits to its applicability. *See Moffett v. Life Care Centers*, 187 P.3d 1140, 1143 (Colo. App. 2008) (when the issue sought to be arbitrated is clearly beyond the scope of the arbitration provision, the court may properly refuse to compel arbitration.) "The party attempting to compel arbitration bears the burden of 'demonstrating a valid arbitration agreement' exists." *Brock v. Flowers Food, Inc.*, Civ. No. 122-cv-02413, 2023 WL 3481395, at *2 (D. Colo. May 16, 2023); *see also Moffett*, 187 P.3d at 1143 (same). "When deciding whether the parties agreed to arbitrate a certain matter ... courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *Brock,* 2023 WL 3481395, at *2 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). And, although the FAA contains several enforcement mechanisms for parties to compel arbitration pursuant to a valid agreement to arbitrate, it is axiomatic that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (internal quotations omitted); *AT&T Tech., Inc. v. Commc'ns Workers*, 475 U.S. 643, 648 (1986) (because arbitration is a creature of contract, a party cannot be forced to arbitrate any issue he has not agreed to submit to arbitration); *Local 5–857 Paper, Allied–*

*Industrial, Chemical and Energy Workers Int'l Union v. Conoco, Inc.*, 320 F.3d 1123, 1126 (10th Cir. 2003) (same). Like other contracts, arbitration agreements may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, (1996).

In determining whether a given dispute falls within the scope of a contractual arbitration provision, courts first determine whether the arbitration clause is broad or narrow. *Chelsea Family Pharmacy, PLLC v. Medco Heath Solutions, Inc.*, 567 F.3d 1191, 1196 (10th Cir. 2009). "Under a narrow arbitration clause, a dispute is subject to arbitration only if it relates to an issue that is on its face within the purview of the clause, and collateral matters will generally be beyond its purview." *Id.* at 1262. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it. *Cummings v. FedEx Ground Package System, Inc.*, F.3d 1258. 1261 (10th Cir. 2005). Here, Chase Bank's arbitration provisions were of a narrow nature, and so Defendants' Motion must be denied.

**1. The Agreement to Arbitrate Does Not Compel Arbitration of Ms. Vaughn's Claims.**

Defendants argue that the DAA's arbitration clause requires Ms. Vaughn to submit all of her claims, regardless of the nature of those claims, to arbitration. *See Motion*, at 7-8. However, Ms. Vaughn never agreed to arbitrate the types of claims alleged in her Complaint, and nowhere in the DAA does it mandate that she do so. No mention of discrimination, tort or other injury claims, or defamation is referenced in the DAA, nor is the arbitration provision authored in a manner broad enough to cover those types of claims.

7

**A:136**

Defendants also argue that the arbitration provision is valid because Ms. Vaughn assented to the arbitration provision by her continual use of her Chase account. Defendants cite the case *Anonymous v. JP Morgan Chase & Co.* in which the plaintiff alleged the defendant Chase Bank extended credit to pay for the plaintiff's gambling losses in violation of Article 1, § 9 of the New York State Constitution and New York General Obligation Laws § 5-401, 5-411, and 5-419; and that the plaintiff had paid his outstanding obligation by a minimum payment. *See* Civ. No. 05-2442, 2005 WL 2861589, at *1 (S.D.N.Y. Oct. 31, 2005). In that case, the court agreed that Chase Bank's arbitration provision controlled. However, the court did so only after a finding that the plaintiff's claims arose out of his credit card use, rendering the dispute within the scope of the agreement's arbitration clause. *Id*. at 4. The same cannot be said here. In *Anonymous*, unlike Ms. Vaughn's case, a reasonable Chase Bank member could foresee that damages springing from an individual's transactions with his credit card would fall under the terms of the deposit account, whereas it is not foreseeable to any reasonable customer, such as Ms. Vaughn, that the transactions and services described in these agreements would include racial discrimination and false and defamatory accusations to the police for no reason other than race. Therefore, Ms. Vaughn's continual use of her account at Chase Bank does not justify compelling arbitration given the narrowness of Chase Bank's arbitration provisions, focusing as they do on specifically described account services in the DAA's written terms.

Additionally, the arbitration agreement should not be enforced because it would be unconscionable to compel arbitration of these types of claims.

> [W]here it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fair[-]minded person would view the ensuing result without being possessed of a profound sense of

8

**A:137**

injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.

*Univ. Hills Beauty Acad. Inc. v. Mountain States Tel. & Tel. Co.*, 554 P.2d 723, 726 (Colo. App. 1976). Courts in the Tenth Circuit have found that "although not all adhesion contracts are unconscionable, an adhesion contract is procedurally unconscionable and unenforceable 'when the terms are patently unfair to the weaker party.'" *Laurich v. Red Lobster Restaurants, LLC*, 295 F. Supp.3d 1186, 1212 (D.N.M. 2017). An adhesion contract is a "contract drafted unilaterally by a business enterprise and forced upon an unwilling and often unknowing public for services that cannot be obtained elsewhere. It is generally not bargained for, but is imposed on a take it or leave it basis." *Jones v. Dressel*, 623 P.2d 370 (Colo. 1981).

In this case, the arbitration provision is signed by tens of millions of users who have received no warning based on the language of the agreement that they are waiving their rights to go to court on racial discrimination, tort, and defamation claims. Additionally, Chase unilaterally impose changes whenever it chooses. *See* ECF 19-3 at 23. If the court compels arbitration here, that means none of Chase Bank's tens of millions of users will have access to justice in the courts, with no warning. It is in the interest of the public and the interest of justice that arbitration clauses such as the one found here be invalidated.

**2. None of Plaintiff's Claims Arise Out of the Deposit Account Agreement.**

The FAA governs an arbitration agreement only to the extent that it compels arbitration of "controvers[ies]" that "aris[e] out of" the "contract" containing the arbitration agreement or the "transaction" evidenced thereby. 9 U.S.C. § 2. A dispute "does not arise out of or in connection with a contract" for the purposes of arbitration "just because the dispute would not have arisen if the contract had never existed." *Int'l Underwriters v. Triple I: Int'l Inv. Inc.*, 533 F.3d 1342, 1347

9

**A:138**

(11th Cir. 2008). Rather, when determining whether a dispute arises out of an underlying contract for arbitration purposes, some courts generally consider whether the dispute in question was an "immediate, foreseeable result of the performance of contractual duties." *See Hearn v. Comcast Cable Comm'ns, LLC*, 992 F.3d 1209, 1213 (11th Cir. 2021). This articulation of foreseeability, much like the Tenth Circuit's "clear" and "unmistakable" articulation, captures the notion that an individual must have sufficient warning before committing claims to arbitration. *See Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 780 (10th Cir. 1998).

Courts must evaluate the threshold question of whether the parties consented to submit a particular dispute to arbitration. *See AT&T Tech.*, 475 U.S. at 649. The Tenth Circuit has further held that broad provisions to arbitrate all disputes arising out of or relating to the overall contract do not provide the requisite clear and unmistakable evidence "within the four corners of the agreement that the parties intended to submit the question of whether an agreement to arbitrate exists to an arbitrator." *Riley Mfg. Co.*, 157 F.3d at 780.

In *Communication Workers of America v. Avaya, Inc.*, the plaintiff Avaya Inc. ("Avaya") appealed to the Tenth Circuit a district court's ruling compelling arbitration of its labor dispute with the Communication Workers of America ("CWA") over the legal status of a class of Avaya employees called "backbone engineers." 693 F.3d 1295, 1301 (10th Cir. 2012). The CWA claimed the collective bargaining agreement between the parties required any dispute over the legal status of "backbone engineers" to be resolved in arbitration, while Avaya claimed the parties did not consent to arbitrate their legal status in arbitration. *Id*. The Tenth Circuit found that the record provided forceful evidence that the parties did not contractually consent to arbitrate these particular disputes because it was neither "clear" nor "unmistakable" that this dispute arose under the

10

**A:139**

contract. *Id*. at 1303. Conversely, courts are loathe to require arbitration of discrimination claims unless they are expressly and knowingly waived. For example, in *Winn v. Ensign U-Healthcare Resort of Leawood*, a Title VII plaintiff was compelled to arbitration after the district court found the arbitration agreement clearly included a clause requiring claims related to race discrimination, harassment, or retaliation to be submitted to arbitration. Civ. No. 19-cv-2715, 2020 WL 2849902, at *2 (D. Kan. June 2, 2020) ("Both contracts clearly include a clause requiring claims related to race discrimination, harassment, or retaliation to be submitted to arbitration. Plaintiffs did not respond to Defendant's motion. Thus, they do not dispute and do not raise a genuine issue of material fact that their dispute is covered by their arbitration agreements.").

In this case, Ms. Vaughn's claims do not arise out of her contract with Chase Bank within the meaning of the FAA. For example, Defendants allege that Ms. Vaughn's Section 1981 and CADA claims could not be brought without alleging that the claim involved a transaction and that her allegations are about the account. *See Motion*, at 12. The dispute here, however, does not arise from the contract and is not about Chase's services vis-à-vis its agreement to provide services for that account. Instead, the dispute arose from the racial discrimination she encountered when she entered the Chase branch and Defendant Pelech shouted at her, required her to leave the building, called the police on her, and falsely accused her of a crime. Even without the DAA, Ms. Vaughn would have had similar claims had she walked into the bank branch, for example, if she had wished to learn about services or use the branch as a third-party without an account there, but was similarly subjected to abuse. In arguing that none of Ms. Vaughn's claims would exist absent the contractual relationship between herself and Chase Bank, Defendants conflate arising out of a contract with arising out of a contractual relationship. *See Motion*, at 10-11. The key analysis is not whether a

11

**A:140**

contractual relationship existed, but whether it was foreseeable under the DAA that Ms. Vaughn was waiving her right to seek redress in court for the types of claims she has alleged, and in this sense, it was not. Unlike the defendant in *Winn v. Ensign U-Healthcare Resort of Leawood*, nowhere in the DAA or within the language of the arbitration provision therein could she have foreseen such a waiver. *Cf. Winn*, 2020 WL 2849902, at *2 (plaintiff did not dispute the express language in the employment agreement agreeing to arbitrate race discrimination claims). Instead, *Avaya* is instructive here. The court reasoned that the "presumption favoring arbitration does not apply when the dispute itself concerns arbitration," and that, "[i]t is not enough for the parties to have an arbitration clause purporting to sweep up all disputes arising from the labor agreement." 693 F. 3d at 1303. There is nothing clear or unmistakable in the DAA's arbitration provision. Nothing suggests that Ms. Vaughn and Chase Bank contractually consented to arbitrate these particular disputes. Instead, Chase Bank relies on an overbroad interpretation, going well-beyond "the four corners of the contract" referred to by the Tenth Circuit in *Riley Manufacturing Corp.* at the expense of Ms. Vaughn and millions of others. As such, the Court must reject Defendants' call for arbitration in this case.

### 3. Defendant Trina Pelech is Not Entitled to Enforce the Agreement to Arbitrate.

Defendants argue that although Defendant Pelech is not a signatory to the DAA, she is nonetheless entitled to enforce its arbitration provision because she is a third-party beneficiary of the DAA. *Motion*, at 14. In addition to the language discussed above, the DAA's arbitration clause further states that, "[a]rbitration applies whenever there is a Claim between you and us. If a third party is also involved in a Claim between you and us, then the Claim will be decided with respect to the third party in arbitration as well." ECF No. 19-3, at 26. Chase Bank goes on to define third

12

**A:141**

parties as, "JP Morgan Chase Bank, N.A., all of its affiliates, and all third parties who are regarded as agents or representatives of ours in connection with a Claim." *Id.* Based on this language, Defendants argue that Ms. Pelech is a third-party beneficiary to of the DAA and that she is entitled to compel arbitration. *See Motion*, at 14. For the reasons stated below, Ms. Pelech is not entitled to enforce Chase Base's arbitration provision as a third-party beneficiary.

> **i.      The Parties Did Not Intend to Benefit Ms. Pelech Because the Claims Fall Beyond the Scope of the Arbitration Clause.**

Courts have observed that ordinary principles of contract and agency law may apply to bind a non-signatory to an arbitration agreement. *See, e.g., Covington v. Aban Offshore Ltd.*, 650 F.3d 556, 558 (5th Cir. 2011) (finding the arbitration agreement clearly stated that it only applied to the parties). Courts in the Tenth Circuit have recognized the third-party beneficiary theory as binding a non-signatory to an arbitration agreement. *See THI of N.M. v. Lovato*, 848 F. Supp.2d 1309, 1326 (D.N.M. 2012) (the issue of whether a non-signatory can be bound by, or compel arbitration under an arbitration agreement is governed by state law). In the context of arbitration, most commonly it is the non-signing party that seeks to avoid mandatory arbitration. *See, e.g., N.A. Rugby Union LLC v. United States of Am. Rugby Football Union*, 442 P. 3d 859, 863-64 (Colo. 2019) (finding non-signatory not bound by an arbitration agreement); *see also La Frontera Ctr., Inc. v. United Behav. Health, Inc.*, 268 F. Supp. 3d 1167, 1215 (D.N.M. 2017) ("[I]n deciding whether a nonsignatory to an arbitration agreement may be subject to, or may compel, arbitration, the Supreme Court of New Mexico would likely review the relevant contract terms to determine whether the nonsignatory is a third-party beneficiary of the arbitration agreement."); *Ouadani v. TF Final Miles, LLC*, 876 F. 3d 31, 39-40 (1st Cir. 2017) (subcontractor's employees were not third-party beneficiaries bound by arbitration agreement against defendant where defendant and

13

**A:142**

plaintiff's employer signed arbitration agreement). However, when a nonsignatory wishes to compel arbitration, the courts must look closely at whether said individual does in fact qualify as a third-party beneficiary.

"A third-party beneficiary may enforce a contract only if the parties to that contract intended to confer a benefit on the third party when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to the third party." *Everett v. Dickinson & Co.*, 929 P.2d 10, 12 (Colo. Ct. of App. 1996). "Such an intent to benefit a third party must be apparent from the construction of the contract in light of all surrounding circumstances, and the intent of the parties is the key inquiry when determining whether a nonsignatory is a third-party beneficiary entitled to enforce the agreement." *Id*. In other words, the crux of the assignment of the benefit must by both parties be "intended to benefit the non-party, provided that the benefit claimed is a direct and not merely incidental benefit of the contract." *E.B. Roberts Const. Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 865 (Colo. 1985) (both parties entered into agreement to benefit third-party, knowing third-party would post bond, complete all of the work under the agreement, and recover compensation for that work as a result).

Here, there is no indication that Ms. Vaughn and Defendant Chase Bank, the parties to the DAA, intended to benefit Defendant Pelech directly by virtue of the overall agreement. Rather, Defendant Chase Bank sought to confer an incidental benefit on Defendant Pelech and its other employees, unrelated to the rest of the DAA's terms. "A non-party is the specifically intended beneficiary only if the contract clearly expresses an intent to primarily and directly benefit the third party or a class of persons to which that party belongs." *Calderon v. Sixt Rent a Car, LLC*, Civ. No. 19-cv-62408, 2020 WL 700381, at *9 (S.D. Fla. Feb. 12, 2020). In *Fundamental*

14

**A:143**

*Administrative Services, LLC v. Patton*, nursing homes and related parties sought to remove a case bought by the representatives of deceased nursing home residents by arguing they were third-party beneficiaries as "affiliates" of an agreement with a non-managing parent company. *See Fundamental Admin. Servs., LLC v. Patton*, 504 F. App'x 694, 699 (10th Cir. 2012). In rejecting their motion to compel arbitration, the Court noted that they failed to establish they were third-party beneficiaries, notwithstanding their conclusory assertions otherwise, and that "the burden of showing that they are covered by the arbitration agreement, which requires them, as non-signatories, to demonstrate that they are third-party beneficiaries to the contract." 504 F. App'x at 701.

Similarly, in *Calderon v. Sixt Rent a Car*, *supra*, the defendants, two related rental car services, attempted to assert that an arbitration agreement between the plaintiffs and a third-party travel-supplier should be enforced after plaintiffs sued defendants for unauthorized, fraudulent fees. 2020 WL 700381, at *1. The court rejected the request given the lack of privity and provisions of the agreement, holding that the plaintiffs' lawsuit fell outside of the scope of the arbitration provision because the suit concerned defendants' practices, not the third-party provider's practices and the defendants were not beneficiaries of the contract. *See id.*, *aff'd*, *Calderon v. Sixt Rent a Car*, 5 F.4th 1204, 1208 (11th Cir. 2021).

The arguments against requiring Ms. Vaughn to arbitrate her claims against Defendant Pelech overlap in many ways with the reason that arbitration should be excused against Defendant Chase Bank. Once again, Ms. Vaughn had no warning that Defendants would interpret racial discrimination, emotional distress torts, or defamation as falling within the narrow scope of Chase Bank's arbitration provisions. This logic would apply as well to claims brought against Ms. Pelech

15

**A:144**

in her individual capacity, even if the Court was to derive the status for Defendant Pelech to bring her challenge. But in addition, Defendant Pelech has not cleared the hurdles showing she is a third-party beneficiary in the first place, neither according to Chase Bank's intentions, and certainly not according to Ms. Vaughn's intentions.

To argue that any current or former employee of Chase Bank's is, regardless of how egregious their conduct, and even if for example, such conduct included physical violence, immune from personal accountability in court merely because of Chase Bank's DAA flies in the face of contract law and greatly undermines access to and the power of the courts. The public policy implications are significant. In essence, Chase Bank argues its employees are immune from suit for any personal conduct while employed by the Bank, no matter how outrageous and unlawful.[3] Such an argument is not well taken. It vastly expands the operation of arbitration agreements and peremptorily circumvents a whole host of laws promising individuals access to their day in court. Therefore, Ms. Pelech is not entitled to compel arbitration based on the third-party beneficiary theory.

### 4. Defendants Have Not Presented Evidence Sufficient to Demonstrate an Enforceable Arbitration Agreement.

Although the Federal Arbitration Act ("FAA") provides a procedure for parties to compel arbitration, "the existence of an agreement to arbitrate is a threshold matter which must be

---

[3] If taken at face value, Defendant Chase Bank could use its arguments to deny one of its client members his or her day in court even if the bank's employee shot that member, so long as the shooting took place on the premises while the member was attempting to access or transacting with their account. According to Chase, such unlawful acts by its employees would be subject to arbitration merely by virtue of the arbitration provision in the DAA, which of course, says absolutely nothing about services or transactions like shooting a client who is just trying to take out money from an ATM.

established before the FAA can be invoked [and the] party attempting to compel arbitration carries the burden of demonstrating a valid arbitration agreement." *Fundamental Admin. Servs., LLC*, 504 F. App'x at 698 (10th Cir. 2012) (internal quotation marks and citations omitted). Where, as here, the parties dispute the existence of an agreement to arbitrate, a court may grant a motion to compel arbitration if "there are no genuine issues of material fact regarding the parties' agreement." *Id.* As when considering summary judgement under Federal Rule of Civil Procedure 56, courts "should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012); *see also Brown v. Dorsey & Whitney, LLP*, 267 F. Supp. 2d 61, 67 (D.D.C. 2003) ("When considering a petition to compel arbitration, "the appropriate standard of review for the district court is the same standard used in resolving summary judgment motions pursuant to Fed. R. Civ. P. 56(c)."); *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008) (noting the district court properly assessed the defendant's motion to compel arbitration under the summary judgment standard); *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980) ("a district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.") (*abrogated on other grounds by Aliments Krispy Kernels, Inc., v. Nichols Farms*, 851 F. 3d 283 (3rd Cir. 2017); *Aliments*, 851 F. 3d at 288-89 (noting that that courts "apply the relevant state contract law to questions of arbitrability, which may be decided as a matter of law only if there is no genuine issue of material fact when viewing the facts in the light most favorable to the nonmoving party.").

17

**A:146**

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). Under this standard, Defendants must present evidence sufficient to demonstrate an enforceable arbitration agreement. If Defendants meet this standard, "the burden shifts to Plaintiff to raise a genuine issue of material fact as to the making of the agreement." *Vernon v. Qwest Communs. Int'l, Inc.*, 857 F. Supp. 2d 1135, 1148 (D. Colo. 2012).

At the very least, a genuine issue of material fact exists as to whether Ms. Vaughn's claims arise out of the contract making it unsuitable to send to arbitration. Chase Bank argues that its broad arbitration agreement encompasses Ms. Vaugh's claims, Ms. Vaughn disagrees. Defendants have failed to produce clear or unmistakable evidence that would suggest that the Parties contractually consented to arbitrate these particular disputes in the exhibits it has submitted. Therefore, Defendants have not met their burden under the summary judgment standard and is not entitled to compel arbitration.

**CONCLUSION**

For all the reasons set forth herein, the Court should deny Defendants' motion to compel arbitration and stay the proceedings in its entirety. Defendants' logic dramatically implicated not only Ms. Vaughn's rights, but tens of millions of others. Such a wide sweeping, all-encompassing post-hoc interpretation harms not only Ms. Vaughn but sets up dangerous precedence. Because Ms. Vaughn and others had no warning that they could be waiving their rights to access the courts not only against Chase but anyone it considers an employee or agent, this Court must be extra

wary. Other corporations would surely adopt the same surreptitious strategy. An agreement to forego court and subject claims to arbitration must be clear and unmistakable.

DATED: November 14, 2023

                            RATHOD | MOHAMEDBHAI LLC

                            *s/ Crist Whitney*
                            Crist Whitney
                            Iris Halpern
                            2701 Lawrence Street, Suite 100
                            Denver, CO 80205
                            (303) 578-4400
                            cw@rmlawyers.com
                            ih@rmlawyers.com

                            ATTORNEYS FOR PLAINTIFFS

**A:148**

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of November 2023, the foregoing Plaintiff's Response to Defendant's Motion to Compel Arbitration and Stay Proceedings was filed with the Clerk of the Court using the CM/ECF system, which serve the following:

Naomi G. Beer
April C. Connally
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
(303) 572-6500
beern@gtlaw.com
April.connally@gtlaw.com

ATTORNEYS FOR DEFENDANTS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Number:  1:23-cv-02266

JEANETTA VAUGHN,

      Plaintiff,

v.

JP MORGAN CHASE & CO. D/B/A CHASE BANK; A
CORPORATION, AND
TRINA PELECH; AN INDIVIDUAL

      Defendants.

_____

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
AND STAY PROCEEDINGS**

_____

**A:150**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anonymous v. JP Morgan Chase,*
    2005 WL 2861589 (S.D.N.Y. Oct. 31, 2005) .......................................................6, 8

*AT&T Techs, Inc. v. Commc'ns Workers of Am.,*
    475 U.S. 643 (1986)................................................................................................3, 4

*Bhakta v. Choice Hotels International, Inc.,*
    2017 WL 86192 (D.Kan., 2017)..................................................................................6

*Brown v. Coleman Co., Inc.,*
    220 F.3d 1180 (10th Cir. 2000) ..............................................................................2, 4

*Cavlovic v. J.C. Penney Corp., Inc.,*
    884 F.3d 1051 (10th Cir. 2018) ..................................................................................2

*Chelsea Fam. Pharmacy, PLLC v. Medco Health Sols., Inc.,*
    567 F.3d 1191 (10th Cir. 2009) ..................................................................................2

*Cirino v. L. Gordon Holdings, Inc.,*
    2014 WL 2880291 (June 24, 2014, E.D. Pa.) ............................................................4

*Clark v. Safeway, Inc.,*
    478 F. Supp. 3d 1080 (D. Or. 2020) ...........................................................................7

*Commc'n Workers of Am. v. Avaya, Inc.,*
    693 F.3d 1295 (10th Cir. 2012) ..................................................................................4

*Dill v. JPMorgan Chase Bank, N.A.,*
    2020 WL 4345755 (S.D.N.Y. July 29, 2020) .............................................................3

*Hampton v. Dillard Dep't Stores, Inc.,*
    247 F.3d 1091 (10 Cir. 2001), *cert. denied*, 534 U.S. 1131 (2002)..........................7

*KPA Promotions,* Inc. *v. JPMorgan Chase & Co.,*
    2021 WL 1317163 (S.D.N.Y. Apr. 8, 2021)...............................................................3

*Lambert v. Teslas, Inc.,*
    923 F.3d 1246 (9th Cir. 2019) ....................................................................................3

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Coors,*
    357 F. Supp. 2d 1277 (D. Colo. 2004)........................................................................9

*Mikes v. Strauss,*
    889 F. Supp. 746 (S.D.N.Y. 1995) .............................................................................5

*Mitsubishi Motors v. Soler Chrysler–Plymouth, Inc.,*
    473 U.S. 614 (1985)....................................................................................................4

i

**A:151**

*Morris v. Dillard Dep't Stores, Inc.*,
   277 F.3d 743 (5th Cir. 2001) ....................................................................................7

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)........................................................................................................3

*P&P Indus., Inc. v. Sutter Corp.*,
   179 F.3d 861 (10th Cir. 1999) ...............................................................................3, 6

*U.S. ex rel. Paige v. B.A.E. Sys. Tech Sols. & Servs. Inc.*
   566 F. Appx. 500 (6th Cir. 2014)...........................................................................5, 6

*Sanchez v. Nitro–Lift Techs.,L.L.C.*,
   762 F.3d 1139 (10th Cir. 2014) .................................................................................3

*Spencer v. TICI LLC*,
   2023 WL 2214530 (D. Colo. Feb. 24, 2023) *report and recommendation*
   *adopted*, 2023 WL 2806856 (D. Colo. Apr. 6, 2023)...............................................9

*St. Charles v. Sherman & Howard*,
   2015 WL 1887758 (D. Colo. Apr. 24, 2015) .............................................................4

*Sunmonu v. Chase Bank, N.A.*,
   2019 WL 1258788 (D. Md. Mar. 19, 2019)................................................................3

*Winn v. Ensign U-Healthcare Resort of Leawood*,
   No. 19-cv-2715, 2020 WL 2849902 (D. Kan. June 2, 2020) .....................................4

**A:152**

Defendants Chase and Pelech hereby submit this Reply in Support of Their Motion to Compel Arbitration and Stay Proceedings (Dkt. 19 ("Motion")).

## I.        INTRODUCTION

Plaintiff does not dispute she opened her Chase account and agreed to the broad, binding arbitration provision contained in the Deposit Account Agreement ("DAA"). Acknowledging the validity of the clause, Plaintiff is left to argue that the clause is narrow and does not cover claims for discrimination, torts or defamation. However, Plaintiff ignores the weight of authority across the county that has construed the very arbitration clause at issue here, and the specific language requiring her to arbitrate "any dispute relating in any way" to her account, transactions involving her account or the contractual agreement, as broad. Tenth Circuit authority also supports this conclusion. There is no carve out in the arbitration provision for any causes of action, discrimination-related or otherwise.

Plaintiff also ignores the core allegations in her complaint that this dispute arose out of her account relationship with Chase and her alleged inability to transact as a Chase customer. This is important because these allegations are a perquisite to pleading a proper claim for discrimination under Section 1981. Plaintiff cannot have it both ways: she cannot allege a transaction involving her account or the DAA governing her account to support her 1981 claim but then disregard these allegations in opposing arbitration of that claim.

Plaintiff's argument that the clause does not apply to Ms. Pelech fails for the same reasons. The arbitration provision is clear that it extends to third-party beneficiaries and Plaintiff does not explain how Ms. Pelech, who Plaintiff identifies as an "agent" of Chase in her complaint, is not covered under the provision. For all of these reasons, the arbitration provision should be enforced.

**A:153**

## II.   ARGUMENT

**A.  The Arbitration Clause in the DAA Covers All of Plaintiff's Claims.**

### 1.  The Arbitration Clause is Broad and has no Carve-out for Specific Causes of Action.

Plaintiff does not dispute she agreed to the DAA's arbitration provision. Rather, she contends the arbitration clause here is "of a narrow nature," and because it never mentions discrimination, tort or defamation claims, it is not broad enough to cover such claims. (Response at 7).[1] Plaintiff's argument is contrary to the weight of authority in the Tenth Circuit and elsewhere that has construed the arbitration provision here, and similar arbitration provisions, as containing broad, all-encompassing language with no carve-outs for specific causes of action.

Plaintiff's characterization of the arbitration clause as narrow is belied by the clause's language encompasses *"[a]ny claims or disputes arising from or relating to this agreement" and "any dispute relating in any way to your account or transactions," including any "[c]laims or disputes between you and us about your deposit account, transactions involving your deposit account, . . . and any related service with us"*. (Motion at 3 and Dkt 19-5, Deck. Decl., Ex. A at 25 (emphasis added).) As explained in Chase's Motion, courts in the Tenth Circuit and elsewhere consistently find these same or similar arbitration clauses to be broad, not narrow. (Motion at 8-10, *citing Cavlovic v. J.C. Penney Corp., Inc.*, 884 F.3d 1051, 1059 (10th Cir. 2018) ("arising out of or relating to' is 'broad' language."); *Chelsea Fam. Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1199 (10th Cir. 2009) (same); *Brown v. Coleman Co.*, Inc., 220 F.3d 1180, 1184 (10th Cir. 2000) ("all disputes or controversies arising under or in connection with this

---

[1] Plaintiff's amended Response filed November 16, 2023 (Dkt. 28) does not include page numbers. Defendants therefore refer to the ECF page numbers at the top of Dkt. 28.

2

**A:154**

Agreement" is broad); *P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) ("arising out of or relating to" is broad). Indeed, as explained in Chase's Motion, numerous courts have reached the same conclusion regarding the very same arbitration provision at issue here. (Motion at 9, *citing Dill v. JPMorgan Chase Bank, N.A.*, 2020 WL 4345755 at *6 (S.D.N.Y. July 29, 2020), *Sunmonu v. Chase Bank, N.A.*, 2019 WL 1258788 at *2 (D. Md. Mar. 19, 2019) and *KPA Promotions*, I*nc. v. JPMorgan Chase & Co.*, 2021 WL 1317163 (S.D.N.Y. Apr. 8, 2021), at *5 n.9 (all finding same DAA language as here to be broad and compelling arbitration).)

Where, as here, the arbitration language is broad, this creates a presumption in favor of arbitrability. *Sanchez v. Nitro–Lift Techs.,L.L.C.,* 762 F.3d 1139, 1151–52 (10th Cir. 2014). *See also AT&T Techs, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (". . .presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

In an effort to avoid this clear case law and the presumption in favor of arbitration, Plaintiff suggests that allegations of discrimination, tort and defamation are somehow subject to a different standard, and because the DAA's arbitration clause does not specifically call out such claims, they are not covered. (Response at 7-13.) Plaintiff is wrong and improperly reads carve-outs into the broad clause where none exist. Initially, there is nothing about a Section 1981 claim (or any of the other claims Plaintiff alleges) that render them unsuitable for arbitration. *See, e.g., Lambert v. Teslas, Inc.,* 923 F.3d 1246 (9th Cir. 2019) (compelling arbitration of discrimination claim under

3

**A:155**

Section 1981 in employment context); *Cirino v. L. Gordon Holdings, Inc.,* 2014 WL 2880291 (June 24, 2014, E.D. Pa.) (same).

Further, where, as here, "a contract contains a broad arbitration clause, matters that touch the underlying contract should be arbitrated." *Brown v. Coleman Co.*, Inc., 220 F.3d 1180, 1184 (10th Cir. 2000) (*citing Mitsubishi Motors v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 624 n. 13 (1985). In such circumstances, a dispute can be removed from arbitration only where there is an express provision excluding a specific dispute or the "most forceful evidence of a purpose to exclude the claim for arbitration." *St. Charles v. Sherman & Howard*, 2015 WL 1887758, at *3 (D. Colo. Apr. 24, 2015) (*citing AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)). No such exclusions are present here. And, the provision does not contain an express provision excluding discrimination or any other causes of action.

*Winn v. Ensign U-Healthcare Resort of Leawood,* No. 19-cv-2715, 2020 WL 2849902 (D. Kan. June 2, 2020) cited by Plaintiff, does not suggest a different result. (Response at 10.) While the arbitration clause in *Winn* mentioned discrimination, harassment, and retaliation, nothing in the court's opinion even remotely suggests that but for that language, those claims would not be arbitrable. *Winn* simply stands for the unremarkable proposition that there is no question of arbitrability when the arbitration provision expressly refers to the claims at issue but says nothing about requiring particular claims to be specifically listed where, as here, the arbitration clause is indisputably broad.[2]

---

[2] Plaintiff's reliance on *Commc'n Workers of Am. v. Avaya, Inc.*, 693 F.3d 1295 (10th Cir. 2012) is similarly misplaced. In *Avaya,* the issue was whether "backbone engineers" were included as a defined party covered by the arbitration agreement. *Id.* at 1296-1297. The Court determined that "backbone engineers" were commonly considered to be management employees and all parties understood that management employees were not covered by the arbitration agreement. *Id.* at

4

**A:156**

Plaintiff also discusses a hypothetical non-Chase customer (or perhaps even Plaintiff herself were she not a Chase customer and had she not agreed to the DAA's terms) coming into a Chase branch to learn about Chase's services or to use Chase's services as a third-party without an account. (Response at 11.) This hypothetical misses the mark, because unlike Plaintiff here, that non-customer would not have signed the DAA and thus could not be subject to any arbitration agreement with Chase. Nor does Plaintiff's reliance on *Mikes v. Strauss*, 889 F. Supp. 746 (S.D.N.Y. 1995), save her hypothetical. There, the Court found a plaintiff-employee's qui tam action was not covered by an arbitration agreement with her employer. While the *Mikes* court did note plaintiff could still have brought suit for presenting false claims to the government even if she had never been employed by defendants, the Court also relied on other facts, including that the government – in whose shoes the plaintiff stood by virtue of bringing a qui tam action – was not a party to the arbitration agreement. *Id.* at 755-56. [3]

Plaintiff's reliance on *U.S. ex rel. Paige v. B.A.E. Sys. Tech Sols. & Servs. Inc.* 566 F. Appx. 500 (6th Cir. 2014) is similarly misplaced. There, the Sixth Circuit held that employees' relation claims under the False Claims Act ("FCA") were not covered by the parties' arbitration agreement because the arbitration agreement limited the scope of the clause to disputes "arising under the

_____

1301-1302. This finding has no bearing on whether the claims alleged here are excluded from the broad arbitration language in the DAA.

[3] As discussed *infra* at _, such a hypothetical plaintiff, like Plaintiff here, could only bring a Section 1981 claim if engaged in an actual transaction; merely exploring potential services is not sufficient.

terms of this agreement" and, unlike the DAA's arbitration provision, did not include claims "related" to the agreement or that arise out of the relationship between the parties. *Id.* at 504.[4]

*Bhakta v. Choice Hotels International, Inc.*, 2017 WL 86192 (D.Kan., 2017) is on point. There, plaintiff argued an arbitration provision that stated ". . . any controversy or *claim arising out of or relating to this Agreement or any other related agreements*, or the breach of this Agreement or any other related agreements, . . . will be sent to final and binding arbitration" did not include tort claims. *Id.* at *1 (emphasis and ellipses in original). The court disagreed, reasoning the strong presumption of arbitration applies "with even greater force" when a broad arbitration clause is at issue, and that presumption may only be overcome "if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at *2. Just as the tort claims in *Bhakta* were covered by the broad arbitration clause, the broad arbitration language in the DAA encompasses the claims alleged here even though they are not spelled out in the provision. *See also P&P Industries,* 179 F.3d at 871-2 (finding tort claims within the scope of broad arbitration agreement).[5]

---

[4] Plaintiff's attempt to bypass the well-settled presumption of arbitrability by arguing she could not foresee the types of allegations here would be covered also fails. (Response at 8-9, 12). Plaintiff offers no case law to support her contention that broad arbitration language such as in the DAA can be avoided by simply arguing the claim was not "foreseeable." And her attempt to distinguish *Anonymous v. JP Morgan Chase,* 2005 WL 2861589 (S.D.N.Y. Oct. 31, 2005), does not help her as that case confirms the broad scope of the DAA's arbitration clause and says nothing about the foreseeability argument Plaintiff attempts to insert into the clause. Further, as even Plaintiff recognizes, foreseeability is not the standard in this Circuit. (*See* Response at 9, noting "*some* courts generally consider whether the dispute in question was an "immediate, foreseeable result of the performance of contractual duties" and citing Eleventh Circuit caselaw (emphasis added).)

[5] Plaintiff tries to create a genuine issue of material fact by characterizing the clause as narrow and arguing the Parties did not agree to arbitrate these specific claims. But, as explained above, the clause is broad and thus encompasses these claims and there is no carve out.

6

**A:158**

**2. Because Plaintiff Must Have Been Engaged in a Transaction to Bring Claims Under Section 1981, Her Section 1981 Claim is Necessarily Subject to Arbitration.**

In an effort to defeat arbitrability, Plaintiff retreats from the allegations in her Complaint that she was attempting to purchase a countercheck at the time of the alleged racial discrimination (Compl. at ¶¶ 22, 100) and now asserts her claims "do not arise out of her contract with Chase Bank within the meaning of the FAA." (Response at 9-11). Plaintiff even goes so far as to say in her Response that the dispute here:

> does not arise from the contract and is not about Chase's services vis-à-vis its agreement to provide services for that account. Instead, the dispute arose from the racial discrimination she encountered when she entered the Chase branch and Defendant Pelech berated her, forced her to leave the building, called the police on her and falsely accused her of a crime.

(*Id.* at 11.).

While Defendants dispute these alleged facts, if the formulation in Plaintiff's Response is indeed her allegation, her Section 1981 claim necessarily fails.[6] As explained in Chase's Motion at 11-12, the alleged interference that forms the basis of a claim under Section 1981 claim in the retail context must be more than "the mere expectation of being treated without discrimination while shopping . . . [there must be] the actual loss of a contract interest, not merely the possible loss of future contract opportunities." *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1118 (10 Cir. 2001), *cert. denied*, 534 U.S. 1131 (2002). *See also Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 753 (5th Cir. 2001) (granting summary judgment to store where there was no "tangible attempt to purchase, or to return, specified goods at the store, or to enter any other contractual agreement"); *Clark v. Safeway, Inc.*, 478 F. Supp. 3d 1080, 1089 (D. Or. 2020)

---

[6] Defendants reserve the right to seek dismissal of the Section 1981 claim as warranted.

7

**A:159**

(collecting cases that "require that a plaintiff who brings a section 1981 claim be engaged in the act purchasing goods to establish a prima facie case."). Plaintiff cannot have it both ways – either her 1981 claim involves a transaction and therefore must be arbitrated under the DAA or her claim does not involve a transaction and her 1981 claim cannot proceed. Plaintiff's allegations are clear, however, that this dispute arose out of her account relationship with Chase and her alleged attempt to transact as a Chase customer, and, therefore, all of her claims are subject to binding arbitration.

**B. The Arbitration Provision Is Not Unconscionable or Against Public Policy To Enforce It As To The Claims Alleged.**

Faced with resounding precedent that broad arbitration clauses such as that in the DAA cover the claims alleged here, and the reality that she must have been engaged in a transaction as a prerequisite to her Section 1981 claim (thus forcing her to concede the applicability of the DAA if she wishes to pursue that claim), Plaintiff argues the arbitration provision in the DAA should not be enforced because it is unconscionable and against public policy. (Response at 8-9.) It is not.

Tellingly, other than general statements regarding contracts of adhesion, Plaintiff does not cite a single case supporting the conclusion that she urges. (*Id.*) And as evident from the cases cited by all parties, courts in this Circuit and elsewhere routinely enforce arbitration clauses in consumer contracts such as the one contained in the DAA and do not find them unconscionable. *E.g., Anonymous,* 2005 WL 2861589 at *5-6 (rejecting unconscionability argument). And contrary to Plaintiff's fear mongering, no injustice arises from enforcing the arbitration agreement, nor is the contract to arbitrate "so unconscionable that no decent fair[-]minded person would view the ensuing result without being possessed of a profound sense of injustice," nor is there any evidence of terms that are patently unfair to any Chase customer. (Response at 8-9.) Compelling Plaintiff's

8

**A:160**

claims to arbitration does not deny her the right to bring her claim, it simply requires her to bring it in a different, and perfectly appropriate, forum.

Plaintiff also offers literally no support for her purported policy argument that the Court should ignore Tenth Circuit precedent, set aside the clear agreement to arbitrate and find the DAA unconscionable because it is "signed by tens of millions of users… who have received no warning based on the language of the agreement that they are waiving their rights [to] access the courts on discrimination, tort, defamation, and other non-account related claims." (Response at 9). To the contrary, the law in this Circuit is clear. Broad arbitration clauses such as that found in the DAA are enforceable and the arbitration clause at issue here encompasses the claims alleged in this case.

### C.  Defendant Trina Pelech is a Proper Third-Party Beneficiary

Plaintiff argues that the arbitration clause, which specifically defines third-parties to include "[Chase], all of its affiliates, and all third parties who [Chase] regarded as agents or representatives of [Chase] in connection with a Claim," (Dkt 19-5, Deck Decl, Ex. A at 25.) does not include Defendant Pelech, and that the parties did not intend to make Defendant Pelech a non-signatory beneficiary to the arbitration agreement because it was not foreseeable. (Response at 13-15). As explained in Chase's Motion, the law is clear that "nonsignatory parties may compel arbitration if the arbitration agreement recognizes them as intended parties or beneficiaries of the agreement." *See e.g., Spencer v. TICI LLC*, 2023 WL 2214530, at *5 (D. Colo. Feb. 24, 2023) *report and recommendation adopted*, 2023 WL 2806856 (D. Colo. Apr. 6, 2023); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Coors*, 357 F. Supp. 2d 1277, 1280 (D. Colo. 2004) (same). Plaintiff never explains how a branch manager such as Defendant Pelech – who Plaintiff went so far as to allege in her Complaint is Chase's "agent" (Compl. at ¶ 158) – is not covered by the

9

**A:161**

language in the DAA, which, by its express terms, includes Chase's agents. Defendant Pelech, as an "agent" of Chase and who allegedly impeded Plaintiff's ability to complete her transaction, is exactly the type of third party expressly covered under the clause.

Plaintiff also posits multiple "shock value" hypotheticals, first arguing Defendants seek to use the arbitration clause to avoid accountability for any type of conduct by any current or former Chase employee, no matter how egregious, "and even if for example, such conduct included physical violence" and that Chase "employees are immune from suit for any personal conduct while employed by the Bank, no matter how outrageous and unlawful." (Response at 16). Plaintiff then takes it a step further and argues that a Chase employee could punch or shoot someone without consequence so long as it took "place while the member was accessing or transacting at the bank." (*Id*. at fn. 2.) These hypotheticals are neither relevant nor helpful, as each case needs to be evaluated based on facts and circumstances surrounding the particular events at issue. Defendants also have not made any such argument in this case. Indeed, it is undisputed that there was no physical violence of any kind. Finally, the argument that compelling arbitration for the claims against Pelech somehow immunizes Chase is nonsensical. As noted above, compelling a case to arbitration does not deprive anyone of any rights, nor does it provide an avenue for a defendant to avoid the claims asserted against it. Plaintiff can still bring her claims, conduct discovery, have her claims fully heard, and both Defendants still have to defend them, just in a different forum.

### III.    CONCLUSION

For the reasons set forth above and in Defendants' Motion, Defendants ask the Court to enforce the DAA arbitration provision, compel arbitration of Plaintiff's claims and stay all further proceedings in this Court.

Dated:  December 5, 2023.

_s/ Naomi G. Beer_
Naomi G. Beer
April C. Connally
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
Telephone: (303) 572-6500
Email: beern@gtlaw.com
april.connally@gtlaw.com

**Attorneys for Defendants Chase and Trina Pelech**

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I hereby certify that on December 5, 2023, I caused true and correct copies ot the foregoing document, titled Defendants' Reply in Support of Motion to Compel Arbitration and Stay Proceedings, including all attachments thereto, to be filed with the Clerk of Court of the United States District Court for the District of Colorado and to be served on counsel for Plaintiff.

Iris Halpern
Crist Whitney
RATHOD | MOHAMEDBHAI, LLC
2701 Lawrence St., Suite 100
Denver, CO 80205
Telephone: (303) 578-4400
Email: ih@rmlawyers.com
       cw@rmlawyers.com

*Counsel for Plaintiff Jeanetta Vaughn*

                                   *s/ Naomi G. Beer*
                                   Naomi G. Beer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-02266-CNS-NRN

JEANETTA VAUGHN,

     Plaintiff,

v.

JP MORGAN CHASE & CO. D/B/A CHASE BANK; A CORPORATION;
TRINA PELECH, AN INDIVIDUAL,

     Defendants.

---

**ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION**

---

     Before the Court are Defendants JPMorgan Chase Bank, N.A. ("Chase") and Trina Pelech's Motion to Stay the Proceedings Pending Disposition of Defendants' Motion to Compel Arbitration (ECF No. 18) and Motion to Compel Arbitration and Stay Proceedings (ECF No. 19). Plaintiff filed responses to both motions (ECF No. 23 (Motion to Stay), ECF No. 28 (Motion to Compel Arbitration)), and Defendants filed reply briefs (ECF No. 32 (Motion to Compel Arbitration), ECF No. 33 (Motion to Stay)). The Court has reviewed the briefs and the relevant authority. For the reasons set forth in this Order, the Court denies the Motion to Compel Arbitration and denies as moot the Motion to Stay.

1

**A:165**

## I.  BACKGROUND[1]

This is a racial-discrimination case. On June 9, 2022, Plaintiff Jeanetta Vaughn, a Chase customer, walked into a Chase branch in Aurora, Colorado, around noon to withdraw money from her account and obtain counter checks (ECF No. 4, ¶¶ 21–23). Upon entering the bank, Ms. Vaughn sat down in a chair in the lobby reserved for customers and began to unlock her Chase card from her phone's Chase Bank Mobile Application (*id.*, ¶¶ 24, 29).[2] Ninety seconds after Ms. Vaughn sat down, Defendant Trina Pelech, the Chase Branch Manager and Vice President, approached Ms. Vaughn and asked whether she could help Ms. Vaughn (*id.*, ¶¶ 30–32, 50). Because it is relevant to Plaintiff's allegations, the Court notes that Ms. Vaughn is Black and Ms. Pelech is White (*id.*, ¶¶ 15, 30).

In response to Ms. Pelech's question, Ms. Vaughn explained that she was unlocking her card on her phone (*id.*, ¶ 32). Purportedly unsatisfied with this response, Ms. Pelech told Ms. Vaughn that she was not welcome in the bank and threatened to call the police (*id.*, ¶¶ 33–36). The interaction took place over the span of a minute and was captured by the bank's video cameras (*id.*, ¶¶ 43–44). But the incident did not end there. Ms. Pelech left the lobby and called 911 (*id.*, ¶¶ 46–47). She told the 911 operator that

---

[1] The background facts are taken from the allegations in Plaintiff's Complaint (ECF No. 4) and the materials submitted in connection with the parties' briefing on the Motion to Compel Arbitration (ECF No. 19, No. 28, and No. 32).

[2] Ms. Vaughn explains that "Chase offers a personal banking service that allows customers to lock and unlock their debit card" as an additional safety feature to prevent unwanted purchases (*id.,* ¶ 25). Ms. Vaughn habitually locks her Chase card between uses in the event her card is lost or stolen (*id.,* ¶ 26). Once inside the Chase app, there is four-step process to unlock the card (*id.,* ¶ 27).

2

**A:166**

Ms. Vaughn was being rude and aggressive and criminally trespassing on bank property (*id.*, ¶¶ 51–53).

There is a dispute over whether Plaintiff was not unlocking her account but actually videoing in the Branch against Chase policy (ECF No. 19 at 4). According to the Complaint, "Chase falsely told the Colorado Civil Rights Division during the agency's investigation of Ms. Vaughn's charge that Ms. Vaughn pulled out her phone camera and began recording the interaction after being ordered to leave the branch" (ECF No. 4, ¶ 54). Also according to the Complaint, Chase falsely told the Colorado Civil Rights Division that, "Ms. Pelech cautioned Ms. Vaughn that if Ms. Vaughn did not stop recording, she would have to leave, or Ms. Pelech would be forced to call the police" (*id.*, ¶ 56). Ms. Vaughn alleges that she never recorded Ms. Pelech nor did she imply she would record her until *after* Ms. Pelech threatened to call the police (*id.*, ¶ 55). And, Ms. Vaughn alleges that Ms. Pelech admitted in her 911 call that she ordered Ms. Vaughn to leave the branch only because she thought Ms. Vaughn was being rude (*id.*, ¶ 57). There apparently is no dispute that Ms. Vaughn was not recording at the time Ms. Pelech called 911 (*id.*, ¶ 58).

Two Aurora police officers arrived at the Chase branch just six minutes after Ms. Pelech called 911 (*id.*, ¶ 59). The officers told Ms. Vaughn that they were responding to a report of trespassing (*id.*, ¶ 60). Ms. Vaughn explained her side of the story, told the officers that she was a Chase customer, and answered the officers' questions (*id.*, ¶¶ 61–67). Ms. Vaughn then told the officers that her husband was on the way to the bank, and that she would wait for him to arrive (*id.*, ¶ 67). One of the officers then spoke with Ms. Pelech separately to record her statement (*id.*, ¶ 68).

3

**A:167**

After some additional discussions separately with Ms. Vaughn and Ms. Pelech, the officers declined to arrest Ms. Vaughn or remove her from the property (*id.*, ¶ 78). She eventually left the bank with her husband (*id.*, ¶¶ 101–21).

In response to Ms. Pelech's actions, Ms. Vaughn filed suit in Arapahoe County District Court, seeking relief on four separate counts: (1) violation of the Colorado Anti-Discrimination Act against Chase; (2) discrimination on the basis of race and/or ethnicity in violation of 42 U.S.C. § 1981 against both Defendants; (3) negligent infliction of emotional distress against both Defendants, and (4) defamation per se against both Defendants (*id.*, ¶¶ 132–76). Defendants removed Ms. Vaughn's case to this Court on September 5, 2023.

About a year and a half before the incident described above, on February 5, 2021, Ms. Vaughn opened her Chase account (ECF No. 19 at 8). As part of enrollment, Chase required Ms. Vaughn to sign the Deposit Account Agreement (*id.* at 1). The Deposit Account Agreement contained the following arbitration provision:

> You and we agree that upon election of either of us, any dispute relating in any way to your account or transactions will be resolved by binding arbitration as discussed below. And not through litigation in any court (except for matters in small claims court).
>
> * * *
>
> What claims or disputes are subject to arbitration?
>
> Claims or disputes between you and us about your deposit account, transactions involving your deposit account, safe deposit box, and any related services with us are subject to arbitration. Any claims or disputes from or relating to this agreement, any prior account agreements between us, or the advertising, the application for, or the approval or establishment of your account are also included . . . .

(*id.* at 1–2, 8–10; ECF No. 28 at 4). It also contained the following "opt out" provision:

> YOU HAVE A RIGHT TO OPT OUT OF THIS AGREEMENT TO ARBITRATE, AS DISCUSSED BELOW. UNLESS YOU OPT OUT OF ARBITRATION, YOU AND WE ARE WAIVING THE RIGHT TO HAVE OUR DISPUTE HEARD BEFORE A JUDGE OR JURY, OR OTHERWISE TO BE DECIDED BY A COURT OR GOVERNMENT TRIBUNAL . . .

(ECF No. 19 at 3 (emphasis in original)).

The parties do not dispute that Ms. Vaughn signed the Deposit Account Agreement to open her Chase account (ECF No. 28 at 4). Nor do they dispute that she did not opt out of the arbitration provision (ECF No. 19-1 at 2). But they do dispute whether Ms. Vaughn's claims fall within the scope of the arbitration clause (ECF No. 28 at 4). This issue is the crux of the Motion to Compel. As explained below, Plaintiff's claims in this action are beyond the reach of the arbitration provision.

## II.  LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that a written arbitration agreement "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2. The FAA expressly permits a party to petition a federal district court to compel arbitration, just as Defendants have done here. 9 U.S.C. § 4.

Federal policy generally favors arbitration of disputes, *Comanche Indian Tribe of Oklahoma v. 49, L.L.C.*, 391 F.3d 1129, 1131 (10th Cir. 2004), but because "arbitration is a matter of contract[,] a party cannot be required to submit to arbitration any dispute which [that party] has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation and quotations omitted). Indeed, arbitration agreements are

generally treated like all other contracts. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (explaining that the FAA's "policy favoring arbitration does not authorize federal courts to invent special, arbitration-preferring procedural rules" (citation and quotations omitted)). "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citation omitted); *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006).

In the instant case, there appears to be no dispute that Colorado law applies (ECF No. 19 at 12; ECF No. 28 at 5, 8). Under Colorado law, [t]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Pierce v. St. Vrain Valley School District RE–1J*, 981 P.2d 600, 603 (Colo. 1999) (citations and quotations omitted). In short, the parties must have "agreed upon all essential terms," *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986), and there must be a "meeting of the minds." *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022).

The party attempting to compel arbitration bears the burden of demonstrating that a valid arbitration agreement exists. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012). When the parties dispute the validity of an agreement to arbitrate, "a court may grant a motion to compel arbitration if there are no genuine issues of material fact regarding the parties' agreement." *Id.* (citation and quotations omitted).

Whether to enforce an arbitration agreement requires a court to employ a two-step process. The first step requires a court to determine whether there is an agreement that

provides the moving party the right to compel arbitration. *Cavlovic v. J.C. Penney Corp., Inc.*, 884 F.3d 1051, 1057 (10th Cir. 2018). If the movant satisfies the first step, the second step requires a court to determine  whether the allegations in the complaint are within the scope of the arbitration provision. *Id.* District courts are required to give the party opposing the motion to compel arbitration the benefit of all reasonable doubts and inferences. *Hancock*, 701 F.3d at 1261.

### III.  ANALYSIS

Defendants argue that (1) Ms. Vaughn entered into a valid agreement to arbitrate, (2) the Deposit Account Agreement contains a broad arbitration clause that creates a presumption of arbitrability, and (3) each of her claims arise from or relate to the Deposit Account Agreement (ECF No. 19 at 5–13). Ms. Vaughn counters by arguing that (1) Defendants have failed to present evidence that no genuine dispute of facts exists, (2) the Chase arbitration provision does not compel arbitration of her claims, and (3) none of her claims arise out of the Deposit Account Agreement (ECF No. 28 at 13).

Having considered Defendants' Motion to Compel Arbitration, related briefing, and the relevant legal authority, the Court declines to compel arbitration.

**A.    The Parties entered into a valid agreement to arbitrate claims related to Plaintiff's deposit account.[3]**

The Court must first decide whether there is an agreement to arbitrate between Chase and Plaintiff. *Cavlovic*, 884 F.3d at 1057. The Court finds that there is. On February 5, 2021, Plaintiff signed the Deposit Account Agreement containing the arbitration provision in question—a point Plaintiff does not dispute (ECF No. 19 at 2, ECF No. 28 at 4 ("Ms. Vaughn signed the DAA to open her Chase account.")).

Having answered the first question in the affirmative, the Court moves on to the second question of the two-part inquiry—whether Plaintiff's claims fall within the scope of the arbitration provision.

**B.    The scope of the Deposit Account Agreement's arbitration provision is not limitless.**

The Court now must determine whether the allegations in the Complaint fall within the scope of the arbitration provision. *Cavlovic*, 884 F.3d at 1057. To make this determination, courts "classify the particular [arbitration] clause as either broad or narrow." *Chelsea Fam. Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191,

---

[3] As a threshold matter, a district court generally must determine whether it has the power to rule on the issue of arbitrability, or whether an arbitrator should decide arbitrability. *See Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1280 (10th Cir. 2017) ("[T]he Supreme Court has held that when parties agree that an arbitrator should decide arbitrability, they delegate to an arbitrator all threshold questions concerning arbitrability—including 'whether their agreement covers a particular controversy.'" (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–79 (2010))). Because neither party contends that this threshold question has been delegated to an arbitrator, the Court proceeds with analyzing whether there is a valid arbitration agreement in this case. *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

1196 (10th Cir. 2009) (quoting *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005)); *see also Cavlovic*, 884 F.3d at 1057.

> 1. *The Deposit Account Agreement's arbitration provision is generally broad.*

Where the arbitration clause is narrow, a court "must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Burlington N. & Santa Fe Ry. Co. v. Pub. Serv. Co. of Oklahoma*, 636 F.3d 562, 569 (10th Cir. 2010) (quoting *Cummings,* 404 F.3d at 1261). Collateral matters generally are outside the scope of a narrow arbitration clause. *Id.* But where the arbitration clause is broad, "there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Cummings*, 404 F.3d at 1261 (internal quotation and citation omitted).

Here, the Court finds that the Deposit Account Agreement's arbitration clause is of the "broad" variety. In *Cavlovic*, the Tenth Circuit held that "arising from or relating to" is "broad language." 884 F.3d at 1059. Compare that language with the identical language in the Deposit Account Agreement: "[a]ny claims or disputes arising from or related to this agreement . . . are also [subject to arbitration]" (ECF No. 19 at 3). This finding creates a presumption in favor of arbitrability. *Cavlovic*, 884 F.3d at 1059.

A:173

>    2. *Although the Deposit Account Agreement's arbitration provision contains broad language, Plaintiff's claims nonetheless fall outside the scope of the agreement.*

Determining that a provision is broad does not end the inquiry. Under Colorado law, the "factual allegations which form the basis of the claim asserted, rather than the legal cause of action pled, should guide the district court in making the determination as to whether a particular dispute falls within the reach of the ADR clause." *City & Cnty. of Denver v. Dist. Ct. In & For City & Cnty. of Denver*, 939 P.2d 1353, 1364 (Colo. 1997); *see also Cavlovic*, 884 F.3d at 1059 (finding under similar Texas law that, once a court deems an arbitration clause "broad," the court's inquiry continues by applying the facts of the case to the plain meaning of the agreement).

Here, Defendants argue that Plaintiff's claims "fall squarely" within the scope of the arbitration provision because her "claims are expressly tied to the DAA" (ECF No. 19 at 2). Defendants also argue that each of Plaintiff's claims "arise or relate to the DAA," stating that none of the claims alleged would exist absent the contractual relationship between the parties established by the Deposit Account Agreement (ECF No. 19 at 10–11). The Court disagrees with both arguments.

The Court finds *Cavlovic v. J.C. Penney Corp.* instructive. In *Cavlovic*, despite the agreement's broad language—which covered all claims "arising from or relating to" J.C. Penney's Credit Card Rewards Program—the Tenth Circuit found that the plaintiff's claims fell outside the scope of the arbitration provision. 884 F.3d at 1059. The plaintiff's dispute centered on J.C. Penney's alleged scheme of marking up products by a significant margin and then immediately offering those marked-up products at steep discounts to

boost sales. *Id.* at 1053. Although the plaintiff was a J.C. Penney cardholder who signed the Rewards Program agreement, the Tenth Circuit held that the plaintiff's claim fell outside the scope of the agreement.[4] *Id.* at 1059. The Tenth Circuit explained that "Cavlovic and J.C. Penney agreed to arbitrate disputes that 'aris[e] from or relat[e] to' the Rewards Program," but the plaintiff's allegations concerned facts outside the scope of the Rewards Program—namely that J.C. Penney falsely inflated the prices of its products only to "subsequently mark the prices back down to leave an impression of a deep discount." *Id.* at 1060 (alterations in original). The court went on to reason that, "with respect to the alleged wrong, it [was] simply fortuitous that the parties happened to have a contractual relationship." *Id.* (quoting *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir. 1995)).

The Court also finds *Jones v. Halliburton Co.* instructive. 625 F. Supp. 2d 339 (S.D.

_____

[4] The court applied Texas law because the 2014 Rewards Program agreement had a Texas choice-of-law provision. *Cavlovic*, 884 F.3d at 1059. Texas law requires a court to "look at the parties' intent." *Id.* at 1059–60 (citing and quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent."); *BBVA Compass Inv. Sols., Inc. v. Brooks*, 456 S.W.3d 711, 718 (Tex. App. 2015) (holding that "[w]hether a claim is subject to arbitration turns on its substance"); and *IHS Acquisition No. 171, Inc. v. Beatty–Ortiz*, 387 S.W.3d 799, 806 (Tex. App. 2012) (a determination of whether a party can compel arbitration "requires courts to honor parties' expectations").

Despite applying Texas law, Colorado courts apply the same basic principles of contract interpretation. *See N.A. Rugby Union LLC v. U.S. Rugby Football Union*, 442 P.3d 859, 863 (Colo. 2019) ("In construing an arbitration agreement, we look to the plain and ordinary meaning of the terms of that agreement, and we construe the agreement to effectuate the parties' intent and the purposes of the agreement."); *City & Cnty. of Denver*, 939 P.2d at 1364 ("The factual allegations which form the basis of the claim asserted, rather than the legal cause of action pled, should guide the district court in making the determination as to whether a particular dispute falls within the reach of the ADR clause."). The Court thus finds *Cavlovic* persuasive.

Tex. 2008), *aff'd*, 583 F.3d 228 (5th Cir. 2009). The plaintiff in *Jones* brought claims against her employer and several co-employees after she allegedly was drugged and brutally raped by several Halliburton employees in her employer-provided barracks room while deployed to Baghdad, Iraq. *Id.* at 352. She brought claims of negligence; negligent undertaking; negligent hiring, supervision, and retention; sexual harassment and hostile work environment under Title VII; retaliation; false imprisonment; breach of contract; various fraud allegations; assault; battery; and intentional infliction of emotional distress. *Id.* at 344. She further contended that the corporate defendants were vicariously liable for the torts committed directly by its employees. *Id.* Halliburton moved to compel arbitration, arguing that the plaintiff agreed to arbitrate "any and all claims that [she] might have against Employer related to [her] employment, including [her] termination, and any and all personal injury claim arising in the workplace." *Id.* at 351.

The district court held that several of the plaintiff's claims fell beyond the outer limits of the broad arbitration provision. Specifically, the Court found that the plaintiff's claims for (a) vicariously liability for assault and battery; (b) intentional infliction of emotional distress arising out of that assault; (c) negligent hiring, retention, and supervision of the employees involved in the assault; and (d) false imprisonment were not related to her employment and thus beyond the scope of the arbitration provision. *Id.* The court commented that the "fact that the rape was allegedly perpetrated by Halliburton/KBR employees does not mean that the assault necessarily had anything at all to do with [the plaintiff's] employment." *Id.* at 352. It went on to say that the "arbitration clause did not require [the plaintiff] to arbitrate any and all claims against her employer,

12

**A:176**

without more. Instead, she [was] required to arbitrate any and all claims *related to her employment*." *Id.* (emphasis in original). And finally, the court held that "[e]ven a broad provision such as this one has limits, and the Court can say with positive assurance that the alleged sexual assault in this case, and the abovementioned claims arising out of that assault, do not even touch on [the plaintiff's] employment." *Id.*

Here, just as in *Cavlovic* and *Jones*, the basis of the claims asserted in Plaintiff's Complaint—racial discrimination, defamation, and negligent infliction of emotional distress—have little or nothing to do with Plaintiff's Chase account, the terms of the Deposit Account Agreement, or the parties' relationship. *See also Coors,* 51 F.3d at 1516 (holding that antitrust claims that are not factually related to parties' contractual relationship were not subject to arbitration agreement). Stated differently, the "but for" causation that is present in many of the cases cited by Defendants is absent here. *See, e.g.*, *St. Charles v. Sherman & Howard L.L.C.*, No. 14-CV-03416-RM-CBS, 2015 WL 1887758, at *4 (D. Colo. Apr. 24, 2015) ("But for the Operating Agreement which establishes the Plaintiff's employment relationship to Defendants, Sherman & Howard and Wear could not have engaged in acts which allegedly violated Plaintiff's rights. The Operating Agreement sets forth Plaintiff's employment obligations and certain permitted actions by Sherman & Howard. Thus, it is not simply fortuitous that the parties had a contractual relationship. Rather, the Operating Agreement established the 'connection' through which actions allegedly in violation of Plaintiff's rights could occur." (citations to the record omitted)). In other words, Plaintiff's claims do not arise from, or relate to, the Deposit Account Agreement.

13

**A:177**

Defendants have not directed the Court to a single case involving an arbitration provision that required a similarly situated plaintiff to arbitrate claims of racial discrimination. Defendants correctly point out that at least two of their cited cases have required a plaintiff to arbitrate alleged violations of § 1981 (ECF No. 32 at 3–4). But the disputes in those cases arose in an employer–employee context and plainly centered on the workplace. *See Lambert v. Tesla, Inc.*, 923 F.3d 1246, 1248 (9th Cir. 2019) (alleging claims of harassment by fellow employees, failure to promote because of the plaintiff's race, and employment discrimination); *Cirino v. L. Gordon Holdings, Inc.*, No. 13-CV-4800, 2014 WL 2880291, at *1 (E.D. Pa. June 25, 2014) (alleging employer unlawfully subjected the plaintiff to discriminatory treatment based on his race, and that he was ultimately terminated by employer due to his race).

Defendants also direct the Court to eight decisions where "courts have regularly enforced the very same Chase DAA arbitration provision at issue in this case" (ECF No. 19 at 7, 7 n.7, 9). True, each respective court determined that the Deposit Account Agreement's arbitration provision was valid. But each case is distinguishable from the facts of this case because each dispute plainly related to Chase's banking services, and therefore, are "[c]laims or disputes between [the plaintiff] and [Chase] about [the plaintiff's] deposit account, transactions involving [the plaintiff's] deposit account, safe deposit box, and any related services" (ECF No. 19-3 at 25). *See, e.g.*,

- *KPA Promotion & Awards, Inc. v. JPMorgan Chase & Co.*, 2021 WL 1317163 (S.D.N.Y. Apr. 8, 2021) (granting Chase's motion to compel arbitration under the FAA after the plaintiffs alleged claims relating to their applications and denials for federally guaranteed COVID-19 Paycheck Protection Program loans from Chase);

14

**A:178**

- *Scott v. JPMorgan Chase & Co.*, 2014 WL 338753 (S.D.N.Y. Jan. 30, 2014), *aff'd*, 603 F. App'x 33 (2d Cir. 2015) (compelling arbitration of dispute alleging Chase unilaterally enrolled the plaintiff and other customers into Chase's Overdraft Protection Program, all of which "principally stem[med] from two withdrawals in her Checking Account");

- *Sha-Poppin Gourmet Popcorn LLC v. JPMorgan Chase Bank, N.A.*, 553 F. Supp. 3d 452 (N.D. Ill. 2021) (granting motion to compel arbitration under the Chase Deposit Account Agreement after plaintiffs, who were Chase customers, alleged that Chase did not process their Paycheck Protection Program loans in a timely manner);

- *Sunmonu v. Chase Bank, N.A.*, 2019 WL 1258788 (D. Md. Mar. 19, 2019) (customer sued Chase after the bank canceled "longtime" Chase customer's bank account alleging breach of contract, the court granted Chase's motion to compel arbitration);

- *Johnson v. JPMorgan Chase Bank, N.A.*, 2018 WL 4726042 (C.D. Cal. Sept. 18, 2018) (ordering arbitration of the plaintiffs' dispute concerning Chase's overdraft and insufficient-funds fees);

- *Sanchez v. J.P. Morgan Chase Bank, N.A.*, 2014 WL 4063046 (S.D. Fla. Aug. 15, 2014) (compelling arbitration after customers sued Chase for breach of contract and related claims after Chase temporarily lowered the transactional limits on the plaintiffs' debit cards in response to a third-party data breach);

- *Novak v. JP Morgan Chase Bank, NA*, 2008 WL 907380 (E.D. Mich. Mar. 31, 2008) (ordering arbitration of the plaintiffs' dispute involving allegedly unauthorized withdrawals, including forged checks, from their jointly held Chase account);

- *Dill v. JPMorgan Chase Bank, N.A.*, 2020 WL 4345755 (S.D.N.Y. July 29, 2020) (compelling arbitration over dispute concerning the escheatment of abandoned property payable on uncashed cashier's checks).

15

**A:179**

In each of the above cases, the dispute directly centered on the receptive plaintiff's relationship with Chase that pertained to account services. Here, that Plaintiff had an account with Chase is irrelevant. Plaintiff was not allowed to even attempt a bank transaction before she was approached and accused of nefarious conduct. Indeed, Defendants acted like Plaintiff was *not* a customer and had *no* relationship with Chase.

In addition to the cases cited above, Defendants assert that *Bhakta v. Choice Hotels Int'l, Inc.*, No. 16-1431-EFM, 2017 WL 86192, at *1 (D. Kan. Jan. 10, 2017), is on point (ECF No. 32 at 6). In that case, the plaintiffs owned and operated a Comfort Suites hotel. *Bhakta*, 2017 WL 86192, at *1. They sued Choice Hotels International, Inc., the franchisor of the Comfort Suites brand, for negligence stemming from the defendant's alleged failure to notify the plaintiffs about the termination of a contractor as a qualified vendor. *Id.* Plaintiffs sought damages for their lost payment to the contractor and for their financial losses resulting from the delayed hotel opening. *Id.*

Choice Hotels moved to compel arbitration to enforce the arbitration provision in the parties' franchise agreement, which required arbitration of "any controversy or *claim arising out of or relating to this Agreement* . . . ." *Id.* (emphasis in original). The plaintiffs did not dispute the validity of the arbitration provision, but they argued that their legal claim—a "wholly independent tort claim"—fell outside the scope of that provision. *Id.* at *2. In rejecting that argument, the court reasoned that the plaintiffs' claim directly related to the "rules and regulations" regarding Choice Hotels' standards and requirements for constructing, equipping, and furnishing the hotel. *Id.* at *3. And the franchise agreement

16

**A:180**

specifically required the plaintiffs to construct and furnish the hotel "according to the Agreement and the Rules and Regulations." *Id.*

The Court is not persuaded that *Bhakta* directs the result Defendants seeks. There, unlike here, the franchisees' claim was based on a contractual relationship with Choice Hotels. Absent the franchise agreement, the plaintiffs would have no claims against Choice Hotels. The facts alleged in Plaintiff's Complaint, however, stand independent from the Deposit Account Agreement. This case would be different if, for example, Plaintiff alleged that Defendants charged her a higher interest rate on a loan because of her race. In that hypothetical, Plaintiff's claim may relate to the Deposit Account Agreement. *See, e.g.*, *Cavlovic*, 884 F.3d at 1060 (hypothesizing that a dispute about whether the plaintiff was receiving an adequate number of Rewards Points may well arise from or relate to the Rewards Program).

"The factual allegations which form the basis of the claim asserted . . . [determine] whether a particular dispute falls within the reach of the ADR clause." *City & Cnty. of Denver*, 939 P.2d at 1364. Plaintiff's claims would exist outside any contractual relationship with Chase and therefore do not necessarily arise from or relate to the Deposit Account Agreement. *See Coors*, 51 F.3d at 1516 ("[I]f two small business owners execute a sales contract including a general arbitration clause, and one assaults the other, we would think it elementary that the sales contract did not require the victim to arbitrate the tort claim because the tort claim is not related to the sales contract. In other words, with respect to the alleged wrong, it is simply fortuitous that the parties happened to have a contractual relationship."); *Novak v. JP Morgan Chase Bank, NA*, 2008 WL

907380 (E.D. Mich. Mar. 31, 2008) (compelling arbitration in part because several of the plaintiffs' claims could not "be maintained without reference to their account and their relationship with Defendant"); *Mikes v. Strauss*, 889 F. Supp. 746, 754 (S.D.N.Y. 1995) (holding that the plaintiff's False Claims Act *qui tam* claims were outside the scope of the arbitration provision and reasoning that, "[e]ven if plaintiff had never been employed by defendants, assuming other conditions were met, she would still be able to bring a suit against them for presenting false claims to the government").

Moreover, the arbitration provision at issue contains limiting language that supports the Court's conclusion that Plaintiff's claims are outside the scope. For example, under the Deposit Account Agreement's header labelled "What claims or disputes are subject to arbitration?," the Deposit Account Agreement provides that "[c]laims or disputes between you and us about your *deposit account, transactions involving your deposit account, safe deposit box, and any related service* with us are subject to arbitration" (ECF No. 19-3 at 25). This limiting language indicates that disputes about Plaintiff's deposit account are subject to arbitration, not claims of racial discrimination—which are claims wholly independent from her account. *See Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1146–47 (10th Cir. 2014) (explaining that "limiting language" can include "restricting arbitration to any specific disputes or to the agreement itself"). Indeed, Plaintiff was approached by Ms. Pelech simply because she entered the branch and was sitting in the lobby.

Finally, despite the arbitration provision's generally broad language, the Court finds that the Deposit Account Agreement's arbitration provision must have some limiting

factor. *See Jones*, 625 F. Supp. 2d at 352 ("Even a broad provision such as this one has limits . . . ."), *aff'd*, 583 F.3d 228 (5th Cir. 2009) (agreeing that "even broad clauses have their limits" and are "not unbounded" (quotations omitted)).

### 3. There is no any evidence that Chase intended to require customers to arbitrate racial discrimination claims.

Defendants filed three declarations from senior Chase employees with their Motion to Compel Arbitration (ECF No. 19-1, No. 19-2, No. 19-6). The declarations detail how Chase customers, including Plaintiff, "Click to Sign" the Deposit Account Agreement when opening a new account (ECF No. 19-6 at 2–4). The declarations go on to detail how Chase updates the Deposit Account Agreement from time to time (ECF No. 19-2 at 2), and how Plaintiff and other customers supposedly "ratify" the newest version of the Deposit Account Agreement (ECF No. 19 at 4, ECF No. 19-6 at 6). And the declarations explain how customers are permitted to "opt out" of arbitration (ECF No. 19-1 at 2).

Missing from these declarations, however, is any evidence of the purported scope of Chase's arbitration provision. Without any evidence that Chase intended to include Plaintiff's claims within the purview of the arbitration provision, the plain text of the Deposit Account Agreement governs. Defendants do not provide any evidence that Chase intended to sweep racial discrimination claims under the arbitration provision. The Court finds the absence of this evidence compelling. Had Chase intended to include such claims within the purview of its arbitration provision, it could have done so. It chose not to. *See Winn v. Ensign U-Healthcare Resort of Leawood*, No. 19-CV-2715-EFM-JPO, 2020 WL 2849902, at *1–2 (D. Kan. June 2, 2020) (compelling arbitration where agreements

"clearly include a clause requiring claims related to race discrimination . . . to be submitted to arbitration").

Nor can Chase claim that it wasn't on notice that customers can allege—and have alleged—racial discrimination against the bank. *See, e.g.*, *Bowes-N. v. JPMorgan Chase Bank NA*, No. 3:21-CV-803 JD, 2022 WL 2237146, at *2 (N.D. Ind. June 21, 2022) (alleging that Chase racially discriminated against the plaintiff by requiring him to produce photo identification prior to accessing his account); *York v. JPMorgan Chase Bank, Nat'l Ass'n*, No. CV-18-04039-PHX-SPL, 2019 WL 3802535, at *1 (D. Ariz. Aug. 13, 2019) (alleging racial discrimination in violation of § 1981); *Coleman v. JPMorgan Chase Bank, N.A.*, No. 317CV00741-GNS-CHL, 2018 WL 6183285, at *1–2 (W.D. Ky. Nov. 27, 2018) (alleging that Chase discriminated against the plaintiff in violation of § 1981 after the bank froze her account to "investigate" payments by one of the plaintiff's parishioners); *Taylor v. JPMorgan Chase Bank, N.A.*, No. CIV. 13-24-GFVT, 2014 WL 66513, at *1 (E.D. Ky. Jan. 8, 2014) (alleging racial discrimination where Chase placed a hold on a check the plaintiff attempted to cash).[5]

Additionally, accepting Plaintiff's allegations in her Complaint as true for the instant purpose, Chase was aware at the time the parties entered the Deposit Account Agreement that Chase had faced previous complaints of racial discrimination (ECF No. 4, ¶¶ 122–31). For example, Plaintiff alleges five instances where Chase allegedly engaged in a pattern of discriminatory treatment against its Black customers (ECF No. 4

---

[5] The Court cites these cases for the sole purpose to show that Chase was on notice that customers have alleged racial discrimination claims against Chase.

at ¶¶ 123–26, 131). Beyond these five instances, Plaintiff further alleges that Chase has "admitted to receiving four complaints of racial discrimination since September 2021 at *the very same branch* where the discrimination against Ms. Vaughn took place," and that three of these complaints were made by Black customers (*id.*, ¶¶ 127–28 (emphasis in original)). It is clear that Chase cannot claim that it had no notice that racial discrimination cases brought by its customers may arise.

A court cannot compel arbitration over a dispute that the parties did not agree to arbitrate. *See Howsam*, 537 U.S. at 83. Despite the broad language of the arbitration provision at issue, Plaintiff's claims do not arise from or relate to the Deposit Account Agreement. Accordingly, Defendants' Motion to Compel Arbitration is denied.[6] *See Price v. Random House, Inc.*, No. CIVA07CV01347-RPM- MJW, 2009 WL 3415821, at *5 (D. Colo. Oct. 16, 2009) ("[A] court may compel arbitration of a particular dispute under § 4 of the FAA only when satisfied that the making of the agreement to arbitrate is not at issue." (quoting *Spahr v. Secco*, 330 F.3d 1266, 1269–70 (10th Cir.2003) (10th Cir. 2003) (quotation marks omitted))).[7]

### C. Defendant's Motion to Stay is denied as moot.

Defendants' Motion to Stay the Proceedings Pending Disposition of Defendants' Motion to Compel Arbitration (ECF No. 18) is moot and thus denied. Per Defendants'

---

[6] Because the Court has ruled that Plaintiff's claims are outside the scope of the Deposit Account Agreement's arbitration provision, the Court need not decide whether the provision is unconscionable as applied to claims of racial discrimination.

[7] Because the Court finds that Plaintiff's claims fall outside the scope of the Deposit Account Agreement's arbitration provision, it necessarily follows that Defendant Pelech is not entitled to enforce the arbitration provision in this case (*see* ECF No. 19 at 14).

request, their responsive-pleading deadline is 30 days from entry of this Order.

**IV. CONCLUSION**

Defendants' Motion to Compel Arbitration and Stay Proceedings (ECF No. 19) is DENIED. As a result, Defendants' Motion to Stay the Proceedings Pending Disposition of Defendants' Motion to Compel Arbitration (ECF No. 18) is DENIED as moot.

DATED this 15th day of December 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Number:  1:23-cv-02266-NRN

JEANETTA VAUGHN,

      Plaintiff,

v.

JP MORGAN CHASE & CO. D/B/A CHASE BANK; A
CORPORATION, AND
TRINA PELECH; AN INDIVIDUAL

      Defendants.

---

**DEFENDANTS JPMORGAN CHASE BANK, N.A. AND TRINA PELECH'S
NOTICE OF APPEAL AND MANDATORY STAY**

---

      Defendants JPMorgan Chase Bank, N.A.[1] ("Chase") and Trina Pelech ("Pelech")

(Chase and Pelech referred to collectively as "Defendants"), through undersigned

counsel, hereby appeal to the United States Court of Appeals for the Tenth Circuit the

Order Denying Defendants' Motion to Compel Arbitration (ECF 34), entered in this case

on December 15, 2023.  This appeal is taken pursuant to 9 U.S.C. §16 and subject to a

mandatory stay of the district court proceedings.  *Coinbase, Inc. v. Bielski*, 599 U.S. 736,

738, 143 S. Ct. 1915, 1918 (2023) ("The sole question here is whether the district court

must stay its pre-trial and trial proceedings while the interlocutory appeal is ongoing.  The

---

[1] JPMorgan Chase Bank, N.A. is incorrectly named as JPMorgan Chase & Co. d/b/a
Chase Bank.

1

**A:187**

answer is yes . . . [ ] the district court must stay its proceedings while the interlocutory appeal is ongoing"); *see also* 599 U.S. at 747, 143 S. Ct. at 1923 (concluding that "after Coinbase appealed from the denial of its motion to compel arbitration, the District Court was required to stay its proceedings.").

Dated:  January 11, 2024.


*s/ Naomi G. Beer*
Naomi G. Beer
April C. Connally
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
Telephone: (303) 572-6500
Email: beern@gtlaw.com
   april.connally@gtlaw.com

**Attorneys for Defendants**

2

**A:188**

## **CERTIFICATE OF SERVICE (CM/ECF)**

     I hereby certify that on January 11, 2024, I caused true and correct copies ot the foregoing Notice of Appeal and Mandatory Stay, to be filed with the Clerk of Court of the United States District Court for the District of Colorado and to be served on all counsel of record via CM/ECF.

                    *s/ Naomi G. Beer*
                    Naomi G. Beer

**A:189**